UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA,

      -against-                                MEMORANDUM & ORDER
                                                  18-CR-0578(JS)
PATRICE RUNNER,

                  Defendant.
-------------------------------X
APPEARANCES
For United States:   John W. Burke, Esq.
                     Charles B. Dunn, Esq.
                     U.S. Department of Justice
                     P.O. Box 386
                     Washington, DC  20044

                     Ann F. Entwistle, Esq.
                     U.S. Department of Justice
                     450 5th Street NE, Suite 6400 S
                     Washington, DC  20001

                     Charles N. Rose, Esq.
                     United States Attorney's Office
                     610 Federal Plaza
                     Central Islip, NY  11722

For Defendant:       James Darrow, Esq.
                     Abra Metz-Dworkin, Esq.
                     Federal Defenders of New York
                     One Pierrepont Plaza, 16th Floor
                     Brooklyn, NY  11201

                     Evan Sugar, Esq.
                     Federal Defenders of New York
                     770 Federal Plaza
                     Central Islip, NY  11722

SEYBERT, District Judge:

        Patrice Runner (the "Defendant") is charged with
operating a nearly twenty-year long fraudulent psychic mail order
scheme that obtained more than $180 million from approximately one

million victims.   (Indictment, ECF No. 1.)   The alleged scheme involved sending letters, purportedly written by world-renowned psychics, to victims in the United States and Canada to induce payments for personalized astrological services and supernatural objects.   (Id. ¶ 1.)   Presently before the Court is Defendant's motion to dismiss the Indictment.   (Mot., ECF No. 37.)   For the reasons that follow, Defendant's motion is DENIED.

FACTUAL BACKGROUND

According to the Indictment,[1] from January 1994 through November 2014, Defendant, together with others, engaged in a direct mail operation based in Montreal, Canada which sent fraudulent letters to consumers throughout the United States and Canada (the "Direct Mail Operation").[2]   (Id.)   As early as 2000, a Canadian corporation doing business as Infogest Direct Marketing ("Infogest"), administered the Direct Mail Operation.   (Id. ¶ 2.) Defendant managed the Direct Mail Operation and directed Infogest's employees to handle many of the scheme's daily activities, including working with third-party vendors to print

---

[1] The Court must assume that the Indictment's allegations are true for purposes of the instant motion to dismiss.  See United States v. Raniere, 384 F. Supp. 3d 282, 292 n.1 (E.D.N.Y. 2019) (citing United States v. Wey, No. 15-CR-611, 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017)).

[2] Throughout the scheme, Defendant resided in various countries, including Canada, Switzerland, France, the Netherlands, Costa Rica, and Spain.  (Id. ¶ 4.)

and mail the letters, tracking responses and payments by victims, maintaining and updating mailing lists, and identifying new victims by renting and trading lists with other direct mailers. (Id.)  Defendant and his co-conspirators used a series of different shell companies to hide their participation in the Direct Mail Operation.  (Id. ¶ 3.)  The shell entities included two Canadian-registered corporations which were doing business as National Parapsychology Center ("NPC") and Zodiac Zone ("ZZ"), as well as two Hong Kong-registered entities, Destiny Research Group, Ltd. ("DRG") and Destiny Research Center, Ltd. ("DRC") (collectively, the "Shell Companies").  (Id.)

Underlying the mail scheme were letters written and edited by Defendant, together with others, that were sent to victims who were often elderly and vulnerable.  (Id. ¶¶ 5-6.)  The letters fraudulently represented that those victims would receive personalized letters from one of two world-renowned French psychics, whom are identified in the Indictment as "Psychic A" and "Psychic B."  (Id.)  According to the letters, the psychics had visions or used their psychic powers to determine that the victims could achieve great wealth and happiness or avoid illness and bad fortune, with the psychic's assistance.  (Id.)  As such, the letters directed victims to make monetary payments to purchase various unique and supernatural objects, or personalized astrological services and studies.  (Id. ¶ 8.)  Many letters also

asked victims to send personal items, including photographs, palm prints and locks of hair to be utilized by the psychics for other personalized rituals.  (Id. ¶ 9.)

Contrary to these representations, the renowned French psychics were not involved in the sending of the letters nor did they receive responses from victims.  (Id. ¶ 7.)  Although the psychics' letters appeared personalized because they referred to recipients by name and appeared handwritten in certain places, in actuality, the letters were mass-produced by Defendant and his co-conspirators by renting and trading mailing lists with other direct mailers, including other fraudulent psychic letter mailers.  (Id. ¶¶ 6-7.)  Moreover, the purportedly unique and supernatural objects were mass-produced trinkets, and the psychics did not provide any personalized astrological services or studies.  (Id. ¶ 8.)

When victims responded to letters by sending payments ranging from $5 to $50, or other personal effects, Defendant and his co-conspirators caused numerous additional follow-up or "back-end" letters to be sent to those victims from one of the psychics. (Id. ¶¶ 8, 10.)  These follow-up letters described more visions, services and supernatural objects that could be obtained for additional payments. (Id.)  Victims who sent payments in response to one fraudulent letter received as many as 30 to 40 of these back-end letters in a single six-month mailing cycle; many victims

4

received more than 100 letters throughout the course of the scheme. (Id.)

