CBD/JWB/AFE/REB
F. #2016R00349

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     v.                                  No. 18-cr-00578 (JS) (AYS)

PATRICE RUNNER,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## TRIAL MEMORANDUM OF THE UNITED STATES

The United States of America, by and through the undersigned attorneys, hereby submits its Trial Memorandum to summarize the Government's proof and the applicable law, and to inform the Court of evidentiary and other issues that may arise during the trial.

### I.       PROCEDURAL HISTORY

On October 25, 2018, a grand jury returned an 18-count indictment against Patrice Runner for conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349, mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and conspiracy to commit money laundering under 18 U.S.C. § 1956(h). The indictment also contains forfeiture allegations. The Defendant was extradited from Spain, made his initial appearance in this District on December 22, 2022, and pleaded not guilty. The Court has scheduled jury selection and voir dire in this matter for May 30, 2023 before U.S. Magistrate Judge Shields, with the trial commencing June 5, 2023.

## II.     STATEMENT OF THE CASE

From 1994 through November 2014, Defendant Patrice Runner was the owner and operator of an international mass-mailing fraud scheme that defrauded more than 1 million Americans out of more than $170 million.  Defendant's operation was headquartered in Montreal, Canada.  The Defendant and his co-conspirators mailed to consumers throughout the United States and Canada fraudulent mass-mailings drafted and edited to appear to be personalized letters from world-renowned psychics.  Through these letters, the Defendant's scheme defrauded victims into paying money to receive supposedly personalized psychic services and supposedly unique and magical items directly from the psychics.

The Defendant and his co-conspirators employed a variety of means and methods to convince the victims of the legitimacy of these mailings and to disguise their origins.  These included using multiple, geographically diverse post office boxes in the United States to receive victim payments and using shell companies in Canada and Hong Kong as the supposed senders of the letters.

## III.     FACTS AND EVIDENCE

### A.     Overview

The Defendant Patrice Runner led an elaborate mail fraud scheme that sent tens of millions of letters to victims through the United States and Canada over a 20-year period.  The Defendant and his co-conspirators identified people who were most likely to believe the scheme's lies and sent initial letters to convince them that they were receiving personal correspondence from world-renowned psychics Maria Duval and Patrick Guerin, and that these psychics were offering the recipients their personalized services.  When a victim responded to the initial letters, the Defendant bombarded the victims with dozens of additional letters that

2

defrauded many victims into paying more money for supposedly personalized psychic services to be provided and performed by Duval and Guerin and unique and valuable items to be provided by Duval and Guerin.

The Defendant's entire mailing operation was a basic confidence scam, carried out by mail. Runner used psychic personas to induce trust on the part of victims, making them believe they were engaging in a one-on-one relationship with world-famous psychics and promising easy solutions to life's most vexing problems about money, relationships, and similar matters. Contrary to the false statements and misrepresentation in his letters, Duval and Guerin did not send the letters, they did not receive the responses from the victims, they did not perform any rituals, readings or other psychic services for the victims who paid money, and they did not provide the unique and valuable items described in the letters. There were no psychics involved in either sending the letters with purported readings or providing goods or services of any kind. All that the victims needed to do was believe and send money. The victims did that, sending personal confidences and information, asking for advice and predictions, and paying for it. The Defendant, in turn, took their money and trashed their letters.

## B.    The Three Steps of The Defendant's Fraud Scheme

The Defendant's fraud scheme involved three basic steps: (1) identify potential victims, (2) learn personal information about them and use it to create the impression of personalized correspondence, and (3) bleed them for money with fake psychic readings and objects. As part of the first step, the Defendant and his co-conspirators rented and traded mailing lists with other psychic mailing operations as well as sweepstakes mailers and other direct mailers. The Defendant sent out enormous numbers of "lead generator" mailings to the individuals whose names appeared on the rented lists. Despite appearing personalized to the individual recipient,

3

lead generator mailing went out to tens or even hundreds of thousands of recipients at a time. The lead generator mailings appeared to be personalized letters from the psychics Maria Duval or Patrick Guerin.  The lead generator mailings offered the psychics' personal services or unique and valuable items, often at a discounted price.  In addition to asking for a small payment, most of the Defendant's lead generator mailings asked the victims to answer a series of questions, such as "Do you have any financial problems?" and "Do you feel lonely or misunderstood?"  When a victim responded to a lead generator mailing, these responses to questions on the lead generator order forms were entered into the Order Motion customer management database.

