UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA,

      -against-                                    MEMORANDUM & ORDER
                                                  18-CR-0578(JS)

PATRICE RUNNER,

                    Defendant.
-------------------------------X
APPEARANCES
For United States:  John W. Burke, Esq.
                    Charles B. Dunn, Esq.
                    U.S. Department of Justice
                    P.O. Box 386
                    Washington, DC  20044

                    Rachel Baron, Esq.
                    Ann F. Entwistle, Esq.
                    U.S. Department of Justice
                    450 5th Street NE, Suite 6400 S
                    Washington, DC  20001

                    Charles N. Rose, Esq.
                    United States Attorney's Office
                    610 Federal Plaza
                    Central Islip, NY  11722

For Defendant:      James Darrow, Esq.
                    Federal Defenders of New York
                    One Pierrepont Plaza, 16th Floor
                    Brooklyn, NY  11201

                    Charles V. Millioen, Esq.
                    Federal Defenders of New York
                    770 Federal Plaza
                    Central Islip, NY  11722

SEYBERT, District Judge:

        In connection with his operation of a mail order psychic

services operation between January 1994 and November 2014, Patrice

Runner ("Defendant"), is charged by an eighteen-count Indictment,

dated October 25, 2018, with conspiracy to commit mail and wire fraud, mail and wire fraud, and conspiracy to commit money laundering. (Indictment, ECF No. 1.) Generally, the Government alleges Defendant fraudulently represented that victims would receive personalized letters and psychic services from renowned psychics in exchange for monetary payments and personal property.

Trial in this case is scheduled to commence on June 5, 2023. Currently before the Court are one motion in limine filed by Defendant and four motions in limine filed by the Government. (Def. Mot., ECF No. 62; Gov't Mot. I, ECF No. 63; Gov't Mot. II, ECF No. 64; Gov't Mot. III, ECF No. 65; Gov't Mot. IV, ECF No. 66.) For the reasons that follow, Defendant's motion is GRANTED IN PART and DENIED IN PART, with DECISION RESERVED IN PART. The Government's first motion is GRANTED, the second motion is DENIED, the third motion is GRANTED, and the fourth motion is DENIED.

## BACKGROUND

The Court presumes the parties' familiarity with the background of this case, which is set forth in the Court's prior decision denying Defendant's motion to dismiss the Indictment and is incorporated herein by reference . See United States v. Runner, No. 18-CR-0578, 2023 WL 2429610, at *1-3 (E.D.N.Y. Mar. 9, 2023) [hereinafter "Runner I"].

On April 26, 2023, the Court issued its decision granting in part and denying in part Defendant's motion pursuant to Federal Rule of Evidence ("Rule") 404(b).  See United States v. Runner, No. 18-CR-0578, 2023 WL 3092915, at *1 (E.D.N.Y. Apr. 26, 2023) [hereinafter "Runner II"].   There, the Court precluded the Government from referencing an uncharged aspect of Defendant's direct mail operation pertaining to weight-loss and nutritional product mailings as well as evidence of a 1998 investigation related thereto.  Id. at *2-3.   However, the Government was permitted to introduce evidence of prior investigations into Defendant's psychic mailings, Defendant's wealth, and debt collection letters sent by a co-conspirator as part of Defendant's psychic mail operation.  Id. at *3-5.

The parties' pending motions in limine were filed on May 1, 2023 and are summarized in greater detail below.

## DISCUSSION

### I.   Legal Standards

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine."  Highland Cap. Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing Luce v. United States, 469 U.S. 38, 41 n.4 (1984)).  "The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence."  United States v. Kuo Chen, No.

10-CR-0671, 2011 WL 197585, at *1 (E.D.N.Y. Jan. 20, 2011) (citing Luce, 460 U.S. at 40 n.2).  In considering a motion in limine, a trial court should only exclude evidence when it is "clearly inadmissible on all potential grounds."  Id. (citing Baxter Diagnostics, Inc. v. Novatek Med., Inc., No. 94-CV-5220, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998)); see also United States v. Ceballo, No. 13-CR-0308, 2014 WL 4980554, at *1 (E.D.N.Y. Oct. 6, 2014) ("Only when evidence is 'clearly inadmissible on all potential grounds' should evidence be excluded on a motion in limine." (quoting United States v. Paredes, 176 F. Supp. 2d 192, 193 (S.D.N.Y. 2001))).  Moreover, "[a] court considering a motion in limine may reserve judgment until trial so that the motion is placed in the appropriate factual context."  Ceballo, 2014 WL 4980554, at *1 (citing Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp., 937 F. Supp. 276, 287 (S.D.N.Y. 1996)).  In its discretion, the Court may also alter a prior in limine ruling at trial "when the case unfolds."  Luce, 469 U.S. at 41-42 ("The [in limine] ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the [movant's] proffer.  Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."); see also United States v. Ulbricht, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015) ("In limine rulings occur pre-trial,

and that fact has significance.  The evidence at trial may come in differently than anticipated, altering the solidity of the proffered basis for a pre-trial ruling.  The Court therefore invites parties who believe that the factual record as developed at trial supports a revised ruling to bring such an application in a timely manner.").

II.  Analysis

The Court will first address Defendant's motion and then each of those filed by the Government.

A.   Defendant's Motion

In his motion, Defendant asks the Court to preclude the Government from: (1) introducing evidence or argument related to a "right to control" theory; (2) introducing cooperation agreements and guilty pleas by witnesses; (3) eliciting testimony by Defendant's customers regarding what the customers "think the [psychic] mailings said"; (4) introducing evidence related to non-psychic services; (5) referring to corporate entities as "shell companies"; and (6) making appeals to jury emotion.  (See Def. Mot. at 1-5.)

1.   "Right to Control"

First, Defendant argues the Government should be precluded from utilizing the "right to control theory."  (See id. at 1 (citing United States v. Binday, 804 F.3d 558, 570 (2d Cir. 2015)).)  Pursuant to this theory, the Second Circuit has

5

"recognized that the property interests protected by the [mail and wire fraud] statutes include the interest of a victim in controlling his or her own assets," Binday, 804 F.3d at 570 (quoting United States v. Carlo, 507 F.3d 799, 802 (2d Cir. 2007)), and that "a cognizable harm occurs where the defendant's scheme 'den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions," id. (quoting United States v. Rossomando, 144 F.3d 197, 201 n.5 (2d Cir. 1998)).

