**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

*David E. Patton*
Executive Director and
Attorney-in-Chief

*Deirdre D. von Dornum*
Attorney-in-Charge

February 8, 2024

BY EMAIL

Ashtin Audain
United States Probation Officer
Eastern District of New York
27 Johnson St.
Brooklyn, NY 11201

Re: *United States v. Patrice Runner*, No. 18 Cr. 578 (JS)

Dear Officer Audain:

The defense respectfully submits the following objections to the draft PSR:

**Loss-Amount-Related Objections**

As an initial matter, the defense maintains its objection to any loss amount determination on the ground that the government failed to sufficiently allege in the indictment or prove at trial that Mr. Runner's business caused any legally cognizable loss. (*See* DE 37 (Motion To Dismiss); DE 109 (Rule 29 Motion)). We intend to preserve these issues for appeal.

As an independent matter, however, the draft PSR's loss amount calculation is incorrect, because the government has not established, whether at trial or otherwise, that Mr. Runner "is accountable for a total loss in excess of $150,000,000." (Paragraph 35; *see also* Paragraph 44). This figure appears to be based on the evidence at trial that the total profit to Mr. Runner's business was approximately $175,000,000, derived from approximately 1.3 million customers. But the government has not proven by a preponderance of the evidence that the entirety of that figure, or anything like it, constituted loss to customers who were victims.

As the draft PSR observes, the jury acquitted Mr. Runner of four of the 13 substantive mail fraud counts, namely: Counts 4, 7, 11, and 13. (Paragraphs 1-2). The acquittals related both to customers who did not testify—Jerome DiMarco (Count 4) and Manuel Sousa (Count 11)—and to customers who did—Farida Beharry (Count 7) and Kathy Ervin (Count 13). (*See* Indictment at 9). This substantial split verdict on the mail fraud counts reflects that, contrary to the government's assertion that the total profit to the business was fraud loss, the jury determined that that was not so, and it did so with respect to four witnesses that the government had

1

cherrypicked to try to establish they had been defrauded. (*See* Tr. 1367-68). In light of the jury's split verdict, there is no competent basis in the record for the draft PSR's assumption that every one of the 1.3 million remaining customers suffered loss.

To the contrary, there is substantial evidence that many did not suffer loss. For example, many of the responses to the questionnaire the government sent to Mr. Runner's past customers reflected that those customers in their own estimation did not consider all the money they paid to have been loss. (*See* Attached Questionnaires of: Timothy Coleman ($1,200 total paid, but answering "none" to the question "What was the financial or personal impact or hardship to you of paying money to Ms. Duval or Mr. Guerin?"); Myles Confrey (also answering "none" to that question; "100% responsible and 100% satisfied;" "very happy with each and every product"); Robert Richardson (eight years of monthly payments; "no hardship, just entertainment"); Bonnie Galiotto (answering "none" to the financial impact or hardship question, "because it was refunded when items were returned"); Simon Nzuzi (financial impact: "none"); Virginia Valenti (financial impact: "none"); David Leonard (financial impact: "no"); Phyllis Wiley ("Ms. Duval – Help me in many []ways and aware of awakening within me. Also Mr. Guerin. I had a lot of things going on with me. I thank them to the fullest."); Barbara Conklin ("Maria's letters gave me more hope than my therapist did. Plus it was always my choice to deal with Maria."); Christina Hayes ("I don't have anything negative to say regarding Maria Duval or Patrick Guerin."); Connie Epley ("I don't have any issues with them or [their] company."); Constantine Rosal (no answer to financial or personal impact or hardship question); Thomas Neary ("I spent about 400 dollars that I did not have to. . . . I have some trinkets amulets + medallions tarot cards I would rather not part with yet"); Joyce Moody ("Some mailings were foolish, some mailings were predictions of future which have been correct so far.").

In light of these questionnaire responses, the sentencing record mirrors the jury verdict, insofar as it reflects that some customers were defrauded and some were not. The PSR should not use the acquittal conduct, or the larger record it reflects of customers who did not experience harm, to increase the loss amount and thus Mr. Runner's potential sentence. The United States Sentencing Commission has proposed amendments to the Guidelines that would either prohibit using acquittal conduct outright at sentencing, authorize a departure for it, or provide that the conduct can only be considered if it is established by clear and convincing evidence (a standard, as discussed above, that the government's loss evidence has not met). *See* U.S. Sentencing Comm'n, Proposed Amendments to the Sentencing Guidelines at 40-41 (Dec. 26, 2023).

These amendments are almost certain to be adopted, or failing that, to be mandated by the Supreme Court. Justice (then-Judge) Kavanaugh once testified before the Commission that "acquitted conduct should be barred from the guidelines calculation." Justice Thomas and multiple former Justices (including Justices Scalia, Ginsburg, Kennedy, and Stevens) have agreed, and Justices Gorsuch, Barrett, and Sotomayor have expressed doubt that considering acquitted conduct to increase a sentence is constitutional. *See* Congressional Research Service, "The Use of Acquitted conduct to Enhance Federal Sentences" (Feb. 8, 2023) *at:* https://crsreports.congress.gov/product/pdf/LSB/LSB11037.