In total, Defendant and his co-conspirators caused millions of fraudulent letters, by United States mail, private commercial carrier and foreign mail, to be sent to victims throughout the United States and Canada. (Id. ¶ 11.) Defendant and others rented and maintained private mailboxes, which were opened by using the names of the Shell Companies, in multiple locations, including: Morristown, New Jersey; Forest Hills, New York; Everett, Massachusetts; Medford, Massachusetts; Sparks, Nevada; and Chicago, Illinois. (Id. ¶ 12.) The letters included pre-printed return envelopes addressed to the psychics, in the care of one of the Shell Companies, at the address of one of these private mailboxes across the United States. (Id. ¶ 13.) As such, correspondence from victims, as well as their monetary payments and personal effects to be utilized in psychic services, were sent to these same addresses. (Id.) When responses from victims were received, Defendant's co-conspirators directed such mail be sent to a "caging service," which is a "company that receives and handles return mail, payments, and correspondence on behalf of a direct mailer." (Id. ¶ 14.) From 1998 through November 2014, the Direct Mail Operation used a caging service located in Deer Park, New York. (Id.) After receiving victim responses, this caging service removed any payments from the envelopes and threw the other

items in the trash, which included personal letters from the victims to the psychics, photographs, palm prints, and locks of hair. (Id. ¶ 15.)

The caging service forwarded victims' payments to a payment processing company in Canada, in the names of the Shell Companies. (Id. ¶¶ 16-17.) To accomplish this, the caging service utilized different methods: (1) by depositing cash into bank accounts controlled by the caging service then writing checks to the Shell Companies who then sent the checks to the payment processing company; (2) by sending checks and money orders by mail and private commercial carrier or by scanning and electronically transmitting them; and (3) by providing victims' credit card information to the payment processing company. (Id. ¶ 17.) Defendant and his co-conspirators used wire transfers to send the payment processing company instructions on how to disburse these proceeds to their various bank accounts across the world, and to pay the co-conspirators and vendors that provided services to the Direct Mail Operation. (Id. ¶ 18.) Over the course of the nearly 20-year scheme, the Direct Mail Operation received more than $180 million from more than one million victims in the United States. (Id. ¶ 19.)

PROCEDURAL HISTORY

I.    The Counts

Based on the foregoing allegations, Defendant is charged by an eighteen-count Indictment, dated October 25, 2018.  Count One charges Defendant with conspiracy to commit mail fraud and wire fraud.  (Id. ¶¶ 20-21.)  Counts Two through Thirteen charge Defendant with mail fraud:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| Two | December 2013 | Payment from Victim B.S., sent by private interstate carrier to caging service in Deer Park, New York. |
| Three | January 2014 | Letter purporting to be from Psychic A, sent by United States mail to Victim I.W. in Farmingdale, New York. |
| Four | February 2014 | Payment from Victim J.D., sent by private interstate carrier to caging service in Deer Park, New York. |
| Five | February 2014 | Payment from Victim W.G., sent by private interstate carrier to caging service in Deer Park, New York. |
| Six | March 2014 | Payment from Victim B.C., sent by private interstate carrier to aging service in Deer Park, New York. |
| Seven | March 2014 | Letter purporting to be from Psychic A, sent by United States mail to Victim B.D. in Farmingdale, New York. |
| Eight | April 2014 | Letter purporting to be from Psychic B, sent by United States mail to Victim B.D. in Arverne, New York. |
| Nine | May 2014 | Payment from Victim K.A., sent by private interstate carrier to caging service in Deer Park, New York. |
| Ten | June 2014 | Payment from Victim M. Sm., sent by private interstate carrier to caging service in Deer Park, New York. |
| Eleven | August 2014 | Payment from Victim M. So., sent by private interstate carrier to caging service in Deer Park, New York. |

| Twelve | August 2014 | Payment from Victim S.W., sent by private interstate carrier to caging service in Deer Park, New York. |
| Thirteen | October 2014 | Letter purporting to be from Psychic A, sent by United States mail to Victim K.E. in Calverton, New York. |

(See id. ¶¶ 22-23.)   Counts Fourteen through Seventeen charge

Defendant with wire fraud:

| Count | Approximate Date | Description |
|---|---|---|
| Fourteen | April 14, 2014 | Wire transfer of $49,089.20 from payment processing company in Canada to caging service in Deer Park, New York. |
| Fifteen | May 2, 2014 | Wire transfer of $31,473.99 from payment processing company in Canada to caging service in Deer Park, New York. |
| Sixteen | May 13, 2014 | Wire transfer of $41,027.86 from payment processing company in Canada to caging service in Deer Park, New York. |
| Seventeen | May 30, 2014 | Wire transfer of $33,344.66 from payment processing company in Canada to caging service in Deer Park, New York. |

(Id. ¶¶ 24-25.)   Finally, Count Eighteen charges Defendant with

conspiracy to commit money laundering.   (Id. ¶¶ 26-27.)

II.   Defendant's Motion

On August 15, 2022, Defendant filed a motion to dismiss

the Indictment.  (Def. Support Memo, ECF No. 37-1.)  In his motion,

Defendant argues that he is charged with fraud for running a

psychic services business, which provides entertainment similar to

a magician, WWE wrestler or Disney World character, and involves

protected speech under the First Amendment.  (Id. at 1.)  Defendant

also contends the Indictment does not allege any cognizable intended injury to customers, arguing that customers suffered no harm by submitting money and other valuables in exchange for psychic services. (Id. at 14-18.) The Government opposes Defendant's motion and Defendant submitted a reply. (Gov't Opp'n, ECF No. 41; Def. Reply, ECF No. 44.)