The second step in the Defendant's scheme was to create, through elaborate and personalized mailings, the impression of a personal connection and direct correspondence between Maria Duval and the victim.  After a victim responded to a lead generator mailing, the Defendant and his co-conspirators then sent to the victim a lengthy letter referred to within the scheme by various names, including "Conversion Package," "Duval 2," "PVR-Conversion Package," or simply "PVR."  Running between 15 and 18 pages, the PVR appeared to be lengthy, personal correspondence from Maria Duval directly to the individual victim.  The lengthy letter described visions Duval had of the victim's situation, including his or her family and financial situation.  Duval offered to use her psychic powers to provide an even lengthier and more detailed astral-clairvoyant study that would tell the victim about visions for their future in numerous areas: "personal finance, luck (lotteries and other games), love, friendship, windfalls of money, interpersonal relations, family situation, etc."  The letter also asked the victims to return a personal item, such as a photograph, to Duval in an included green envelope "to enhance my psychic gifts about you each time I work on your case . . . As soon as I have your photo in my possession, I am going to be able to concentrate all my psychic strengths further.  I will keep

the photo with me for months and years to come so that my contact as a psychic can be with you permanently." The PVR letter requested payment of $55 for the more detailed study and asked the victim to return payment with the order form and the green envelope.

Of course, this lengthy letter was not personal correspondence from Maria Duval to the victim. In fact, Runner himself wrote this lengthy letter. The name of the letter—PVR—was short for Patrice Van Runner. Runner created the PVR as a form letter with fillable fields for a computer to insert the victim's name, date of birth, other personal information, and blocks of text corresponding to the answers that victim provided on the lead generator order form.

The purpose of the lead generator mailing and the "Conversion Package" or "PVR" letter was not so much to generate profit, but to learn the identity of those who would respond to these types of mailings and were thus vulnerable to the Defendant's scheme. After a victim responded to a lead generator and the PVR, they were considered a buyer and placed in the mailing cycle for the scheme's "back-end" mailings.

The third step in the scheme was known as the "back-end cycle," and involved obtaining as much money as possible from the buyers who responded to the initial mailings, including the PVR letter. The back-end mailings were the real money-making engine of the Defendant's scheme. Having identified victims who believed his lies, the Defendant then bombarded the victims with a huge variety of back-end mailings. The evidence at trial will show that the Defendant himself wrote some of these letters and that he edited others. The Defendant used dozens of back-end mailings. By the time the scheme ended in 2014, there were well over 50 different versions of back-end mailings in use. Each back-end mailing used a different set of lies and misrepresentations to convince the victims to send more money, and had in common that they (1) appeared to come from Maria Duval or Patrick Guerin, (2) requested payment for

5

additional personalized psychic services, such as rituals or readings, or for additional supposedly unique and valuable items, and (3) maintained the overall impression that a victim was in frequent and often intimate individual correspondence with a world-renowned psychic.

Like all of the Defendant's mailings, the back-end mailings were lies. No psychic performed services; no items were unique, valuable, or supernatural. The readings were lies concocted by the Defendant and his co-conspirators and the "magical" items were cheap trinkets that Defendant's co-conspirators bought in bulk through suppliers.

### C.     The Letters and Lies

The Defendant used approximately 100 different letters, including lead generators, the PVR Conversion Package, and back-end mailings to defraud the victims.   For example, the Defendant and his co-conspirators called one back-end mailing "29 Days."  29 Days is a letter supposedly written by Maria Duval in which she claims that she had a very intense flash of clairvoyance indicating that the recipient of the letter may receive more than $200,000 on a date 29 days later.  The letter then requests that the recipient fill out a questionnaire and send $45. Maria Duval will then complete and prepare a "Grand Special Reading for Wealth and Happiness in Your Future," which the letter states will provide the recipient with "all the information you need for this first sum of money that you are going to receive, such as, for example: the form in which the money is going to come to you…."  Maria Duval did not have a vision or write this letter. In fact, no psychic had a vision or provided a "reading."