Shortly after briefing concluded on Defendant's motion, the Supreme Court invalidated the Second Circuit's right to control theory of liability. See Ciminelli v. United States, 598 U.S. --, 2023 WL 3356526, at *3 (2023). In so ruling, the Supreme Court held that the fraud statutes reach "only traditional property interests," and "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest." Id. at *5 ("[T]he theory treats mere information as the protected [property] interest, [meaning] almost any deceptive act could be criminal."). Under Ciminelli, the Government "must prove not only that wire fraud defendants 'engaged in deception,' but also that money or property was 'an object of their fraud.'" Id. at *4 (quoting United States v. Kelly, 140 S.Ct. 1565, 1574 (2020)).

6

Because a fraud conviction cannot be based upon the right to control theory, Defendant asks the Court to preclude the Government from suggesting Defendant "defrauded his customers merely by depriving them of material information" in accordance with that theory. (Def. Mot. at 1.)  While the Court is bound by Ciminelli, the Government's charging theory here is not based upon victims' property rights to information.  (See Gov't Opp'n, ECF No. 72, at 2.)  Rather, the Government's theory is that Defendant intended to and tangibly harmed victims by causing money and personal property to be sent in response to psychic mail solicitations, which contained material misrepresentations as to the nature of the bargain.  (See id.)  Defendant cannot use Ciminelli as a shield to prevent the Government from introducing the misrepresentations or omissions underlying the alleged scheme to defraud under the guise of construing those same deceptions as exclusively relevant to a victim's property interest to "mere information" to render them unactionable.  See Ciminelli, 2023 WL 3356526, at *5.  For example, as previously stated in Runner I, Defendant's alleged misrepresentations "may, at a minimum, be directly related to the quality and nature of the bargain" for psychic services at issue.  Runner I, 2023 WL 2429610, at *9.  The Court does not interpret Ciminelli to undermine this conclusion from Runner I, which concerns the materiality of the fraudulent misrepresentations for purposes of establishing a scheme to

defraud and does not pertain to a victim's property right to potentially valuable economic information.

Accordingly, Defendant's first <u>in limine</u> request is GRANTED to the extent that the Government is precluded from utilizing a "right to control" theory; however, Defendant's request is DENIED to the extent that the Government is permitted to introduce evidence which shows victims were deprived of material information.

### 2. Cooperation Agreements and Pleas

Second, Defendant moves to preclude the Government from introducing the cooperation agreements and guilty pleas of his former business colleagues/co-conspirators. (Def. Mot. at 2.) In light of Defendant's position that "the entire charged conspiracy [i]s legally invalid" and that the cooperating co-conspirators "are innocent," he "does not currently intend to impeach the[m]" nor attack their credibility because "they pled guilty or . . . are trying to curry the [G]overnment's favor." (<u>Id.</u>) Consequently, he argues the Government should be precluded from eliciting the terms of the cooperation agreements and guilty pleas on direct examination. (<u>Id.</u>) The Government opposes, arguing it should be permitted to elicit such testimony on direct to, <u>inter alia</u>: (1) "enabl[e] the jury to properly assess the credibility of the witnesses"; and (2) "prevent any jury confusion about whether . . . the witnesses have been criminally charged and the

reasons surrounding that decision." (Gov't Opp'n at 2.) The subject testimony is limited to three cooperators. (Id.)

It is well-established that the prosecution "may not introduce the bolstering aspects of a cooperation agreement unless and until the witness's credibility has been questioned in ways that 'open the door' to the admission of the agreement." United States v. Certified Env't Servs., Inc., 753 F.3d 72, 86 (2d Cir. 2014); see also United States v. Williams, 787 F. App'x 8, 10 (2d Cir. 2019) ("Where an opening statement 'sufficiently implicates the credibility of a government witness,' we have held, 'testimonial evidence of bolstering aspects of a cooperation agreement may be introduced for rehabilitative purposes during examination." (quoting United States v. Cosentino, 844 F.2d 30, 33 (2d Cir. 1988))). This restriction, however, does not apply to the "impeaching aspects" of a cooperation agreement, which the Government is "free to introduce even on the witness's direct examination." Certified Env't Servs., 753 F.3d at 86; see also Cosentino, 844 F.2d at 33 ("It may sometimes be useful, however, to develop impeaching matter in direct examination of a 'friendly' witness in order to deprive an adversary of the psychological advantage of revealing it to the jury for the first time during cross-examination. We have accordingly held that impeaching aspects of cooperation agreements may be brought out in the government's direct examination of a witness who testifies

pursuant to such an agreement." (citing United States v. Borello, 766 F.2d 46, 57 (2d Cir. 1985))).

The Government acknowledges these principles and is well-aware of the parameters within which it may utilize the cooperation agreements and guilty pleas of its witnesses on direct examination. (See Gov't Opp'n at 2-4.) The Court does not share Defendant's concern that the Government will improperly or prematurely bolster the cooperators' credibility (see Def. Mot. 2-3; Def. Reply at 1); nor does the Court find sufficient grounds exist to preclude the highly relevant cooperation agreements or guilty pleas.

Particularly with respect to the cooperators' guilty pleas, Defendant argues this evidence is "extremely prejudicial" and the "natural human tendency" for jurors would be to "improperly consider [these] pleas as probative" of Defendant's own guilt. (Def. Mot. at 2 (quoting United States v. Prawl, 168 F.3d 622, 626 (2d Cir. 1999)).) Defendant relies upon Prawl to demonstrate the prejudicial effect of introducing such pleas; however, Prawl notes this prejudice in the context of discussing why a limiting instruction "is necessary" should a plea be introduced. See Prawl 168 F.3d at 626 (citing Gov't of Virgin Islands v. Mujahid, 990 F2d 111, 115 (3d Cir. 1993)). As stated by the Second Circuit in Prawl, "[a] limiting instruction is justified when evidence - such as the guilty plea of a testifying co-defendant - is admissible

for a limited purpose but might also be considered for a purpose that is impermissible." Id. (citing FED. R. EVID. 105). "When a plea is introduced for any proper reason, . . . the district court, when asked, should instruct the jury that the co-defendant's plea may not be considered as evidence of the defendant's guilt." Id.