To be clear, the questionnaire evidence above is a tiny subset of the boxes and boxes of questionnaire responses in the government's possession. There are very likely more positive (or at least neutral) responses that mirror the jury's acquitted counts—even after dozens of hours of review, we have not been able to go through all the boxes. Moreover, the responses themselves are without question an undercount of the actual customer attitudes with respect to loss, both because the questionnaire did not go out to every customer, and because a survey expert determined that the questionnaire itself was selectively biased toward eliciting responses from people who would generate a response saying they had suffered some harm (Tr. 1193-95, 1244).

The trial record supplies yet more evidence that many, many more customers than merely the ones relating to the four acquitted counts experienced no loss. For example, Mary Thanos, the government's own cooperating witness, testified at trial that it was her "understanding at the time that the buyers bought because they liked the products," and that customers wrote in positive testimonials about their transactions which Thanos "believed . . . were true." (Tr. 523-27). Plentiful evidence at trial supported this testimony, showing that customers bought the products repeatedly, and that they did so because they liked them. (*See* Rule 29 Motion at 2-8). To be sure, the government countered that this satisfaction was unimportant, because all of the customers were secretly being defrauded. But the split verdict reflects that the jury did not accept that blanket argument as to all customers. In light of the jury's determination, a more nuanced approached to loss amount is warranted than accepting the full amounts paid by all customers, contrary to the evidence discussed above.

Until the government comes up with such an approach, if it can, no loss amount beyond the specific customers referenced in the trial evidence should be considered by the draft PSR with respect to loss amount.

Finally, at a minimum, the PSR should reflect (in Paragraph 100), that the massive increase in the offense level caused by the stated loss amount warrants consideration of a downward variance, in light of the fact that the stated loss amount does not square with Mr. Runner's culpability. The Second Circuit has so held. "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding "to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence.").

**Objection To Violation Of Prior Administrative Order Enhancement**

The defense objects to Paragraph 37, which applies a two-point enhancement for "a violation of any prior, specific judicial or administrative order . . . not addressed elsewhere in the guidelines" in light of Mr. Runner's purported violation of a "final order" of a settled

3

administrative action.  USSG 2B1.1(b)(9)(C).  There is no competent evidence that Mr. Runner, or the company in question, violated that order.  The settlement agreement is not such evidence: it makes clear that there was no admission or concession of violation of law, and that it itself is not evidence of any violation.  (GX 400, at 116).  Moreover, it was undisputed at trial that the postal service never alleged breach of the agreement by Mr. Runner, the company, or anyone.  (Tr. 667).  To the contrary, the government's own evidence at trial showed that Mr. Runner ordered the business to comply with the final order, in that "the lead generators had to be changed," that Mr. Runner made those changes, and that "[t]he promotion in question [was] stopped."  (Tr. 352).  The enhancement should be stricken.

**Addition Of Additional Basis For Variance**

The PSR should include, as an additional basis for a downward variance in Paragraph 100, the period of months that Mr. Runner spent in custody in Spain as he awaited extradition to the United States following his arrest there in December 2018.  Note that the PSR cover page and Paragraph 27 incorrectly shows Mr. Runner's arrest as July 2020.

**Factual Objections As To Offense Conduct**

The defense objects generally to the characterization of the offense conduct, because we intend to contest the jury's guilty verdicts on appeal.  However, there are two specific errors that warrant correction as well.

First, we object to the references to "shell companies" and "paper directors."  While those terms were used by the government at trial, there was no finding that the companies and directors were unlawful or improper, and to the contrary there was substantial evidence that they were not.  (Def.'s Rule 29 Motion at 11-12).  The terms should be stricken.

Second, as to Paragraph 20, we are not aware of promotions that suggested customers could "avoid illness" by using the products.  We object to that phrase.

**Factual Corrections As To Personal History**

Paragraph 65: Mr. Runner and his brother Yannick are not estranged—they spoke recently, and Yannick supports him.  Mr. Runner's sister Fredrique died in December 2017 at age 50—she previously lived in France, and was partially paralyzed.  Jean-Marc lives in France, not Morrocco.

Paragraph 66: Mr. Runner's parents first separated when he was six years old; they then divorced when he was nine years old.  Following that, his father relocated first to Africa for eight years, then to Haiti.  Mr. Runner was six years old when his mother pushed his sister down the stairs, causing the disability she lived with for the remainder of her life.  The reason Mr. Runner

relocated to Costa Rica was because he and his then-wife did not like the school his sons were attending, and they preferred the schools and weather in Costa Rica.

Paragraph 67-68: Mr. Runner has a cordial relationship with both his exes, Delphine and Karin. Axel Runner lives in Squamish. Dylan Runner is age 26.

Paragraph 71: In addition to the migraines (several times a week) and blood in his urine (for the last 18 months), Mr. Runner has experienced the following medical conditions while at MDC Brooklyn: (1) severe vertigo and loss of balance; (2) four broken teeth, only one of which was repaired, a year after it was broken; (3) COVID-19, twice; (4) eczema; (5) disordered sleep; (6) pain in the lower back, neck, and left knee. Each of these has been regularly reported to the MDC health department. Few of these have been addressed, and none were addressed timely.

Paragraph 80: The high school was in Haiti; it was named Alexandre Dumas, and was located in Port-au-Prince.

Respectfully,

/s James Darrow

James Darrow
Assistant Federal Defender
Tel. (718) 407-7419
james_darrow@fd.org

*Attorneys for Patrice Runner*

cc:   Counsel of record (by ECF and by email, with attachments)
      Chambers of the Hon. Joanne Seybert (by ECF and by email, with attachments)