ANALYSIS

I.  Legal Standards

    A.  Motion to Dismiss

       Pursuant to Federal Rule of Criminal Procedure ("Rule") 12, defendants may "challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds." United States v. Benitez-Dominguez, 440 F. Supp. 3d 202, 205 (E.D.N.Y. Feb. 24, 2020)(quoting United States v. Ahmed, 94 F. Supp. 3d 394, 404 (E.D.N.Y. 2015)). "A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." United States v. Taveras, 504 F. Supp. 3d 272, 277 (S.D.N.Y. 2020)(quoting United States v. Smith, 985 F. Supp. 2d 547, 651 (S.D.N.Y. 2014)).

B.   Mail Fraud and Wire Fraud

Defendant's motion focuses on mail fraud and wire fraud because dismissal of those counts would require dismissal of the remaining counts.  (See Def. Support Memo at 13.)

The federal mail and wire fraud statutes penalize using the mails or wire communications to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  See 18 U.S.C. §§ 1341, 1343.  "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way."  United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017)(quoting United States v. Greenberg, 835 F.3d 295, 305 (2d Cir. 2016)); see also United States v. Connolly, 24 F.4th 821, 833 (2d Cir. 2022)("Section 1343 uses the same 'scheme or artifice to defraud' language that is used in 18 U.S.C. § 1341, which prohibits fraudulent or deceptive use of the mails, and thus the two statutes are analyzed 'in the same way.'" (quoting United States v. Slevin, 106 F.3d 1086, 1088 (2d Cir. 1996))).  As stated by the Second Circuit, the elements of both mail fraud and wire fraud are: (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) use of the mails or wires to further the scheme.  Weaver, 860 F.3d at 94 (citing United States v. Binday, 804 F.3d 558, 569 (2d Cir. 2015)).

II.  Discussion

          Defendant moves to dismiss the Indictment on two grounds: (1) the Indictment fails to allege a scheme to defraud; and (2) the Government's theory of fraud violates the First Amendment's protections for freedom of expression.

     A.  Scheme to Defraud

          1.  Materiality and Intent

          "The gravamen" of mail fraud and wire fraud offenses is whether there is a "scheme to defraud." Greenberg, 835 F.3d at 305 (citing United States ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 657 (2d Cir. 2016)).  To demonstrate the existence of a scheme to defraud, the government must prove that a defendant made material misrepresentations and acted with the requisite scienter.  See Weaver, 860 F.3d at 94 (first citing O'Donnell, 822 F.3d at 657; then citing Greenberg, 835 F.3d at 305-06).

          "A statement is material if the 'misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct.'" Id. (quoting United States v. Rybicki, 354 F.3d 124, 145 (2d Cir. 2003)).  The materiality of a statement is dependent upon whether the statement "has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaker to which it was addressed." Id. (citing United States v. Corsey, 723 F.3d 366, 373 (2d Cir. 2013));

see also United States v. Connolly, No. 16-CR-0370, 2018 WL
2411760, at *5 (S.D.N.Y. May 15, 2018) ("The Supreme Court has
quite recently emphasized that a false and fraudulent statement
will not support a federal fraud conviction unless it was material
to some decision that had to be taken by the person to whom the
statement was made." (citing Univ. Health Servs., Inc. v. United
States, 579 U.S. 176, 192-93 (2016))). Moreover, "[f]raud requires
more than deceit.  A person can dissemble about many things, but
a lie can support a fraud conviction only if it is material, that
is, if it would affect a reasonable person's evaluation of a
proposal." Corsey, 723 F.3d at 373.

        To establish fraudulent intent, the government "need not
prove 'that the victims of the fraud were actually injured,' but
only 'that defendants contemplated some actual harm or injury to
their victims.'" Greenberg, 835 F.3d at 306 (quoting United States
v. Novak, 443 F.3d 150, 156 (2d Cir. 2006)) (emphasis in original).
"It is not sufficient that [a] defendant realizes that the scheme
is fraudulent and that it has the capacity to cause harm to its
victims." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir.
1999) (citing United States v. Gabriel, 125. F.3d 89, 97 (2d Cir.
1997)).  Rather, "the proof must demonstrate that the defendant
had a 'conscious knowing intent to defraud . . . [and] that the
defendant contemplated or intended some harm to the property rights
of the victim.'" Id. (quoting United States v. Leonard, 61 F.3d

12

1181, 1187 (5th Cir. 1995) (alterations in original).  "'[D]irect proof of defendant's fraudulent intent is not necessary,' and '[i]ntent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false.'" United States v. DeFilippo, No. 17-CR-0585, 2018 WL 11211500, at *5 (S.D.N.Y. July 23, 2018) (quoting Guadagna, 183 F.3d at 129)).

The materiality and fraudulent intent elements for the mail and wire fraud statutes are intertwined.  As acknowledged by the Second Circuit:

> We have noted the connection between the materiality element and the additional requirement that the government prove fraudulent intent. United States v. Thomas, 377 F.3d 232, 242 (2d Cir. 2004).  The "role of the ordinary prudence and comprehension standard [in the materiality element] is to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless." Id.; see United States v. Svete, 556 F.3d 1157, 1165 (11th Cir. 2009) (observing that "the focus of the mail fraud statute, like any criminal statute, is on the violator," meaning that "the purpose of the element of materiality is to ensure that a defendant actually intended to create a scheme to defraud").  That is, the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent in designing the fraudulent scheme, whereas the materiality of the false statement does.