Another of the Defendant's letters was called "Vibratory Crystal." It promised that in exchange for $45, Maria Duval would take a sample of the recipient's "vibrations and energy" and personally program a specially selected "Vibratory Crystal." The Vibratory Crystal would help the recipient "win quickly the initial total sum of up to $51,000.00 with several more wins

to follow."  In fact, the crystal was a cheap trinket not selected or programmed by Maria Duval

or any other psychic.  These letters are just two examples of the enormous number and variety of

false statements and misrepresentation in the scheme's dozens of letters.

### D.   U.S. Postal Inspection Service Administrative Action

The Defendant's mailing operation was the target of an administrative action brought in a

U.S. Postal Service administrative court proceeding by the U.S. Postal Inspection Service

("USPIS") in November 2004, pursuant to 39 U.S.C. § 3005.  This Postal action was negotiated

by USPIS and the Defendant's operation (through counsel) between 2004 and February 2007.

The Postal action, which named as Respondents Maria Duval, Maria Duval c/o the National

Parapsychology Center, Zodiac Zone, and Patrice Runner, described the Defendant's scheme

thus:

> Respondents attract attention to their scheme by means of direct
> mail solicitations sent to members of the public.  They solicit
> money through the mail to MARIA DUVAL and THE
> NATIONAL PARAPSYCHOLOGY CENTER . . . Attached to
> this complaint as Exhibits 1 through 3, are copies of mailings
> employed by Respondents to solicit money or property through the
> mails.

> <u>FALSE REPRESENTATIONS</u>

> 7.      By means of Exhibits 1 through 3 attached to this
> Complaint, and other similar materials, respondents represent,
> expressly or impliedly, in substance and effect, whether by
> affirmative statements, implications or omissions, that:
>> a.      The Respondent has personal knowledge of the
>>         recipient;
>> b.      The recipient of the solicitation has been
>>         specifically selected to receive the mailing;
>> c.      The recipient was selected to receive the mailing
>>         based on a reason other than the fact that the
>>         person's name appears on a mailing list;
>> d.      The Respondent is aware of specific information
>>         about the recipient which will directly impact on the
>>         person's well being;

e.    The Respondent can provide the recipient with information which will allow the addressee to achieve personal happiness;

f.    The Respondent can provide the recipient with information which will allow the addressee to obtain a financial benefit;

g.    The Respondent can provide the recipient with information which will allow the addressee to improve their personal security;

h.    The Respondent has provided useful information to law enforcement authorities which has been instrumental in resolving outstanding cases.

The Defendant was not part of the ultimate settlement agreement with USPIS.  Paragraph 19 of the settlement agreement states, "Because Respondents have provided proof that Patrice Runner is no longer involved with Zodiac Zone, Complainant has agreed to remove Patrice Runner's name from the caption."  The remaining Respondents resolved the Postal action through a Settlement Agreement Containing Consent Order to Cease and Desist signed in April 2007.  However, the Defendant never severed his connection to the mailing operation.

### E.    Steps Taken to Avoid Detection

Shortly after the filing of the administrative action, the Defendant and his co-conspirators created one or more new shell companies and continued to perpetrate the same fraud scheme while his attorney negotiated with the Postal Service.  On January 5, 2005, less than two months after the filing of the Postal administrative action, the Defendant and his co-conspirators incorporated Destiny Research Group ("DRG"), a Hong Kong corporation. On January 18, 2005, Martin Dettling, the Swiss owner of the shell company DRG, opened a P.O. Box in Massachusetts under the name DRG.  The Defendant and his co-conspirators then used the name DRG and that P.O. box to perpetrate the fraud scheme until 2010.  In 2010, the Defendant and his co-conspirators created a new shell company, Destiny Research Center, another Hong Kong corporation.   There is no evidence that these purported businesses operated to do anything other

8

than provide cover for the Defendant to continue to run the psychic mail fraud scheme while avoiding detection.

In addition to changing the names of his companies, the Defendant took numerous steps to avoid connection to the fraud scheme and detection as its owner, as set forth below.

1.     Victim Responses

The Defendant and his co-conspirators did not give out their company address for direct response from victims. Instead, victims mailed their responses to P.O. boxes, including boxes in Chicago and Las Vegas first. Those responses were then packaged together and shipped, typically multiple times per week, from the rented P.O. boxes to a Long Island "caging service," which is a company that opens and handles mail.  The Long Island caging service opened the envelopes, removed the payments, and collected data concerning the victims' responses so that the Defendant and his co-conspirators could update mailing lists, create the PVR letter and other seemingly personalized letters, and perform other tasks related to optimizing their operation's profitability.  In addition to order forms and payments, the victim responses often included handwritten letters to Maria Duval that included personal information and intimate details about the victims' lives.  Many of the responses included photographs and other personal effects, including in the green envelopes requested by the PVR letter. The victims were told their responses would go to Maria Duval to be used in her psychic services. Instead, the Defendant and his co-conspirators directed the caging service to get the information they needed from the letters to generate the next letter, then throw the rest away in the trash.