Thus, the appropriate remedy to address Defendant's stated Rule 403 concerns with the cooperation agreements and guilty pleas is not wholesale preclusion at the in limine stage, but rather, the issuance of a limiting instruction once trial commences. Accordingly, Defendant's second request is DENIED.

3.   Customers' Recollections of the Mailings' Contents

Defendant's third in limine request seeks to preclude testimony from customers "about what they think the mailings said, and instead require proof of the mailings themselves." (Def. Mot. at 3.) For example, Defendant highlights Government witness Ingrid Wolf who "purchased services from over 70 separate mailings" but then threw those mailings "in the garbage." (Id. at 3.) According to Defendant, Wolf's Section 3500 material suggests the Government will elicit testimony from her regarding "her recollection of what the mailings generally said," e.g., "beautiful promises" "from a psychic named Maria Duval" who "informed Wolf that she was going to soon win a large sum of money" if she "perform[ed] certain acts." (Id. (quoting GOV-08629936).)

11

In its opposition to this request, the Government begins by noting that Defendant was provided "substantial proof of the content of the mailings sent to victims of this scheme, even where those victims did not provide copies of the specific mailings they received." (Gov't Opp'n at 4.) The Government maintains that Defendant's operation used "nearly identical mass-mailings" based on templates, and that the Government identified each offered "promotion" by a distinct three-letter code in discovery. (Id.) As such, the Government has provided Defendant: "(1) the specific mailing at issue provided by the identified victim; or (2) where that original mailing was not available, a document from the scheme's printer containing the same bulk outgoing mailing as the letter the victim received, identified either by the keycode on the mailing or the approved template for that outgoing mass-mailing." (Id.) Thus, the Government does not intend to offer testimonial evidence from the victims in lieu of introducing the actual language of the mailings; rather, the Government will elicit testimony about the impressions the letters created in the minds of the victims and, inter alia, whether the mailings had "the intended effect on the victim." (See id.) More specifically, the proffered testimony will show the mailings "created the impression in the mind[s] of the victims that Maria Duval was corresponding with them personally and was offering personal services to improve their lives and help them win money." (Id. at 5.)

12

Where the original mailing received by a victim is unavailable, as with Wolf, nothing in the Government's opposition leads the Court to believe that the prosecution will utilize testimonial evidence as a substitute for the actual contents of the mailings.  To the extent the proffered evidence differs from this expectation, defense counsel is not prevented from lodging an objection or cross-examining the witnesses as to the language within the letters they purportedly received.  Further, although Defendant concedes the Government "can elicit testimony about why customers responded, what writings they focused on, and what inferences or beliefs they derived from the writings," he simultaneously argues against customers testifying about their "impressions of what the mailings actually said."  (Def. Reply at 2.)  The Court is perplexed by the distinction Defendant is attempting to draw here.  Certainly, the Government can elicit testimony as to the witnesses' "inferences or beliefs" derived from the mailings, as well as the impressions the letters imparted for purposes such as demonstrating the materiality of the alleged misrepresentations or Defendant's intent.  See Runner I, 2023 WL 2429610, at *10 ("Whether customers chose to purchase Defendant's goods and services purely for entertainment or whether the customers had any expectations for those goods and services are matters the parties are free to address with the jury at trial."

(citing _United States v. Guadagna_, 183 F.3d 122, 129 (2d Cir. 1999))).

Accordingly, Defendant's third _in limine_ request is GRANTED to the extent that the Government shall not introduce victim testimony in lieu of the psychic mailings; however, this request is DENIED to the extent that the Government may elicit the victims' impressions of the mailings.

### 4.   Non-Psychic Services

Citing _Runner II_, which precluded the Government from referring to an uncharged aspect of Defendant's mail operation related to weight-loss and nutritional supplement mailings, Defendant objects to several Government exhibits which "refer explicitly to weight-loss and other non-psychic products." (Def. Mot. at 4 (citing _Runner II_, 2023 WL 3092915, at *2-3).) Although the defense has identified several potentially problematic exhibits (_see id._), the Government has agreed to redact "product names and other nutritional products from its exhibits" (_see_ Gov't Opp'n at 5). Further, Defendant has agreed to "postpone addressing the admissibility of the specific exhibits mentioned" until trial so that the exhibits, if introduced, are placed in the appropriate context. (_See_ Def. Reply at 2.) Accordingly, Defendant's fourth _in limine_ request is DENIED WITHOUT PREJUDICE TO RENEW.

5.   <u>Shell Companies</u>

Next, Defendant seeks to preclude the Government and its witnesses from referring to the corporations involved in the mail operation as "shell companies." (Def. Mot. at 4-5.) In support of this argument, Defendant cites <u>United States v. Watts</u>, which held the term "'shell company' . . . could be perceived to have a pejorative meaning" and that use of the term adds "[n]o evidentiary value." (<u>Id.</u> at 5 (quoting <u>United States v. Watts</u>, 934 F. Supp. 2d 451, 482 (E.D.N.Y. 2013)).) The Government asks the Court to overlook <u>Watts</u> and permit references to the term, noting any such use of "shell company" will be "de minimis" during its case-in-chief, closing argument, and witness examinations. (<u>See</u> Gov't Opp'n at 6-7.) The Government intends to demonstrate that Defendant "created entities for the purpose of disguising his involvement and otherwise concealing himself and his mail operation from authorities, for example, by creating a business entity in Hong Kong where his mailing operation had no presence and conducted no business." (<u>Id.</u> at 7.)

While the Court is cognizant that references to Defendant's various entities as shell companies "could be perceived to have a pejorative meaning," <u>see</u> <u>Watts</u>, 934 F. Supp. at 482, the Court believes the term at issue is neutral, should the Government be able to establish a factual predicate that shows the subject entities are shell companies prior to usage of the

15

descriptive term, see Wherevertv, Inc. v. Comcast Cable Commc'ns, LLC, No. 18-CV-0529, 2023 WL 2664200, at *5 (M.D. Fla. Mar. 28, 2023) (denying without prejudice motion to exclude reference to "shell company"); H&L Farms LLC v. Silicon Ranch Corp., No. 21-CV-0134, 2023 WL 1795705, at *6 (M.D. Ga. Feb. 7, 2023) ("If there is evidence that any of the defendants is a shell corporation (a corporation with no active business that exists only in name as a vehicle for another company's business operation), then Plaintiffs shall not be precluded from using the term 'shell company.'"); DNT, LLC v. Sprint Spectrum, LP, No. 09-CV-0021, 2010 WL 582164, at *4-5 (E.D. Va. Feb. 12, 2010) (finding "shell company" to be a "neutral term[]" and permitting references should the term be "accurate"). As such, Defendant's request to preclude references to "shell companies" is DENIED WITHOUT PREJUDICE.