Weaver, 860 F.3d at 95.

2.    Benefit of the Bargain

The Second Circuit has drawn a "a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid -- which do not violate the mail or wire fraud statutes -- and schemes that depend for their completion on a misrepresentation of an essential element of the bargain -- which do violate the mail and wire fraud statutes." United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007).  To illustrate the contours of this boundary, a review of the Second Circuit's precedent on this issue is necessary.

In  United States v. Regent Office Supply Co., the defendants' scheme involved sales personnel misrepresenting their identities to customers for purposes of selling stationery. 421 F.2d 1174, 1176 (2d Cir. 1970).  For example, when making sales pitches to potential customers, defendants' agents falsely represented that they were (1) referred to customers by the customers' friends; (2) referred to corporate customers by officers of the corporation; (3) doctors or "other professional person[s]" who had stationery that needed to be disposed of; and (4) in need of assistance to dispose of deceased friends' stationery.  Id.  Although these statements gave defendants' agents "a false reason for being able to offer the bargain," the agents "did not attempt to deceive their prospective customers with respect to the bargain they were offering": "There was no

14

substitution of merchandise contrary to the customer's understanding of the offer, and no 'quid pro quo of equal value' exchanged for the customer's money which did not meet his reasonable expectations.  No customer testified that he felt he had been cheated." Id. at 1182.  Consequently, the defendants' mail fraud convictions were reversed.  Id.

The defendants' mail fraud convictions in United States v. Starr were reversed on similar grounds.  816 F.2d 94 (2d Cir. 1987).  The Starr defendants operated a bulk mailing service and charged customers for high-rate mail packages; however, the defendants hid the high-rate mail in low-rate packages and only paid the post office for low-rate price shipments.  Id. at 95-96. To accomplish this, defendants manufactured and mailed false invoices to customers show that the high-rate price was paid.  Id. at 96.  Although the Second Circuit acknowledged the parties' bargain assumed customers' money would be used for a specific purpose, "that defeated expectation alone would not affect the nature or quality of the services that was the basis of the customers' bargain.  The misappropriation of funds simply has no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion." Id. at 99-100.  The customers "received exactly what they paid for" and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." Id. at 98-99.  In the absence of

any intention to inflict harm upon customers, the Starr Court found that the government failed to prove the defendants' fraudulent intent.  Id. at 98-101; see also id. at 101-102 ("No doubt many customers would not have wished to do business with the defendants had they known that the defendants were defrauding the Post Office in the course of performing the service the customers had purchased. . . .  But a customer's regret at doing business with a company that defrauds one of its trade creditors does not transform fraud upon the creditor into fraud upon the customer . . . .  An indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed.  However, the indictment for defrauding the customers has led to a conviction that must be reversed.") (Newman, J., concurring).

Next, in United States v. Schwartz, the Second Circuit affirmed the defendants' wire fraud convictions.  924 F.2d 410 (2d Cir. 1986).  During the relevant time period, the government had a variety of restrictions in place regarding the export of military equipment.  Id. at 416.  The defendants purchased military-grade night vision goggles from Litton Industries ("Litton") for purposes of reselling them.  Id. at 414.  Although Litton sought assurances that the defendants would not impermissibly export the goggles, and the defendants agreed to abide by all applicable export regulations, the defendants nevertheless sold the goggles

to prohibited nations. Id. at 414-16. A Litton executive testified at trial that if the defendants had not agreed to these export restrictions, Litton would not have sold its product to them. Id. at 421. On this basis, the defendants' misrepresentations "went to an essential element of the bargain between the parties and were not simply fraudulent inducements to gain access to Litton equipment." Id.

Then in a case factually similar to Schwartz, the Second Circuit found the indictment legally insufficient. See Shellef, 507 F.3d at 109 ("We recognize that the facts on which this prosecution rested closely resemble those in Schwartz."). In United States v. Shellef, the defendants were in the business of distributing industrial chemicals and induced a company to sell them its products by falsely representing that the products would not be resold domestically. Id. at 87, 107-08. To wit, the Shellef indictment alleged "[i]t was further part of the scheme and artifice that by promising to export all of the [chemicals] purchased, defendant . . . induced [the manufacturer] to sell additional amounts of the [chemicals] . . . that it would not have sold had it known that [defendant] in fact intended to sell the product domestically. Id. at 109 (emphasis added). The Second Circuit analogized this language first to Starr, finding the indictment failed to allege any discrepancy between benefits reasonably anticipated and actual benefits received, and then to

17

Regent Office, finding no misrepresentations as to the nature of the bargain. Id. (first citing Starr, 816 F.2d at 98; then citing Regent Office, 421 F.2d at 1179). The Second Circuit highlighted the emphasized language above, noting the indictment only alleges that the defendants' misrepresentation "induced [the manufacturer] to enter into a transaction it would otherwise have avoided," and did "not assert that [the] misrepresentation had 'relevance to the object of the contract.'" Id. (quoting Starr, 816 F.2d at 100). In so ruling, the Shellef Court found that the jury might have erroneously convicted the defendants for making "simpl[e] fraudulent inducements to gain access to" the manufacturer's products, rather than misrepresenting an essential element of the bargain. Id. (citing Schwartz, 924 F.2d at 421).