2.     Victim Payments

Rather than depositing cash and checks into bank accounts in the Defendant's name or in the names of his corporate entities, the Defendant and his co-conspirators had the Long Island

caging service send all victim payments to a third-party payment processor known as "PacNet," based in Vancouver, British Columbia, Canada.  The caging service mailed or electronically transmitted victim checks and money orders from Long Island to PacNet in Vancouver.  The caging service also deposited cash sent by the victims into its own bank accounts and sent checks for that amount to PacNet.

At the direction of the Defendant and his co-conspirators, PacNet then wired the proceeds to a wide variety of bank accounts, taking a fee for the service.  PacNet sent wires to pay the scheme's vendors, such as its printers, trinket suppliers, and the Long Island caging service, among others.  It also sent wires to pay the Defendant and other co-conspirators, representing their cut of the proceeds.

The Defendant took elaborate steps to distance himself from the scheme. For instance, in 2008, the Defendant opened a bank account in Liechtenstein in the name of his United Kingdom shell company.  Beginning in 2012, Defendant received his fraud proceeds at his account in Liechtenstein and then wired the money to accounts in his name and his wife's name in Switzerland and France.

### F.      Government's Evidence

#### 1.      Witnesses

During the trial of this matter, the Government intends to present testimony from witnesses, to include:

- two of the Defendant's longtime employees and co-conspirators concerning the operation of the Defendant's scheme;

- a list broker co-conspirator who provided names of potential victims to the Defendant and his operation;

- victims concerning receipt of the Maria Duval and Patrick Guerin letters and the victims' belief that they were receiving personalized correspondence from Duval, Guerin, or both;

10

- the Inspector-Attorney who negotiated the settlement of the Postal actions against the Defendant's scheme; and

- law enforcement personnel who participated in the investigation.

2.    <u>Documentary Evidence and Stipulations</u>

The Government has numerous documents from a variety of sources. Of note, the Government obtained via search warrant a copy of the Order Motion customer management database containing information about victim responses and payments, dating back to approximately 1999. The parties have stipulated that the data contained in this database is authentic and is admissible as a business record of the entities involved in running the mailing operation, including Infogest Direct Marketing and Destiny Research Center. *See* D.E. 58, Stipulation at 4 (citing Fed. R. Evid. 803(6)). Aggregated data from the database shows that from 1999 until the Defendant's scheme was enjoined in November 2014, the scheme received more than $175 million from more than 1,393,000 U.S. victims. The scheme also received millions of dollars from hundreds of thousands of Canadian victims.

**IV.   LAW APPLICABLE TO THE CHARGED COUNTS**

**A.  Counts 2–13 (mail fraud); 14–17 (wire fraud)**

To prove mail and wire fraud, the Government must establish the following elements: (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme. *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004).

In order to prove the scheme to defraud, the Government must prove that the misrepresentations were "material" and that a defendant acted with fraudulent intent. *Weaver*, 860 F.3d at 94 (citations omitted). The focus in assessing a misrepresentation's "materiality" remains on a defendant's intent and whether his conduct was intended to deceive; whether or not

a misrepresentation was "material" does not excuse criminal conduct on the basis of a victim's unreasonable reliance on the misrepresentation or a victim's mental state—the law does not permit a defendant to take advantage of the "stupid or careless." *Id*. at 95 (quoting *United States v. Thomas*, 377 F.3d 232, 242 (2d Cir. 2004)). *See also United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (en banc) (noting that "materiality" requires proof that misrepresentations or omissions "ha[d] the natural tendency to influence or [were] capable of influencing the [victim] to change its behavior."); *United States v. Thomas*, 377 F.3d 232, 240–41 (2d Cir. 2004) (noting that it is no defense to fraud that the victim was foolish or made insufficient inquiries to avoid the fraud).