### 6. Appeals to Jury Emotion

In his last in limine request, Defendant asks the Court to preclude four types of "irrelevant appeals to jury emotion": (1) references to negative publicity on the Internet about Maria Duval, including those describing her mailings as a "scam"; (2) 730 pages of Better Business Bureau ("BBB") complaints; (3) 50 letters to Duval from non-testifying customers; and (4) evidence of witnesses' "vulnerability that is divorced from materiality." (Def. Mot. at 5.)

a.   <u>Internet Publicity on Duval</u>

First, as to the Internet references concerning Duval and her "scam," Defendant submits there is "no indication" these statements were made by consumers and that "the word 'scam,' without more, could simply refer to the practice of selling astrology products to the elderly . . . which the [G]overnment does not contend is fraud." (<u>Id.</u>)  Defendant also argues that his knowledge, if any, of this evidence is irrelevant and would improperly suggest that the products he sold are fraudulent. (<u>See id.</u>)  In its opposition, the Government submits that this evidence is relevant to Defendant's knowledge and intent. (<u>See</u> Gov't Opp'n at 7.)

At trial, the Government will proffer an exhibit marked as GX 100, an email by one of the mail operation's payment processors to Mary Thanos, a co-conspirator, which Thanos forwarded to Defendant and other individuals. (<u>See id.</u>)  The email from the payment processor informs Thanos that the negative publicity about Duval "has started to become quite a problem" and that the processor's "main USA bank, Bank of America, printed out some of the internet 'scam alert' pages on Maria Duval and brought them to a compliance meeting at [its] office." (<u>Id.</u>; GX 100.) The Government does not intend to offer these references to matters on the Internet "to show the existence of websites describing Maria Duval as a 'scam,' but to show both notice of . . . online

complaints to Mr. Runner and his co-conspirators and how Mr. Runner and his co-conspirators responded." (Gov't Opp'n at 7.) The Court is persuaded by the Government's argument and finds that references to the online publicity are highly relevant of Defendant's intent to defraud, especially where, as here, the evidence indicates Defendant was directly advised of the matters by one of his co-conspirators. Accordingly, this aspect of Defendant's motion is DENIED.

b.   BBB Complaints

Second, with respect to the BBB complaints, the Court previously denied Defendant's request to exclude them. See Runner II, 2023 WL 3092915, at *3-4. Although the documentation described by Defendant is voluminous (see Def. Mot. at 5), the Government submits that GX 467, the more than 700-page exhibit at issue containing the BBB complaints, has already been parsed down (see Gov't Opp'n at 8). GX 467 consists of complaints lodged with the BBB of Northern Nevada "where the records reflected that one of Mr. Runner's co-conspirators responded to the complaint," and the Government "excluded any BBB complaints for which it did not possess evidence that the complaint was received by members of the conspiracy." (Gov't Opp'n at 8.) Although the Court has concerns that the Government's proffer of GX 467 may be excessive and present cumulative evidence, the Court will not preclude GX 467 at

this time.    Therefore, Defendant's motion is DENIED WITHOUT PREJUDICE.

c.    <u>Customer Letters to Duval</u>

Next, the Court considers the letters marked GX 411 through GX 462, which are letters sent by customers to Duval.  The Government states that these letters were "sent to the Post Office Boxes where the scheme received victim mail and payments, and subsequently thrown in the trash by the caging service on Long Island that received, opened, and processed victim responses and payments."  (<u>Id.</u>)  The letters, many of which indicate that the victims had "troubles in their lives," were then collected by Postal Inspectors from the trash "outside the caging service on four separate occasions between May and November of 2014."  (<u>Id.</u>) The Government intends to utilize these letters to demonstrate: (1) Defendant and his co-conspirators were aware that victims regularly wrote to Duval; (2) "the operation of the scheme"; and (3) "the impression the mailings created on the minds of the recipients as circumstantial evidence of Mr. Runner's intent to defraud."  (<u>Id.</u>)

Although the manner in which the caging service processed the responses and payments from victims is relevant to how Defendant's scheme operated, the Court will not endorse the wholesale admittance of the contents of the letters at this time.

In addition to concerns regarding the excessive and cumulative nature of the letters, it is unclear whether any of the letters were read by Defendant's co-conspirators prior to them being thrown in the trash. Absent Defendant's or his co-conspirator's knowledge of what the victims wrote in the letters, the Court is not convinced that the contents of the letters are circumstantial evidence of intent, as argued by the Government. Accordingly, the Court is DEFERRING ruling on the admissibility of the letters until trial.

### d.   Appeals to Jury Emotion

Last, Defendant asks the Court to prevent the Government from eliciting testimony from victims regarding their "vulnerability" that is "divorced from materiality." (Def. Mot. at 5.) For example, Defendant asks to preclude witnesses from testifying about whether they are a "veteran, cancer survivor, or a widow," as such evidence is "not relevant to the witness's perceived value of representations that products came from a psychic, or that they appeared personalized or unique." (Id.) In response, the Government argues that the solicitation letters contained misrepresentations that Duval "had individualized knowledge of the hardships in victims' lives," that their lives had potential for improvement, and that she "was offering personalized assistance to ameliorate those hardships." (Gov't Opp'n at 9.) Based upon the "nature of the misrepresentations,

20

testimony from victims regarding their understanding of the solicitations and reasons for responding will inevitably include some description of the hardship in their lives." (Id.)

The hardships present in the lives of some of the victims who responded to the solicitations certainly appear intertwined with the reasons as to why those victims responded to Defendant's letters. (See id.)  In support of his own motion, Defendant even conceded that victims may testify about why they responded to the mailings. (See supra at 13 (quoting Def. Reply at 2).)  However, the Government does not clarify in its opposition what sort of hardships the testifying victims experienced, thereby stymying the Court's ability to determine whether such evidence will be admissible at trial.  Accordingly, the Court is DEFERRING ruling upon this request until trial, so that the victims' anticipated testimony may be placed in the appropriate context.