More recently in United States v. Binday, the defendants' mail and wire fraud convictions were affirmed. See Binday, 804 F.3d at 601. In Binday, the insurance broker defendants misrepresented their intent to immediately transfer to third-party investors certain life insurance policies that they had induced insurers to issue, called stranger-oriented life insurance ("STOLI") policies, all while knowing the insurers had banned their brokers from authorizing such transfers of STOLI policies. Id. at 565-67. The Binday Court found sufficient evidence of the defendants' intent to harm because the defendants' misrepresentations concerned a central part of the bargain:

18

"whether the policies would certainly be sold and whether and at what price the insurers would issue them." <u>United States v. Johnson</u>, 945 F.3d 606, 613 (2d Cir. 2019) (citing <u>Binday</u>, 804 F.3d at 569-71, 575-76). "[E]ven though the victim received the benefit of its bargain under the terms of the parties' contract, there was proof of fraudulent intent because the defendants' misrepresentations implicated an essential element of the bargain." <u>Id.</u> (citing <u>Binday</u>, 804 F.3d at 565-67, 575-76).[3]

Thus, the Second Circuit has "repeatedly rejected the application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain. But . . . [has] upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement." <u>Binday</u>, 804 F.3d at 570.

### 3. <u>Sufficiency of the Indictment</u>

With these principles in mind, the Court turns to the parties' arguments concerning the sufficiency of the Indictment in this case. Defendant submits the Government has failed to allege he intended to cause a cognizable injury because customers were

---

[3] The Second Circuit's ruling in <u>Binday</u> also comports with its precedent that has held the "value of credit or insurance transactions inherently depends on the ability of banks and insurance companies to make refined, discretionary judgments on the basis of full information." <u>Binday</u>, 804 F.3d at 579 (quoting <u>United States v. Rossomando</u>, 144 F.3d 197, 201 n.5 (2d Cir. 1998)).

provided psychic services and objects in exchange for payment and received the benefit of their bargain.  (Def. Support Memo at 14.) With respect to the contents of the letters, Defendant acknowledges the alleged misrepresentations, which have been distilled by both sides as: (1) neither Psychic A nor Psychic B wrote the letters or had specific visions about the letters' recipients; and (2) the astrological services and supernatural objects offered/ultimately provided to customers were not personalized and unique.  (Id. at 7-8, 18-21.)  Yet, Defendant submits these misrepresentations are not material for separate reasons.  (Id. at 19.)

As to the first set of alleged misrepresentations concerning the identity of the psychics authoring the letters and the "specific visions" those psychics had about customers to induce them into purchasing psychic goods and services, Defendant concedes that such statements are deceitful, but argues they were not material to the psychic transactions.  (Def. Support Memo at 18.)  According to Defendant, "purported . . . individualized communications from one or more world-renowned psychics" are not actionable misrepresentations because they "do no more than cause their victims to enter into transactions than they would otherwise avoid."  (Id.; see also Def. Reply at 5 ("Simple inducement is not actionable fraud.").)  With respect to the second category of statements, that the letters offered personalized and magical goods and services, Defendant submits that such representations

are not fraudulent but "were simply ways for the [Direct Mail
Operation] to make the services more plausible and thus more
valuable." (Def. Support Memo at 19-20.) Thus, Defendant's
argument is premised upon the entertainment value of psychic
services: "Marketing the literal truth would have destroyed that
value for the customers, just as a magician who reveals the source
of her trick before her performance destroys the value of any magic
for the audience." (Def. Support Memo at 26.) In its opposition,
the Government argues the fact "that the solicitation letter was
written and sent by a psychic who had an individualized vision
regarding the recipient and misrepresentations that the psychic
will be providing individualized psychic services [and items] are
misrepresentations of an essential element of the bargain." (Gov't
Opp'n at 13-14.) The Government parrots language from the
Indictment which alleges that victims who made payments did not
receive individualized psychic services and unique and magical
objects (id. at 10 (citing Indictment ¶ 8)), and submits that
Defendant's misrepresentations were clearly directed to the
quality of the psychic goods/services (id. (citing Binday, 804
F.3d at 578); see also id. at 13-14).

        The primary issue presented by these arguments is
whether the victims of the Direct Mail Operation scheme received
the benefit of their bargain. Put differently, are the present
facts more similar to the non-actionable schemes described in

Regent, Starr, and Shellef, and Defendant's mail order psychic letters did no more than cause his customers to enter into transactions they would otherwise avoid?  Or does the instant case more closely resemble the actionable schemes in Schwartz and Binday, and the Direct Mail Operation hinged on receiving payments from customers based upon a material misrepresentation of an essential element of the bargain for psychic goods and services? Although the instant case presents a medium between these choices in more ways than one, the Court concludes the Indictment sufficiently alleges a scheme to defraud to survive Defendant's motion to dismiss.

Here, Defendant's intent to cause cognizable harm is not readily apparent based upon the Indictment because the parties do not appear to dispute that Defendant's customers did receive some sort of psychic services and goods in exchange for payment.  See Regent, 421 F.2d at 1181 ("If there is no proof that the defendants expected to get 'something for nothing,' Harrison v. United States, 200 F. 662 (6th Cir. 1912) or that they intended to get more for their merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud in the defendants' falsehoods.").  Rather, the problems with the services and goods received by customers, as alleged by the Indictment and argued by the Government, is that they were not personalized or

unique, nor were they provided by Psychic A or Psychic B as advertised in the letters.  (Indictment ¶ 1.)