Concerning intent to defraud, "[i]t need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim." *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991). Use of the mails and wires "in furtherance of a scheme to offer services in exchange for a fee, with the intent not to perform those services, is within the reach of" the mail and wire fraud statutes. *United States v. Paccione*, 949 F.2d 1183, 1196 (2d Cir. 1991). *See also United States v. Frank*, 156 F.3d 332, 335 (2d Cir. 1998) (noting that a "defendant who has used the mails fraudulently to bill a customer for services that have not been provided may not defeat a mail fraud charge simply by providing alternative services").

Moreover, mail and wire fraud can be found even where a victim receives something approximating what they thought they bargained for, where a defendant misrepresents the nature and quality of the services to be provided. *United States v. Walker*, 191 F.3d 326, 335–36 (2d Cir. 1999) (attorney guilty of mail fraud for mispresenting "the nature and quality of the legal services" even though some clients received the desired results). Where, as here, "the false

12

representations are directed to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *United States v. Regent Off. Supply Co.,* 421 F.2d 1174, 1182 (2d Cir. 1970).

Direct proof of the Defendant's fraudulent intent is not necessary. Intent may be proven through circumstantial evidence. *United States v. Guadagna*, 183 F.3d 122, 129-30 (2d Cir. 1999). Moreover, "when the 'necessary result' of the . . . scheme is to injure others, fraudulent intent may be inferred from the scheme itself," and as a result, "a jury may bring to its analysis of intent on individual counts all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated." *Id.*

There is no requirement that the victim of the fraud be deceived by the very document that satisfies the statute's mailing requirement; rather, the requirement is merely that the mailing be "in furtherance of" the fraud. *Paccione,* 949 F.2d at 1196 (citing *United States v. Novod*, 923 F.2d 970, 973 (2d Cir. 1991).

## B. Count 1 (Conspiracy to commit mail fraud)

Conspiracy to commit mail fraud under 18 U.S.C. § 1349 requires proof that a defendant agreed with another to commit the offense of mail fraud, and that he knowingly engaged in the conspiracy with the specific intent to commit mail fraud. *United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012) (listing elements of honest services fraud under 18 U.S.C. § 1349). Proof of an overt act is not required. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015). The Government need not show an explicit agreement, but rather, may show "that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001). The evidence need only be "sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with

consciousness of its general nature and extent," which may be demonstrated through circumstantial evidence in light of the secretive nature of conspiracies.  *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003).

Once a conspiracy has been established, *Pinkerton* renders each defendant liable for all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy.  *United States v. Bryser*, 954 F.2d 79, 88 (2d Cir. 1992), citing *Pinkerton v. United States*, 328 U.S. 640 (1946).

### C.  Count 18 (conspiracy to commit money laundering)

The money laundering conspiracy statute requires proof that "the defendant agreed with another to commit the offense" and "that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy."  *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008).  A "conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement."  *United States v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003).

Count 18 charges the Defendant with conspiring to commit three separate money laundering offenses.  The first object of the conspiracy was to transport, transmit, or transfer funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the specific unlawful activity of mail fraud, in violation of 18 U.S.C. § 1956(a)(2)(A). The second object was to transport, transmit, or transfer funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States knowing that the funds are proceeds of some form of unlawful activity and knowing that the transfer of funds is designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds, in violation of 18

14

U.S.C. § 1956(a)(2)(B)(i).  Finally, the third object was to use mail fraud proceeds to make expenditures greater than $10,000, in violation of 18 U.S.C. § 1957(a).

## V.   EVIDENTIARY AND OTHER ISSUES THAT MAY ARISE DURING TRIAL

The parties have agreed to a stipulation that establishes the authenticity of much of the evidence the Government intends to offer at trial, as well as the parties' agreement that many categories of evidence are admissible.  Dkt No. 58.  The stipulation includes agreements as to (1) admissibility of the bank records the Government intends to offer and rely on for summary exhibits, (2) the data from the Order Motion database used by the scheme to track victim payments and responses, (3) records relating to the Defendant's email account, and (4) records of the Better Business Bureau of Northern Nevada.  The stipulation also includes an agreement that certain emails obtained through search warrants and emails and records provided to the Government by the Defendant's co-conspirator employees are authentic records of those entities.