B.   The Government's Motions

The Government's four motions consist of the following requests: (1) to permit remote testimony by one victim (Gov't Mot. I); (2) to preclude Defendant from advancing an advice of counsel or good faith defense (Gov't Mot. II); (3) to introduce summary exhibits (Gov't Mot. III); and (4) to preclude Defendant's proposed expert (Gov't Mot. IV; Gov't Supp. Mot. IV, ECF No. 69).

1.  <u>Remote Testimony</u>

First, the Government asks the Court to permit remote trial testimony by one witness, who is identified as "B.C." and is the victim noted in Count Six of the Indictment.  (Gov't Mot. I at 2-3.)  B.C. is 81-years-old, resides in Wyoming, and has underlying medical conditions which require her to use oxygen throughout the day.  (<u>Id.</u>)  Although the Court generally requires witnesses to testify in-person, the Court will permit B.C. to testify virtually in light of her location, age, health, and Defendant's consent to the Government's application.  (<u>Id.</u> at 1 ("This motion is unopposed, upon the condition that the witness is not amongst the first two of the [G]overnment's case-in-chief.  The [G]overnment will honor that condition.").)  The Government has indicated that the U.S. Postal Inspection Service will either provide B.C. with access to a facility near her home where there is appropriate video-teleconferencing equipment, or bring the equipment to B.C.'s home.  The Court takes no position on where the witness testifies, so long as the Government ensures that she is provided with the necessary equipment to enable her to do so. Accordingly, the Government's first motion is GRANTED.

2.  <u>Advice of Counsel and Good Faith</u>

The Government's second <u>in limine</u> motion asks the Court to preclude the defense from arguing, eliciting testimony, or introducing evidence regarding: (1) an advice of counsel defense;

(2) the role attorneys played in Defendant's mail operation; and (3) Defendant's good faith concerning the legality of the operation. (Gov't Mot. II at 1.) Alternatively, the Government asks for: (1) Defendant to disclose all attorney-client communications, work-product, and similar material; and (2) a ruling on the sufficiency of any advice-of-counsel defense and the admissibility of any evidence concerning good faith. (Id.) On two occasions, Defendant has assured the Government that it does not intend to present an advice of counsel defense, therefore, the Government's request to preclude such a defense is DENIED AS MOOT.

According to the Government, Defendant "has been more equivocal about the role of counsel vis-à-vis 'good faith.'" (Id.) Despite the fact that Defendant does not intend to assert an advice of counsel defense at trial, the Government appears to be utilizing this stated intention as a pretext to preclude Defendant from advancing argument or introducing evidence regarding the role any attorneys played in Defendant's operation relevant to a good faith defense. (See Def. Opp'n to Gov't Mot. II ("Def. Opp'n II"), ECF No. 74, at 1.) To wit, the Government argues where, as here, "the defense . . . cannot satisfy the elements of the advice-of-counsel defense, a limited 'good faith' defense is inappropriate." (Gov't Mot. II at 3.) Although the scope of the good faith defense Defendant may advance at trial is largely unclear to the Court, Defendant's opposition indicates he may utilize such a defense

premised upon "a co-conspirator's reliance on the advice of counsel that is communicated to defendant," which does not trigger pre-trial notice or disclosure requirements. (See Def. Opp. II at 3.) The Government even acknowledges case law that indicates a limited good faith defense premised upon "indirect legal advice, such as that provided to a third party and relayed to a defendant." (Gov't Mot. II at 3 n.2 (citing United States v. Hagen, 542 F. Supp. 3d 515 (N.D. Tex. 2021)).) Defendant notes that the Government's exhibits contain evidence of co-conspirators' communications with counsel, and presumes that those witnesses will testify about those exhibits on direct examination. (Def. Opp'n II at 3.) Thus, to the extent the Government's motion can be construed as a request to prevent Defendant from cross-examining the co-conspirators as to those communications, which are non-privileged and within the Government's possession, any such request is DENIED.

Without any further insight as to Defendant's potential good faith defense, the Court is unable to make a pre-trial ruling regarding the admissibility of the evidence Defendant may use, the defense's legal sufficiency, or whether any further disclosures by the defense are warranted. Thus, the remaining aspects of the Government's second motion are DENIED WITHOUT PREJUDICE. The Court will reassess this ruling upon request by the Government as the trial unfolds.

In the interim, to ensure that there will be no delay during trial, Defendant is directed to file an ex parte letter under seal and advise the Court as to the scope of his good faith defense, particularly whether it implicates (a) any advice of counsel beyond the "indirect legal advice" described supra or (b) any privileged material that the Government's filter team provided to Defendant during discovery.  This letter shall be filed within one week of the date of this Memorandum & Order.

### 3. Summary Exhibits

The Government's third motion seeks to introduce summary exhibits without admitting into evidence the underlying data. (Gov't Mot. III at 1 (citing Fed. R. Evid. 1006).)  Defendant likewise intends to introduce summary exhibits under these circumstances and does not oppose this motion.  (Id.)

The summary exhibits at issue contain information derived from a "Customer Relationship Management" ("CRM") software called "Order Motion" that was utilized by Defendant's mail operation.  (Id.)  The software was used to track and fulfill customer orders and to collect personal and financial information, along with other data, for Defendant's customers.  (Id.)  The Government obtained CRM data for Defendant's alleged victims from the 1999 to 2014 period, which includes names, addresses, dates of birth, full transaction histories, and private information victims submitted in response to the psychic mailings.  (Id.)  This data

encompasses more than six million transactions involving more than one million different individuals. (Id.) If printed, the CRM data is at least 400,000 pages. (Id.) Further, the data cannot be redacted to remove the customers' identifying information. (Id.)