Whether Defendant's customers were actually harmed and received less than what they bargained for is not an issue the Court can or should reconcile at this juncture.   It is an impossible task for the Court to determine, in a pre-trial motion to dismiss, whether Defendant's victims ultimately received the benefit of the bargain by engaging in transactions through the Direct Mail Operation for intangible benefits.  In large part, the worth of the psychic goods and services offered by Defendant through the Direct Mail Operation is derivative of, <u>inter alia</u>, the entertainment or informational value placed upon them by customers.  The evidence at trial may even demonstrate the absence of injury on the part of Defendant's clientele.  But attempting to quantify the harm, if any, for transactions that yield no pecuniary return to customers is an inquiry beyond the province of the Court based upon the face of the Indictment.  Moreover, it is unnecessary for the Court to estimate the delta, if any, between the benefits provided to customers through personalized astrological goods and services provided by world-renowned psychics versus run-of-the-mill mass-produced readings and trinkets from allegedly non-psychic beings.  The Government has alleged that Defendant's customers did not receive what they paid for, and while the Government has not proffered the evidence it intends to present at

trial, it is not required to do so at this time because "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss the indictment." United States v. Zemlyansky, 945 F. Supp. 2d 438, 446 (S.D.N.Y. 2013) (quoting United States v. Alfonso, 143 F.3d 772, 776–77 (2d Cir. 1998)). As such, the Court declines to dismiss the Indictment on this basis.

Nevertheless, "[t]he indictment need not allege, and the government need not prove, that the specified harms had materialized . . . or were certain to materialize in the future." Binday, 804 F.3d at 576; see also Weaver, 860 F.3d at 95 ("[W]e have explained that the government 'need not prove that the victims of the fraud were actually injured, but only that defendants contemplated some actual harm or injury to their victims.'" (quoting Greenberg, 835 F.3d at 306)). Further, the Second Circuit has "concluded that even [where] the victim received the benefit of its bargain under the terms of the parties' contract," fraudulent intent may still be established if "the defendant's misrepresentations implicated an essential element of the bargain." Johnson, 945 F.3d at 613 (citing Binday, 804 F.3d at 565-67, 575-76). Where the allegedly "false representations are directed to the quality, adequacy or price of the goods themselves," a customer "is made to bargain without facts obviously essential in deciding whether to enter the bargain" and fraudulent

24

intent may be "apparent." Id. (quoting Regent, 421 F.2d at 1182). According to the Government, "whether or not the letter was written and sent by the psychic offering personalized assistance is directly relevant to the quality and nature of the services to be sold. . . . [I]n this context, misrepresentations that the items purchasers will receive are unique and magical and that individual psychic services will be provided go directly to the nature of the bargain." (Gov't Opp'n at 14.)   On this basis, the Government argues the instant case is distinguishable from Regent.

In Regent, the sales agents "did not attempt to deceive their prospective customers with respect to the bargain they were offering; rather, they gave a false reason for being able to offer the bargain." Regent, 421 F.2d at 1182.  As set forth above,[4] "[t]here was no substitution of merchandise contrary to the customer's understanding of the offer, and no 'quid pro quo of equal value' exchanged for the customer's money which did not meet his reasonable expectations." Regent, 421 F.2d at 1182.  Further, "[n]o customer testified that he felt he had been cheated," which necessitated the government in Regent to ask the court to improperly "infer some injury from the mere fact of the falseness of the representations and their connection with a commercial transaction." Id.  With the benefit of a fully developed record

---

[4] See supra at 14-15 (citing Regent, 421 F.2d at 1182).

at trial, the Regent Court concluded that the defendants deceived customers, but did not intend to defraud because the materiality of the misrepresentations were "not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception."  Id.

Regent is similar to the instant case in the sense that, as alleged, Defendant "gave a false reason for being able to offer the bargain" of psychic goods and services by leading customers to believe those goods and services were being provided by Psychic A or Psychic B.  Unlike Regent, the alleged misrepresentations here regarding the identity of the psychic and the personalization of the goods and services, may, at a minimum, be directly related to the quality and nature of the bargain at issue.  Curiously, in neither its opposition brief or the Indictment does the Government elaborate how or why these representations are directly relevant to customers' decisions to procure psychic services and goods. Although the Government is not required to give the defense a preview of its case before trial, in an attempt to connect the dots drawn by the Government, the Court poses the following questions.  What is the value of having psychic services provided by Psychic A or Psychic B?  Is it that their personalized services and objects may be more "accurate," entertaining, magical, or informational than other individuals', such that customers would

be willing to pay for them where they otherwise would not?  If the answer is yes as the Government implicitly argues, absent other evidence of intent to defraud, the Court has a difficult time envisioning the Direct Mail Operation as anything but a scheme that does no more than induce individuals to enter into transactions they would otherwise avoid, which is not actionable under the fraud statutes according to Second Circuit precedent. To find in Defendant's favor on this issue now though requires the Court to improperly make certain assumptions regarding the evidence the Government may introduce at trial regarding Defendant's intent.  (See Gov't Opp'n at 11 ("[T]he government will present evidence at trial that Mr. Runner's intent was to deceive the recipients of the letters into thinking that they were in fact from Maria Duval or another psychic, and to further deceive them into thinking that with their payment they were purchasing unique and magical items and psychic services by Ms. Duval or another psychic that would allow them to win large sums of money, such as the winning lottery numbers.")  As stated by the Government, "[w]hether the defendant possessed the requisite intent to defraud by sending the[] letters is a question of fact, and it is for the jury to determine the credibility of the evidence and to draw such inferences from it as are reasonable."  (Id. (citing Guadagna, 183 F.3d at 129-30).)