### A.  Summary Charts and Diagrams

The Government intends to present certain summaries of the Government's evidence, including summaries of data derived from the Order Motion database, summary charts of banking information, a graphics chart representing the flow of victim payment instruments and funds, and a graphics chart showing payments by wire from the payment processor PacNet in Canada.  These summaries are derived from evidence that was provided to the Defendant during Rule 16 discovery and much of it was contained in the Government's initial production of exhibits.

The use of summary testimony and documents is governed by Rule 1006 of the Federal Rules of Evidence.  Rule 1006 provides, in pertinent part: "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart,

summary, or calculation. The originals or duplicates shall be made available for examination or copying, or both, by other parties at a reasonable time and place." FED. R. EVID. 1006.

Here, the proposed summaries of admissible evidence summarize voluminous underlying documents and data that have been previously made available to the Defendant. With respect to summaries of the Order Motion database tracking victim responses and payments, the parties have stipulated to the authenticity and admissibility of certain proposed summary exhibits derived from the Order Motion data. D.E. 87. The stipulated summaries contain the purchase histories of specific purchasers or feature several basic calculations, such as the number of purchases and total amount received by the scheme each year, and the total number of unique purchasers.

The Government also intends to use other chart summaries during its case in chief to assist the jury's understanding of the complexities of Defendant's scheme. For example, the Government intends to use summaries of banking information reflecting voluminous bank records. The Government also intends to use basic, graphic flowcharts to illustrate how victim payments moved from a victim, to post office boxes in Nevada and Illinois, to the Long Island caging service, to PacNet in Canada, and on to the Defendant, other scheme participants, and various vendors and service providers. Such evidence is properly admissible in summary format. *See*, *e.g.*, *United States v. Chi Ping Patrick Ho*, 984 F.3d 191, 207 (2d Cir. 2020) (finding "meritless" the defendant's challenge to trial judge's admission of timelines and other summary evidence under Rule 1006 in a complex fraud case); *United States v. Rosario*, No. 09-CR-415-2, 2014 WL 6076364, at *4 (S.D.N.Y. Nov. 14, 2014) (ruling maps admissible as a summary under Rule 1006).

**B.   A refund policy and so-called disclaimers in the Defendant's psychic letters do not negate misleading statements and other evidence of intent to defraud**

The Court has already ruled that neither the payment of refunds nor so-called disclaimers on the Defendant's psychic letters are a basis to dismiss the indictment. The Government anticipates that the Defendant will attempt to emphasize the payment of refund and the presence of small, inconspicuous disclaimers in the psychic letters.  Generally, the scheme's disclaimers were printed in such small print that they were barely legible and ran vertically along the edge of the order form to deliberately draw minimal attention.  The order forms themselves typically described a refund policy. They do not—at any point—correct any of the lies in the letters, including that there were psychics providing services and objects to the victims. Nor do these disclaimers inform the victims that their psychic readings come from a computer program, a caging service, and the Defendant.

It is well-settled that a disclaimer does not operate to correct misleading statements in mail and wire fraud prosecutions.  *See*, *e.g.*, *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (per curiam) (holding that contractual disclaimers of reliance on prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes); *Press*, 336 F.2d at 1010 (mail fraud conviction upheld despite the use of disclaimers); *United States v. Schlussel*, No. 08 CR. 694, 2008 WL 5329969, at *1 (S.D.N.Y. Dec. 15, 2008) (presence of disclaimer did not negate intent to defraud such that indictment should be dismissed); *see also United States v. Yarnell*, 129 F.3d 1127, 1134 (10th Cir. 1997) (affirming mail fraud convictions where "the jury could have found that Five Star Towing formally made the disclaimers to which Yarnell testified, but intended such disclaimers to be ineffective").

Moreover, the Defendant is not relieved of criminal liability because he refunded the victims who managed to track him down. The offense of mail fraud was completed upon use of

17

the mail, not after the Defendant decides whether or not to give back a victim's money if called to account. *United States v. Hickey*, 16 F. Supp. 2d 223, 234 (E.D.N.Y. 1998) (noting that the offense of mail fraud "is complete upon the hatching of the scheme with the requisite intent supplemented by the use of the mails"); *United States v. Kenner*, 272 F. Supp. 3d 342, 412 (E.D.N.Y. 2017) (denying motion for acquittal on wire fraud counts despite evidence that defendant offered refund). And the conspiracy was completed as soon as the Defendant and his co-conspirators agreed to trick the victims out of their money.