Both sides intend to proffer the CRM data in summary form and feature "several basic calculations, such as total dollar amounts paid by victims, the number of victim payments by month or year, . . . the overall total of victim payments, as well as payments by specific victims." (Id. at 2.) Given the voluminous nature of the CRM data and the inability to make appropriate redactions, the Government's motion to introduce summaries of the CRM data without admitting the underlying data is GRANTED.[1]

4.   Defendant's Expert

In its fourth motion, the Government seeks to preclude Defendant's expert, Professor David Gal, from testifying at trial. (See Gov't Mot. IV.) According to Defendant's expert disclosures and his opposition to the instant motion, Professor Gal is a Professor of Marketing at the University of Illinois and is an expert in consumer psychology decision-making, marketing techniques and industry practice, and survey design. (Def. Initial

---

[1] The parties have stipulated to the admissibility of their respective summary exhibits derived from the Order Motion data. (See Order Motion Summaries Stip., ECF No. 87.)

Expert Disc., ECF No. 61, at 1.)   Defendant separates Professor Gal's testimony into two categories: valuation testimony and industry practice testimony.   (Def. Opp'n to Gov't Mot. IV ("Def. Opp'n IV"), ECF No. 73.)   The anticipated testimony concerning valuation will consist of the following opinions:

> 1.   It is well-accepted in consumer psychology that repeat purchase of a product is generally determined by satisfaction with that product—as opposed to, for example, the seller's persuasive messaging.  Applying this principle to, among other things, the purchase history of the expected customer witnesses, the sales and repeat-purchase data for all customers compared to industry norms, and the mailings and products, Prof. Gal will opine with high confidence that this information is consistent with a high level of customer satisfaction.

> 2.   It is well-accepted in consumer psychology that refund rates lower than retail standards generally indicate customer satisfaction.  Applying this principle to, among other things, customer refund information derived from the operation's sales data and the refund guarantees in the mailings, Prof. Gal will opine with high confidence that this information is consistent with a high level of customer satisfaction.

> 3.   It is well-accepted in consumer psychology that customers value how products make them feel (hedonic value), not just their usefulness.  Applying this principle to, among other things, the mailings and products, Prof. Gal will opine with high confidence that the product value of the products and services was in large part hedonic.

> 4.   It is well-accepted in behavioral science that a response sample to a survey measuring attitudes or beliefs must be representative

27

and unbiased, and that questionnaires not lead
to biased responses.  Applying this principle
to, among other things, the questionnaire the
government sent to customers, Prof. Gal will
opine with high confidence that the survey was
biased, failed to capture customers who did
not feel harmed, and captured biased
responses.

(Id. at 4.)  Professor Gal's opinions concerning industry practice

will consist of:

> 1.   Personalization, including use of the
> customer's name, print that looks like
> handwriting, and phrases like "for you," are
> standard industry practice.
>
> 2.   Using lead generators to acquire
> customers, and maximizing lifetime customer
> value through repeat purchase, is standard
> industry practice;
>
> 3.   Addressing customer complaints by
> issuing refunds is standard industry practice
> to keep customers satisfied, decrease poor
> publicity, and avoid regulatory scrutiny.
>
> 4.   Customer mailing lists, including lists
> that target elderly customers, are standard
> industry practice, and elderly customers are
> a standard market segment.

(Id.)

Defendant will proffer these opinions based upon

Professor Gal's "training and experience as a professor and

academic researcher and during previous periods of employment in

the marketing industry, as well as [his] publications."  (Def.

Initial Expert Disc. at 2.)  In formulating his opinions, Professor

Gal also relied upon "hundreds of pages of mailings, letters,

depictions of objects, and other case-related materials in the 'Victim Documents' from the Government's Production." (Def. Supp. Expert Disc., ECF No. 68, at 1.)

a. <u>Admissibility of Expert Testimony</u>

The admissibility of expert testimony is governed by Rule 702, which allows the testimony of "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

While the party seeking admission of the expert testimony bears the burden of demonstrating its admissibility, <u>see In re Vivendi, S.A. Sec. Litig.</u>, 838 F.3d 223, 253 (2d Cir. 2016), under Rule 702, district courts perform a "'gatekeeping role' by 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" <u>United States v. Napout</u>, 963 F.3d 163, 187-88 (2d Cir. 2020) (quoting <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993)). In fulfilling its role as gatekeeper, the district court "should look

to the standards of Rule 401 in analyzing whether [the] proffered expert testimony is relevant." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).

"Next, the district court must determine 'whether the proffered testimony has a sufficiently "reliable foundation" to permit it to be considered.'" Amorgianos, 303 F.3d at 265 (quoting Daubert, 509 U.S. at 597). The Court "should consider the indicia of reliability identified in Rule 702." Id. "In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Id. at 265-66 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

In addition to the indicia of reliability identified in Rule 702, "Daubert enumerated a list of additional factors bearing on reliability that district courts may consider." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). These additional factors include:

> (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained

> general acceptance in the relevant scientific
> community.

Id. (quoting Daubert, 509 U.S. at 593-94).  Importantly, the additional factors enumerated in Daubert are not intended to constitute "a 'definitive checklist or test.'"  Amorgianos, 303 F.3d at 266 (quoting Daubert, 509 U.S. at 593).  Instead, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one, and 'the gatekeeping inquiry must be tied to the facts of a particular case.'"  Id. (alterations in original) (first quoting Daubert, 509 U.S. at 594, then quoting Kumho Tire, 526 U.S. at 150).

### b.   Whether Professor Gal May Testify

The Government seeks to preclude Professor Gal's proffered testimony on two grounds: (1) his testimony "is unnecessary to explain familiar, uncomplicated concepts"; and (2) his testimony "is not helpful, reflects no reliable principles and methods or their reliable application, and has little probative value when weighed against its prejudicial effects, confusion of issues, and misleading the jury."  (Gov't Supp. Mot. IV at 2.)[2]

### i.   Necessity of Expert Opinion

The Government's first objection to Professor Gal's testimony is premised upon the argument that his opinions "can be obtained through questioning lay witnesses who witnessed events in person," particularly, "three insiders" from Defendant's operation

---

[2] The Government does not object to Professor Gal's qualifications.

that the Government will call to testify.  (Gov't Supp. Mot. IV at
2 (citing <u>United States v. Ray</u>, 583 F. Supp. 3d 518, 540-43
(S.D.N.Y. 2022)).)  With the exception of one of the eight areas
of Professor Gal's testimony, which concerns bias associated with
questionnaires the Government sent to victims, the Government
submits that the other seven areas of testimony "on marketing are
basic sales concepts familiar to any consumer in America" and do
not require expert opinion.  (<u>Id.</u> & n.1.)  In opposition, Defendant
argues "the principles and methods of consumer psychology and
behavioral science are technical and scientific--they are not
opinions a customer or 'insider' would be qualified to give." (<u>See</u>
Def. Opp. IV at 5-6.)