To be sure, in accepting the Indictment's allegations as true, Defendant certainly misled his customers -- and the parties do not appear to dispute that.  See In re Cedar Hill Cemetery Litig., 853 F. Supp. 706, 709 (S.D.N.Y. 1994) ("That one patronizes or works with a suspicious service provider reasonably may trigger further investigation and action by proper authorities. . . .  But by itself it does not constitute participation in a criminal scheme to defraud under the mail fraud statute or similar laws requiring criminal intent." (citing United States v. Falcone, 109 F.2d 579 (2d Cir.), aff'd 311 U.S. 205 (1940))).  But "[a]n intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed.  That is the teaching in Starr."  See Novak, 443 F.3d at 159 ("Although the Government insists that the contractors would not have paid for the no-show hours had they been aware that Novak would receive a portion of the money, that hypothetical contention is inadequate to support a finding of fraudulent intent."); see also id. at 157 ("In reversing the jury's guilty verdict, this Court [in Starr] found that, although the customers were unquestionably deceived, no evidence indicated that the defendants intended to defraud them.  In other words, while the customers' assumption that the money they paid to defendants would be directed toward a lawful purpose did 'implicitly constitute[] a part of the bargain between the parties, that defeated expectation alone [did]

28

not affect the nature or quality of the services that was the basis of the customers' bargain.'   Therefore, this Court found that defendants possessed no intent to defraud their customers because '[t]he customers received exactly what they paid for.'" (quoting Starr, 816 F.2d at 98-100)).   Thus, even if Defendant knew that Psychic A or Psychic B did not author the letters distributed as part of the Direct Mail Operation, that, in and of itself, may not be enough to support a cogent theory of fraud in the criminal context.   The Government is on notice that it faces an uphill battle at trial; however, for the Court to issue such a "pretrial factual finding [against the Government] [would] constitute[] a premature adjudication as to the sufficiency of the . . . evidence and [be] improper at the Rule 12(b) stage."   United States v. Sampson, 898 F.3d 270, 278 (2d Cir. 2018).   Once again, the Court will not usurp the role and function of the jury to decide issues of Defendant's intent that involve dispositive evidentiary questions that are more appropriately determined at trial.   See id. (citing United States v. Knox, 396 U.S. 77, 83 & n.7 (1969)); see also United States v. Wilson, 26 F.3d 142, 159 (D.C. Cir. 1994) ("[A] decision on a [Rule 12] motion should be deferred[ ] if disposing of the motion involves deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself."); United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986) ("If [a] pretrial claim is

'substantially founded upon and intertwined with' evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." (quoting United States v. Williams, 644 F.2d 950, 953 (2d Cir. 1981))).

Insofar as the alleged misrepresentations pertain to the personalization, uniqueness or even magical nature of the psychic goods and services offered by the letters, the Court reaches the same conclusion. In essence, Defendant asks the Court to consider these statements as mere puffery and sales tactics to make the Direct Mail Operation successful rather than as material misrepresentations:

> [A] customer who paid the requested fee to Mr. Runner's operation only did so if she was willing to suspend her disbelief -- or maybe choose to believe -- in the magic of the psychic services on offer. Just as the value of a magician's tricks is that they could plausibly be magical, the value of psychic services is that they could plausibly be psychic. Accordingly, representations that the services were, in fact, genuinely astrological, as well as also personalized or unique, were simply ways for the operation to make the services more plausible and thus more valuable. . . .
>
> Indeed, hiding the truth that the psychic services were not magical or personalized is part of what gave the services their entertainment or informational value. Marketing the literal truth would have destroyed that value for the customers, just as a magician who reveals the source of her

> trick before her performance destroys the
> value of any "magic" for the audience.

(Def. Support Memo at 20.)  Defendant's argument is flawed for two reasons.  In addition to asking the Court to make inferences regarding the rationale for the alleged misrepresentations, which go to Defendant's intent, Defendant also asks the Court to make certain assumptions about the mindsets of his customers.  Whether customers chose to purchase Defendant's goods and services purely for entertainment or whether the customers had any expectations for those goods and services are matters the parties are free to address with the jury at trial.  See Guadagna, 183 F.3d at 130-31 ("Although [the defendant's] statements to [the victim] that she 'hit it big' in the 'jackpot' might, 'without more, be mere 'puffery,' there was more on which a jury could find that [the defendant] had the requisite intent.  The court was obliged to consider . . . all of that evidence in evaluating whether a rational trier of fact could find beyond a reasonable doubt that [the defendant] was guilty.").  To mitigate the appearance of fraudulent intent, Defendant argues the letters contained disclaimers which said "individual results may vary," "there are no guarantees," and "for novelty and entertainment purposes only" (Def. Support Memo at 12); however, the Second Circuit has made clear that "[w]hile such disclaimers may in some circumstances defeat a civil claim for damages based on fraud, Grumman Allied