### C. Victim-relative testimony concerning victims' beliefs and characteristics

The Government is not required to prove that an intended victim was actually defrauded. *United States v. King*, 860 F.2d 54, 55 (2d Cir. 1988). Nevertheless, the Government may present victim testimony in mail fraud cases to show that the defendant's mailing had the intended effect on the victim, *i.e.*, that they were defrauded, and to otherwise serve as circumstantial evidence from which a jury could infer the Defendant's intent to cause harm. *Weaver*, 860 F.3d at 97; *see also United States v. Baren*, 305 F.2d 527, 534 (2d Cir. 1962) (testimony as to why the purchasers bought sewing machines was properly admitted in mail fraud case).

As alleged in Paragraph 5 of the Indictment, many of the victims of Defendant's scheme were elderly and vulnerable. Indeed, four victims who are part of the substantive mail fraud counts have passed away since the Government first indicted the Defendant in 2018, and others are infirm to the point of being unable to testify. In order to present relevant and necessary evidence, the Government intends to call family members of two victims of the Defendant's mass mailing scheme. These family members possess relevant knowledge that is admissible under the Federal Rules of Evidence.

For example, the Government may call Laura Carissimi as a witness.  Ms. Carissimi will testify that she witnessed her late mother, Irene Kanning, fall victim to the Defendant's scheme. Ms. Kanning was in her late 80s and received a large volume of mail that appeared to come from multiple psychics, as well as other direct mail offers.  Kanning was particularly fond of the psychic services offered in the Maria Duval mailings from Destiny Research Center.  After some of Kanning's checks to Destiny Research Center did not clear, Kanning started to receive collection letters relating to her checks.  Carissimi intervened and requested that Destiny Research Center stop mailing letters to Kanning.  DRC mailed a refund check to Kanning.

Ms. Carissimi's testimony is based on her own actions and firsthand observations, including observations of the statements and behavior of Ms. Kanning.  The Government intends to elicit testimony regarding Ms. Kanning's statements of belief concerning the letters she received from Maria Duval.  These statements (and those related by similarly situated witnesses) are admissible to demonstrate the victims' beliefs that they were in direct, personal correspondence with a world-renowned psychic who was using her powers to assist the victims and are offered for the non-hearsay purpose of demonstrating their beliefs, and not for the truth of the matter asserted (because it was not true).  *See*, *e.g.*, *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) (holding that where a statement is offered as circumstantial evidence of the declarant's state of mind rather than for the truth of the matter asserted, it is not hearsay).  Such statements are also admissible as an exception to the hearsay rule under Rule 803(3), as evidence of the declarant's state of mind.  *See generally* 2 Wharton's Criminal Evidence (15th ed.) § 6:22. These statements are, by definition, not presented for the truth of the matter asserted by Ms. Kanning—that Maria Duval was sending her personal correspondence and providing her with

winning lottery numbers—as the Government intends to prove that these representations were lies.

Moreover, lay witnesses may testify to their opinions concerning the mental states of others—such testimony is not barred by Federal Rules of Evidence 701 or 704.  *See United States v. Rea*, 958 F.2d 1206, 1214-15 (2d Cir. 1992) (citing Weinstein's Evidence P701.02, at 701-19 to 701-21 (1991)); *see also* 4 Weinstein's Federal Evidence § 701.03 (2021) ("A lay witness may rely on prior personal experiences to interpret his or her perceptions… [provided they are] sufficiently numerous or informative to provide a rational basis for the opinion.").

### D.  Checks are non-hearsay, self-authenticating commercial paper

The Government may offer as exhibits checks sent by some victims of the scheme in response to the scheme's mailings.  Checks are considered to be verbal acts—thus not falling within the general prohibitions of the rule against hearsay—and are self-authenticating commercial paper under FED. R. EVID. 902(9).  *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Nov. 13, 1984*, 616 F. Supp. 1159, 1162 (E.D.N.Y. 1985) (noting that checks are self-authenticating); *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004).

Dated: Central Islip, New York
     May 30, 2023

Respectfully submitted,

/s/ John W. Burke
JOHN W. BURKE
CHARLES B. DUNN
ANN F. ENTWISTLE
RACHEL BARON
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
(202) 305-2001
Josh.Burke@usdoj.gov

cc:    James Darrow (by ECF only)

Charles Millioen (by ECF only)