        The Court is not persuaded by the Government's citation
to <u>Ray</u>, which consists of a cherry-picked quotation, and declines
to preclude Professor Gal's testimony on the basis that his
anticipated testimony should be elicited from lay witnesses.  To
wit, the Government cites <u>Ray</u>, where the court excluded the
defendant's expert and suggested the defense should offer "lay
testimony from percipient witnesses." (Gov't Supp. Mot. IV at 2
(quoting <u>Ray</u>, 583 F. Supp. 3d at 540).)  To provide additional
context for this quotation, the portion of <u>Ray</u> to which the
Government refers states as follows:

        In this case, there is a distinct danger that
        Dr. Pierre's testimony will confuse the jury
        and cause unfair prejudice to the Government,

and those dangers far outweigh any probative
value that his testimony could provide. As he
himself explained at the Daubert hearing, Dr.
Pierre's opinion that Ray suffers from
"specific" and "firmly-held" delusions does
not reflect a clinical diagnosis but is based
on his four one-hour interviews of Ray—which
he accepted at face value—and his comparison
of Ray's statements during the interviews with
the medical records he requested, and a
handful of records selected by counsel for the
defense. On the basis of those interviews and
that review of evidence, he is prepared to
testify that Ray suffers from "delusion-like
beliefs and belief in primarily a conspiracy
theory" because Ray "believes that for many
years he's been the victim of poisoning as
well as other forms of persecution or
harassment as a coordinated attack on him.
Not just by a few central figures, but by a
larger conspiracy of figures who are basically
in cahoots with those individuals." But, as
further explained below, the latter testimony
regarding what Ray "believes" is not expert
testimony at all. It is a regurgitation of
the defense uttered through the mouth of an
expert. If the defense wishes to put on
evidence regarding Ray's beliefs, assuming
that such evidence is relevant, it can do so
through lay testimony from percipient
witnesses who can be subject to cross-
examination. It would only confuse the jury
and prejudice the defense for Dr. Pierre to
reiterate what would otherwise be considered
to be hearsay and attach to it the expert
label.

Ray, 583 F. Supp. 3d at 540 (internal citations omitted). The

Court finds the instant circumstances wholly distinguishable,

primarily because Professor Gal is not expected to testify about

what Defendant "believes" or "regurgitat[e] the defense." See id.

The Government's next contention is that Professor Gal's testimony is not reliable, will not assist the jury, and is irrelevant. (See Gov't Supp. Mot. IV at 2.)  The Government argues that Professor Gal's testimony is not reliable because he "employs no methodology and merely offers unsubstantiated opinion" and that his testimony is not helpful because "whatever analysis [he] has done, it was long after the end of the charged conspiracy and thus cannot illuminate Mr. Runner's intent between 1994 and 2014." (Id. at 2-3 (citing United States v. Gatto, 986 F.3d 104, 117-18 (2d Cir. 2021)).)  The Government also submits that "the proffered testimony invites acquittal on improper grounds, as the expert would presumably opine that Mr. Runner used some of the same basic marketing techniques that legitimate businesses use," and that the testimony "would shift the focus of the trial and responsibility for Mr. Runner's scheme to the victims." (Id. at 3.)  Further, the Government argues "[t]here is no grounding in the methods and procedures of Professor Gal's field, here, and it does not take an expert to point out to the jury that the CRM database shows a small percentage of victims received refunds." (Id. at 4.)

### ii.  Reliability

As to the reliability of Professor Gal's testimony, the Government attempts to force his opinions into the Daubert framework set forth above, which is not necessarily applicable to a "non-scientific regulatory expert" such as Professor Gal.  In re

_Mirena IUD Prod. Liab. Litig._, 169 F. Supp. 3d 396, 480 (S.D.N.Y. 2016) (citing _Kumho Tire_, 526 U.S. at 152).  "Sometimes, expert testimony does not rest on traditional scientific methods.  In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that '[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called general truths derived from . . . specialized experience.'" _Davis v. Carroll_, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (quoting _Kumho Tire_, 526 U.S. at 149-50).  As stated by the Court above, the inquiry under _Kumho Tire_ is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  See _supra_ Section II(B)(4)(a).

While the Court is cautious of Professor Gal's testimony, the Government has not objected to his qualifications. In light of Professor Gal's background and area of expertise in behavioral science, consumer psychology, marketing, and survey design, the Court will not preclude his testimony at this stage of the inquiry.  If, as trial unfolds, his testimony "is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," the Court will reconsider this ruling. _Davis_, 937 F. Supp. 2d at 413 (quoting _Zerega Ave. Realty Corp. v._

Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 (2d Cir. 2009)).  "This is particularly true where a field is characterized by established standards for arriving at expert conclusions and a proposed expert fails to engage with those standards, departs from them in a report, or cannot cite published works in support of a position."  Id. (citing Dev. Specialists, Inc. v. Weiser Realty Advisors LLC, No. 09-CV-4084, 2012 WL 242835, at *8 (S.D.N.Y. Jan. 24, 2012)).

### iii. Relevance

Next, the Court considers the relevancy of Professor Gal's opinions.  The Government heavily relies upon Gatto, a case where the defendants were convicted of engaging in a scheme to defraud three universities.  Gatto, 986 F.3d at 109.  The Gatto defendants paid thousands of dollars to high school athletes to induce them to attend universities and then covered up the payments to enable the recruited athletes to certify to the universities that they complied with the NCAA's rules against student-athletes from being paid.  Id. at 109-10.  At trial, the defendants intended to call an expert to discuss "quantitative and qualitative" benefits "that a successful men's basketball program bestows upon a university," which "would have proven they intended to help, not harm, the schools" when they paid the recruits.  Id. at 117.  The trial court did not permit the expert to testify, finding: (1) the expert would not have been helpful because his testimony was based

36

on a study conducted in preparation for litigation and would shed no light on the defendants' states of mind; and (2) the testimony was substantially more prejudicial than probative because it "could have invited improper acquittals by enticing the jury to base its decision on the perceived unreasonableness or unfairness of the NCAA's amateurism rules." Id. at 117-18. The Second Circuit affirmed, finding the expert's testimony would have been substantially prejudicial:

> No doubt, universities stand to profit if their men's basketball programs are successful. It is even possible, as Defendants' expert would have suggested, that a cost-benefit analysis would reveal that universities come out net-positive when they commit recruiting violations. But this does not help Defendants. The law is clear: a defendant cannot negate the fraud he committed by wishing that everything works out for his victim in the end. That the Universities might have ultimately benefitted monetarily from having top tier recruits would not have changed whether Defendants were guilty of wire fraud, and the evidence might have clouded the issue for the jury.