31

Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 734 (2d Cir. 1984), they do not bear on the defendant's criminal liability." Weaver, 860 F.3d at 95-96 ("Weaver's arguments to the contrary are not persuasive, and largely 'confuse materiality . . . for reliance.' First, Weaver contends that, because the fraud's victims signed a contract expressly acknowledging that no earlier representation 'influenced' their decision to purchase the machines, the earlier misrepresentations could not be material because no reasonable person would alter his decision based on those statements. That argument would effectively require reliance as part of the materiality inquiry, and is therefore contrary to Supreme Court precedent instructing that reliance is not an element of criminal fraud, while materiality is." (quoting United States v. Ghilarducci, 480 F.3d 542, 543 (7th Cir. 2007))). Defendant advances a similar argument based upon the availability of refunds on product order forms, which is also unpersuasive. See United States v. Kenner, 272 F. Supp. 3d 342, 412 ("[T]he dispositive issue is not whether Constantine offered to refund Privitello's investment, and any attempt by Constantine to shift the blame to Privitello for refusing to accept that offer is unavailing. The critical inquiry is whether, at the time of Privitello's investment, Constantine possessed the requisite scienter -- i.e., that he had a 'conscious, knowing intent to

defraud' and 'contemplated or intended some harm to the property rights of' Privitello." (quoting Guadagna, 183 F.3d at 129)).

Accordingly, the Court finds that the Indictment sufficiently pleads a scheme to defraud and survives Defendant's motion to dismiss.

B.   Constitutional Challenges

Next, the Court considers Defendant's constitutional challenges to the Indictment.   (See Def. Support Memo at 2-5, 21-27; Def. Reply at 7-8.)   Defendant argues the Government's charging theory is an "expansive interpretation of the 'scheme to defraud' element," such that Defendant is being punished for providing psychic services, a protected form of expression under the First Amendment.   (See Def. Support Memo at 21.)   Defendant then contends the consequences of permitting the Government to pursue its theory of the case are not only a threat to "criminalize the $2 billion psychic services industry," but a precursor to rendering "any entertainment transaction a federal crime" as well. (Id.)   The first of these arguments is more aptly described as an "as-applied" First Amendment challenge to the fraud statutes whereas the second argument is a vagueness challenge rooted in the Fifth Amendment's Due Process Clause.

Defendant is correct that the Supreme Court's First Amendment jurisprudence protects "speech we detest," United States v. Alvarez, 567 U.S. 709, 729 (2012) (finding criminalization of

33

false statements about having a military medal unconstitutional), as well as conduct that is "offensive or disagreeable," Texas v. Johnson, 491 U.S. 397, 414 (1989) (finding conviction for burning the American flag inconsistent with the First Amendment). (See Def. Support Memo at 22.)   Relying upon the Supreme Court's decision in Alvarez, Defendant argues there is no "general exception to the First Amendment for false statements," and his psychic speech and expression are protected despite the fact he allegedly knew the psychic services provided through the Direct Mail Operation were not, in fact, magical or personalized.   (Id. at 23 (quoting Alvarez, 567 U.S. at 719).)   However, the Supreme Court has carved out limited categories of speech that are generally unprotected under the First Amendment, such as fraud and speech integral to criminal conduct.   See United States v. Stevens, 559 U.S. 460, 468-69 (2010) (citing Va. Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949)).

Critical here, the Government does not take the categorical position that all psychic speech or services is fraudulent.   (See Gov't Opp'n at 18 ("[C]ourts explicitly acknowledge that the appropriate way for the government to protect consumers from fraud operating under the guise of psychic prediction is through prosecution for fraud or deceptive marketing, rather than through blanket bans on psychic prediction

as a category of speech.").)  Moreover, Defendant is not being
charged under statutes that impose content-based restrictions such
as those that were challenged and invalidated in the cases upon
which he relies.  See, e.g., Argello v. City of Lincoln, 143 F.3d
1152 (8th Cir. 1998) (striking down city ordinance prohibiting
persons from engaging in clairvoyancy, fortunetelling and similar
practices on First Amendment grounds); Adams v. City of Alexandria,
878 F. Supp. 2d 685, 690 & n.6 (W.D. La. 2012) (striking down city
ordinance against palmistry, calm reading, astrology,
fortuntelling, and mediums, regardless if free or paid for);
Nefredo v. Montgomery County, 414 Md. 585 (Ct. App. 2010) (striking
down county ordinance that prohibited the acceptance of
remuneration for the performance of fortunetelling as a violation
of the First Amendment); see also Alvarez, 567 U.S. at 724-30
(finding the Stolen Valor Act's prohibition on false claims of
receipt of military medals a content-based restriction on free
speech, in violation of the First Amendment).  Rather, Defendant
is being charged under the mail and wire fraud statutes, which are
content-neutral and encompass a broad range of potentially illicit
behavior.

Despite Defendant's claims to the contrary, the charges
against him are not simply that he committed fraud because he
provided psychic services. (See Def. Support Memo at 1, 21-24.)
Instead, the Indictment here sufficiently alleges a scheme to

defraud, which involves the mailing of letters not actually written by their purported authors that contained offers to provide services and goods that Defendant did not intend to expressly fulfil in exchange for payments from customers.  On this basis, Defendant is not prevented from engaging in the legitimate exercise of First Amendment rights, and his constitutional challenges to the Indictment are rejected.

CONCLUSION

For the stated reasons, **IT IS HEREBY ORDERED that** Defendant's motion to dismiss is DENIED.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March 9, 2023
       Central Islip, New York