Id. at 118 (citations omitted).

With respect to Professor Gal's valuation testimony, Defendant agrees with the holding in Gatto to the extent that a defendant's belief "that he will ultimately be able to work things out so that the victim suffers no loss" is not a defense to fraud charges. (Def. Opp'n IV at 3. (emphasis in original).) Rather, Defendant essentially argues he did not intend to cause any

cognizable harm in the first place, such that he did not believe he would "ultimately be able to work things out," rendering <u>Gatto</u> inapplicable here.  (<u>Id.</u>)  Defendant similarly argues Professor Gal's industry practice testimony is admissible and distinguishable from the expert in <u>Gatto</u> because: "[T]he point here is not that marketers commit fraud because the law is unreasonable or unfair.  [The point] is that industry practice shows that the marketing in this case was not fraudulent or material." (<u>Id.</u> at 2.)

This case certainly asks the Court to walk a fine line with respect to admitting expert testimony that could potentially raise an improper defense as suggested by the Government, which would run afoul of <u>Gatto</u>.  However, a distinguishing feature between this case and <u>Gatto</u> is that Professor Gal's opinions, particularly those as to valuation, are highly relevant to the materiality of Defendant's alleged misrepresentations, which go directly to the quality of Defendant's goods and services and the ultimate bargain, and are inextricably intertwined with Defendant's intent such that they will be helpful to the jury. See <u>Runner I</u>, 2023 WL 2429610, at *8-9 ("[T]he problems with the services and goods received by [Defendant's] customers, as alleged by the Indictment and argued by the Government, is that they were not personalized or unique, nor were they provided by [the psychics] advertised in the letters.  Whether Defendant's

customers were actually harmed and received less than what they bargained for is not an issue the Court can or should reconcile at [the motion to dismiss stage]. . . .  In large part, the worth of the psychic goods and services offered by Defendant through the Direct Mail Operation is derivative of, <u>inter alia</u>, the entertainment or informational value placed upon them by customers.  The evidence at trial may even demonstrate the absence of injury on the part of Defendant's clientele. . . .  [And] [t]he alleged misrepresentations here regarding the identity of the psychic and the personalization of the goods and services, may, at a minimum, be directly related to the quality and nature of the bargain at issue.").  Cf. <u>United States v. Gatto</u>, No. 17-CR-0686, 2019 WL 266944, at *10 (S.D.N.Y. Jan. 17, 2019) ("Defendants' relevancy argument . . . essentially was that had this [expert] testimony on the significant, subsequent economic benefit of recruiting elite student-athletes to NCAA Division I universities been admitted, the jury might have inferred that the fact of a student-athlete's ineligibility was not 'capable of influencing' the Victim Universities.  The Court was not persuaded.  Generalized testimony concerning the quantitative benefits of recruiting five-star high-school men's basketball players without controlling for the student-athletes' eligibility to compete at best would have been only tenuously relevant to the jury's materiality inquiry in this case."), aff'd, 986 F.3d 104 (2d Cir. 2021).

While the potential for prejudice and jury confusion is certainly present by admitting Professor Gal's testimony, as was the case in Gatto, the Court does not find that those same Rule 403 concerns substantially outweigh the significant relevance of his valuation testimony to justify preclusion.  The Court will consider a proposed limiting instruction to assuage these concerns.  Accordingly, the Government's motion to preclude Professor Gal from testifying as to opinions concerning valuation is DENIED.

Focusing on Professor Gal's proffered industry practice opinions, Defendant submits that such testimony is relevant to intent because it "will permit the jury to compare aspects of the business which the [G]overnment contends were hallmarks of fraud to standard industry practice regarding" "personalization techniques in mailings," "use of lead generators to identify customer demand . . . to maximize value through repeat purchase," "the use of refunds to address customer complaints," and "the use of rental lists that target the elderly."  (Def. Opp'n IV at 6.)

Certain of Professor Gal's industry practice opinions may be of dubious value, i.e., those regarding the availability of refunds.  See Runner I, 2023 WL 2429610, at *10 (rejecting Defendant's argument that "the availability of refunds on product order forms" mitigates fraudulent intent (citing United States v. Kenner, 272 F. Supp. 3d 342, 412 (E.D.N.Y. 2017))); see also United States v. Lizza, No. 19-CR-0548, 2023 WL 1475317, at *10 (E.D.N.Y.

Feb. 2, 2023) ("To the extent Defendants seek to utilize industry practices evidence to mitigate criminal intent, they must establish that the practice – more than just being popular – is in fact legal." (citing United States v. Nicholas, No. 08-0139, 2009 WL 10710392, at *1 (C.D. Cal. Aug. 3, 2009) (cleaned up))); Nicholas, 2009 WL 10710392, at *1 ("Even a universal industry practice may still be fraudulent." (quoting Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266, 274 (3d Cir. 1998))). However, so long as Professor Gal does not testify as to "ultimate legal conclusions" couched in expert opinion on industry practice, the Court will receive his testimony into evidence. See United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir. 1991) ("Although testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice." (citation omitted)). It will be for the jury to determine how much weight the industry practice opinions carry and how that evidence may negate Defendant's fraudulent intent. Accordingly, the Government's motion to preclude Professor Gal's industry practice opinions is DENIED.

CONCLUSION

For the stated reasons, **IT IS HEREBY ORDERED that** Defendant's motion (ECF No. 62) is GRANTED IN PART and DENIED IN PART, with DECISION RESERVED IN PART.  The Government's first motion (ECF No. 63) is GRANTED, the second motion (ECF No. 64) is DENIED, the third motion (ECF No. 65) is GRANTED, and the fourth motion (ECF No. 66) is DENIED.


**SO ORDERED.**


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: May 30, 2023
       Central Islip, New York