# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

April 1, 2024

BY ECF

The Hon. Joanna Seybert
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

Re:   *United States v. Patrice Runner*, No. 18 Cr. 578 (JS)

Your Honor:

This office represents Patrice Runner.  I respectfully submit this letter in connection with Mr. Runner's sentencing, which is scheduled for April 10, 2024, at 1:30 p.m.  Attached for the Court's consideration are letters from Mr. Runner's family, as well as certain customer responses to the government's investigative questionnaire.[1]

## I.    PRELIMINARY STATEMENT

The Court should sentence Patrice Runner to 60 months' incarceration.

The advisory Guidelines are not a reasonable benchmark for Mr. Runner's sentence.  The government's absurd proposed sentencing range—life imprisonment—is vastly inflated for a familiar reason: the fraud Guideline's irrational focus on loss amount as the principal driver of punishment.  That approach is particularly problematic here, where the jury verdict and the larger record contradict the government's assertion that every customer of Mr. Runner's business experienced loss.  Because the government's sole proposed loss estimate is provably wrong, and three other proposed enhancements do not apply, the Guidelines should be disregarded.

An alternative sentencing benchmark is readily available, namely, the sentences of defendants comparable to Mr. Runner—including one whose case the government has called "highly similar"—all of whom have received sentences of approximately 60 months or less. Much longer sentences have largely been reserved for much more grave misconduct.

---

[1] We anticipate one or two additional letters.

This is a very unusual fraud case, and not just because a substantial proportion of Mr. Runner's customers experienced no financial harm. In addition, any financial harm that did occur was spread thinly across hundreds of thousands of individuals, the vast majority of whom lost, at most, $40. Moreover, in the exceptional circumstances of this case, the *personal* impact upon the customers—*i.e.*, their disappointment that the promised astrology did not magically improve their lives—is not something for which Mr. Runner is culpable. Fully lawful astrological products would have had exactly the same impact. In sum, Mr. Runner's business had a substantial lawful component, the vast bulk of any financial harm was both diffuse and minimal, and the emotional "harms" the government has elicited are a feature of astrology, not fraud. A 60-month sentence would appropriately reflect these facts.

At trial, the government was at pains to try to portray Mr. Runner as preying upon the unusually vulnerable and motivated by greed. But this was not so. Rather, the government's own cooperating insider testified, in uncontradicted testimony, that the business targeted an older demographic because those are the people who buy astrological products. There was no evidence Mr. Runner knew anything personal about the customers, let alone that he targeted their unusual vulnerability. Rather, Mr. Runner's motivation was to give them what they wanted. For better or for worse, he sold astrology because he felt he understood why people wanted it— as a child, he, too, had been deprived of love, safety, and stability, and needed hope. As for the money Mr. Runner made, his personal expenditures were largely for his children's education and his family's travel—his consistent motivation was family, not greed.

For more than three years, Mr. Runner has been subject to extraordinarily harsh conditions of confinement at MDC Brooklyn. He has been confined to his cell for most of that time, under conditions that district judges have accurately characterized as "dreadful" and "inhumane." He has been, and continues to be, deprived of critical medical care. For months at a stretch, he has been denied the ability to communicate with his family, review the evidence against him, or meaningfully participate in his own defense. He has already suffered more, by all accounts, than our society accepts as punishment. In light of this fact alone, a 60-month sentence would be sufficient to accomplish punishment, deterrence, and the other purposes of sentencing.

## II.     FACTUAL BACKGROUND

### A.      Mr. Runner's Chaotic Adult Life Is Sourced In Childhood Abuse

Patrice Runner has never been at peace. His adult life has been plagued by chronic drug abuse, fractured personal relationships, and constant uprooting from place to place. He experiences chronic anxiety. Permanently vigilant, he anticipates disaster at all times.

This internal and external chaos is a continuation of what Mr. Runner experienced as a child. His mother, Daina Drouilly, was abusive and mentally ill. When Mr. Runner and his siblings were very young, Ms. Drouilly beat them regularly. She withheld their food, neglected them, and often refused to let them go to school. Mr. Runner recalls his mother as a dangerous stranger in the house: someone to watch out for, not someone to love or rely upon.

2

Mr. Runner has blocked out most of his own abuse.  It is easier to recall examples of what happened to his siblings.  For example, when his sister was five years old, she wet the bed, and Ms. Drouilly reacted by pushing her down the stairs.  The child fell unconscious, but Ms. Drouilly did not seek medical attention until the morning, when her brother learned what had happened and insisted she call an ambulance.  By then it was too late.  The girl was in a coma for months, and suffered permanent brain damage and paralysis.  When she was later examined at the hospital, doctors found microfractures all over her body from her mother's beatings, and the sister was removed from her mother's care.  The abuse still continued, however, whenever the children were around their mother.  Mr. Runner remembers eating dinner with his mother and sister several years afterward.  His mother had prepared artichokes, and the sister had a difficult time eating them because her face and throat were partially paralyzed.  Ms. Drouilly, enraged, forced the girl to eat not just the edible pulp, but the entire, sharp leaves of the artichoke, until the girl could not physically continue and had to leave the table.  Mr. Runner's sister eventually died from her paralysis, after choking on food at a restaurant.

Mr. Runner's father was neglectful in a different respect: he abandoned the family when Mr. Runner was young.  What had been a hand-to-mouth existence for Mr. Runner with his father in the picture—the PSR accurately reflects that the father sometimes had to steal food for the family to eat—became an impoverished and abusive existence without him.  Mr. Runner was able to move in with his father after his mother's abuse became unsustainable, but the father moved often for work—relocating Mr. Runner to Haiti and France—and, even when physically present, was an emotionally remote, pathological liar.

Because Mr. Runner never had stable relationships as a child, he was never able to forge them as an adult.  His two marriages, for example, were turbulent—in some ways, his relationships with his ex-wives are much more solid now than they were during the marriages themselves.  Mr. Runner's friendships and professional relationships, too, go through unending cycles of fracture and mistrust.  He is profoundly lonely, and does not know how to feel otherwise.

Nor has Mr. Runner ever felt he had a home.  His dangerous childhood with his mother and his constant moving with his father meant that there was no place he felt safe or comfortable.  As a result, it felt unsafe to remain in one place as an adult—he and his family uprooted frequently, and travelled nearly constantly.  When Mr. Runner's discomfort and loneliness became too much to bear, he turned to drugs.  He used cocaine and marijuana, principally, in large quantities for decades.  The drug use was frequent, intense, and regular.  It was the clearest manifestation of his profound internal distress.

## B.      Mr. Runner's Only Stability Has Been His Children And His Career

There have been two points of stability for Mr. Runner in this chaos.

One has been his children, whom he has tried to provide with a much better childhood than he experienced himself.  For example, notwithstanding the government's attempt to portray his lifestyle as frivolously "lavish," Mr. Runner's main expenses for years were the education of his sons Dylan and Axel, and ensuring that his sons remained with him while he travelled.  For

Mr. Runner, who, growing up, never had a safe home, had little in the way of stable formal education, and never had anyone close to him, it was a priority for his own sons to have a guarantee of all three.

The attached letters of Mr. Runner's ex-wife Karin Civitella and his son Axel corroborate these priorities. Ms. Civitella writes that she acquiesced to Mr. Runner's desire for a big, close family with children—the opposite of what he grew up with. Both letters recount how the family balanced the desire to travel with ensuring that the children received an excellent education.

Mr. Runner is just as devoted to his younger children. As the PSR reflects, before Mr. Runner's arrest, he shared custody of those children and lived in Spain to be near them. It is a point of pride for Mr. Runner that, unlike his own neglect as a child, he has spent his life attending closely to all his children, and, despite the chaos of his own life, he has been able to make their lives happy.

The other source of stability in Mr. Runner's life has been his work. Patrice Runner was drawn to mail order marketing, and in particular the marketing of astrology, because he felt he understood why people wanted it. As a child, he had no one to give him hope—for love, for safety, for stability. He knew what it meant to feel alone in the world.

Mr. Runner wanted to give people hope. To help them feel not alone, so they could have the strength and support to help themselves, as he had helped himself. When he learned of the market for astrological goods and services, it felt natural to devote himself to meeting that demand.

The government has portrayed Patrice Runner as greedy, cynical, and heartless. He is none of those things. To be sure, the jury has determined that much of his astrological work was fraudulent. But it also determined that much was not. Hundreds of thousands of customers, hopeful for magic, came to Patrice Runner for astrological goods and service. Whatever one might say about Mr. Runner's motivations, it is undisputed that he spent years trying to help them believe they were getting exactly what they wanted.

### C.     Much Of Mr. Runner's Astrological Business Was Not Fraudulent

The jury determined that a substantial proportion of Mr. Runner's business was not fraudulent. It acquitted Mr. Runner of four out of twelve charged substantive mail fraud counts: Counts 4, 7, 11, and 13. (PSR ¶¶ 1-2). The acquittals related to customers who did not testify— Jerome DiMarco (Count 4) and Manuel Sousa (Count 11)—and to customers who did—Farida Beharry (Count 7) and Kathy Ervin (Count 13). (*See* Indictment at 9).

Substantial corroborating evidence mirrors the jury verdict, insofar as it reflects that many customers were not defrauded. Specifically, many customer responses to the government's investigative questionnaire reflect that those customers, in their own estimation, do not consider all the money they paid to have been loss.

4

For example:

- Questionnaire of Timothy Coleman: reflecting $1,200 total paid, but answering "none" to the question "What was the financial or personal impact or hardship to you of paying money to Ms. Duval or Mr. Guerin?"

- Questionnaire of Myles Confrey: also answering "none" to that question; "100% responsible and 100% satisfied;" "very happy with each and every product";

- Questionnaire of Robert Richardson: reflecting eight years of monthly payments; "no hardship, just entertainment";

- Questionnaire of Bonnie Galiotto: answering "none" to the financial impact or hardship question, "because it was refunded when items were returned";

- Questionnaire of Simon Nzuzi: financial impact: "none";

- Questionnaire of Virginia Valenti: financial impact: "none";

- Questionnaire of David Leonard: financial impact: "no";

- Questionnaire of Phyllis Wiley: "Ms. Duval – Help me in many []ways and aware of awakening within me. Also Mr. Guerin. I had a lot of things going on with me. I thank them to the fullest."

- Questionnaire of Barbara Conklin:" Maria's letters gave me more hope than my therapist did. Plus it was always my choice to deal with Maria."

- Questionnaire of Christina Hayes: "I don't have anything negative to say regarding Maria Duval or Patrick Guerin."

- Questionnaire of Connie Epley: "I don't have any issues with them or [their] company."

- Questionnaire of Thomas Neary: "I spent about 400 dollars that I did not have to. . . . I have some trinkets amulets + medallions tarot cards I would rather not part with yet";

- Questionnaire of Joyce Moody: "Some mailings were foolish, some mailings were predictions of future which have been correct so far."

These are just a tiny subset of the boxes and boxes of questionnaire responses in the government's possession. There are likely many more positive (or at least mixed) responses that mirror the jury's acquitted counts—even after dozens of hours of review, we have not been able to go through all the boxes. Moreover, the responses themselves are an undercount of actual customer attitudes with respect to loss, both because the questionnaire did not go out to every

customer, and because a survey expert determined that the questionnaire itself was selectively biased toward eliciting responses from people who would generate a response saying they *had* suffered some harm (Tr. 1193-95, 1244).

The trial record supplies yet more evidence that many, many more customers than merely the ones relating to the four acquitted counts experienced no loss.  For example, Mary Thanos, the government's own cooperating witness, testified at trial that it was her "understanding at the time that the buyers bought because they liked the products," and that customers wrote in positive testimonials about their transactions which Thanos "believed . . . were true."  (Tr. 523-27).  Plentiful evidence at trial supported this testimony, showing that customers bought the products repeatedly, and that they did so because they liked them.  (*See* Rule 29 Motion at 2-8).  To be sure, the government countered that this satisfaction was unimportant, because all the customers were secretly being defrauded.  But the split verdict reflects that the jury did not accept that argument as to all customers.

### D.    Mr. Runner's "Inhumane" Conditions Of Confinement At MDC Brooklyn

Mr. Runner has been incarcerated at MDC Brooklyn since his arraignment in December 2020.  At that time, the facility was still in the grip of months-long COVID-19-related lockdowns.  Inmates were "secured in their assigned cells," being allowed out only a few times a week for 30 minutes to shower, communicate remotely with their attorneys, or review discovery. *See* Letter of Warden H. Tellez to Chief Judge Roslynn R. Mauskopf, Jan. 14, 2021, *at:* https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20210114.pdf.

In the three years since, the MDC has reimposed lockdowns for weeks and months at a stretch, in light of chronic short-staffing issues, repeated COVID-19 outbreaks, and rampant security issues (including the deaths of multiple inmates).  *See, e.g.*, *United States v. Dwight Boyd*, No. 21 Cr. 486 (SHS) (S.D.N.Y. Feb. 3, 2022), at 3 ("[D]uring the past several months, the MDC and Essex have been hamstrung by staffing issues, quarantines due to COVID-19, and lockdowns due to security issues.  These lockdowns—which are continuing—make it impossible for attorneys to visit their clients to prepare strategy . . . and attorneys have repeatedly reported to this Court the difficulty of arranging for extended telephone calls with their clients to prepare for upcoming conferences, pleas, trials, and sentencings."); Memorandum of Warden S. Ma'at, Mar. 24, 2023, at 1 ("Recently, it has been difficult for many of you, due to the increase of weapons, cellphones, drugs, and fights. . . .  Therefore, this memo is declaring my decision to implement a planned lock-down"); *United States v. Gustavo Chavez*, No. 22-CR-303 (JMF) (S.D.N.Y. Jan. 4, 2024), at 1-2 (citing "near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care").

The prison has been a nightmare for Mr. Runner for many reasons, but a major one is the fact that he has spent the majority of his pretrial detention confined within a tiny cell.  *See Chavez*, at 9-10 ("[C]onfining inmates to their cells is . . . tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane.").  Near-solitary confinement has been particularly hard on Mr. Runner because he, unlike most inmates in pretrial detention, has been at MDC Brooklyn for over three years.  In that time, he has endured months at a stretch when he could only shower briefly three times a week, was unable to communicate with his

6

family, had no hot food of any kind (sample lockdown menu: breakfast of cereal, apple, and granola bar; lunch of one hot dog served cold, two potatoes, one cold egg; dinner of peanut butter and jelly sandwich), and was unable to meet substantively with us or review his discovery.

The length of Mr. Runner's detention is a direct result of MDC dysfunction, which has punished him for his decision to go to trial. As the Court will recall, discovery review was a major problem in this case. It took months of effort by this office, the government, and this Court before the MDC would accept a hard drive with even a limited quantity of discovery documents. Even then, MDC staff often refused to let Mr. Runner review that drive in the minimal time available. It was only in the months shortly before trial that Mr. Runner was given anything like meaningful access to the full discovery in his case.

Mr. Runner's detention was particularly harsh in another respect as well: the shocking disregard for his medical care. In mid-2022, Mr. Runner began to experience blood in his urine, pain in his back, and dizziness. Despite dozens of sick calls, urgent pleas from this office, and an order from this Court, it took more than a year before the MDC finally brought Mr. Runner to a specialist in January 2024. That doctor could not determine the cause of his troubling symptoms, but prescribed antibiotics to rule out an infection. The MDC has since refused to dispense those antibiotics to Mr. Runner.

That is hardly the only medical issue. For example, Mr. Runner requested the COVID-19 vaccine dozens of times since they became available. He did not receive it for two years, until a court order finally mandated that he get it. No explanation was ever given. Mr. Runner has contracted COVID-19 three times since his incarceration.

In sum, even accounting for the "dreadful," "inhumane" conditions at MDC Brooklyn for the past three years, Mr. Runner's own experience has been a nightmare.

## III. THE ADVISORY GUIDELINES SHOULD BE DISREGARDED IN THIS CASE

### A. A Non-Guidelines Sentence Is Warranted

A sentencing court is required to consider the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence in each individual case. *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Section 3553(a) directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)]," which in turn sets forth that the applicable purposes are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To arrive at such a sentence, the Court is further directed to consider these additional factors set forth in Section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution.  In every case, the sentencing court "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.

As is plain from the statutory structure, the Guidelines range is just one of several factors set forth in Section 3553(a) that a district court must consider when imposing sentence.  *See also Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011).  A sentencing court thus "has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'"  *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted).

The need for a non-Guidelines sentence is obvious in this case.  The PSR calculates Mr. Runner's advisory Guidelines range to be imprisonment for life.  (Paragraph 85).  This is the most serious non-capital punishment.  It is reserved for the most serious crimes.  Bernie Madoff, El Chapo, Richard Reid, and Ramzi Yousef were all sentenced to life in prison.  Whatever one might think about Mr. Runner, his conduct was not in the same league.  Mr. Runner did not wipe out people's savings accounts; he did not commit violence.  To the contrary, as discussed below, half of his customers spent, at most, $40, and the remainder spent, on average, $300.  *See* Section IV.A.2.  Indeed, the jury determined that, as to a substantial proportion of customers the government cherry-picked for trial, Mr. Runner committed no crime at all.

Yet under the PSR's proposed Guidelines, none of that matters.  If adopted, Mr. Runner would be treated equivalently to the perpetrator of billion-dollar Ponzi scheme, a narco-trafficker, or a terrorist, based principally upon a wildly inflated estimate of loss amount.  As discussed below, that estimate is not reasonable, and the government has failed to prove by a preponderance of evidence any reasonable alternative, despite several available candidates from the sales data in its possession.  Furthermore, it is well-established that the fraud Guideline's dependency upon loss enhancements is not rational.  That is why the Second Circuit permits courts to consider "whether the significant effect of the loss enhancement . . . should result in a non-Guidelines sentence."  *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).[2]

_____

[2] As a procedural matter, should the Court be inclined to accept the PSR's proposed loss amount, which is so enormous that it exposes Mr. Runner to a recommended penalty of life imprisonment, the government should be required, under the Fifth and Sixth Amendments and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to prove the fact of its proposed loss amount to a jury beyond a reasonable doubt.  *See Alleyne v. United States*, 570 U.S. 99, 103 (2013) ("any fact that increases the penalty for a crime" must "be submitted to a jury, and proved beyond a reasonable doubt").

**B.      The Proposed Loss Amount Is Not Reasonable**

The PSR maintains that Mr. Runner "is accountable for a total loss in excess of $150,000,000," resulting in a whopping 26-level enhancement to the applicable base offense level of 7.  (Paragraphs 34-35; *see also* Paragraph 44).  For the following reasons, this figure necessarily includes acquitted conduct, and is therefore not a "reasonable estimate" of loss. U.S.S.G. § 2B1.1 cmt. n.3(C).[3]  The government has not put forward any of several reasonable potential alternatives that could be derived the data in its possession.  As a result, there is insufficient grist in the sentencing record for anything like the proposed loss enhancement.  A non-Guidelines sentence should be imposed for this reason alone.

1.      The Proposed Loss Estimate Fails To Account For Acquitted Conduct.

The PSR's loss estimate appears to be based on the evidence at trial that approximately 1.4 million customers paid approximately $175,000,000 to Mr. Runner's business.  (*See* GX 800 & 801).  But the government has not proven by a preponderance of the evidence that that figure, or anything close to it, constituted loss to customers who were victims.

As discussed above, there was a substantial split verdict at trial.  This reflects that, contrary to the PSR's assumption that the total amount paid by customers was fraud loss, the jury determined that that was not so, and it did so with respect to four witnesses that the government selected to try to establish they had been defrauded.  (*See* Tr. 1367-68).  As discussed above, substantial evidence in the trial record supported the jury's conclusion that much of the business was not intended to be fraudulent and customers were satisfied.  (Tr. 523-27; Rule 29 Motion at 2-8).  Furthermore, the larger record contains affirmative evidence that many customers did not suffer loss.  As discussed above, many of the responses to the questionnaire the government sent to Mr. Runner's past customers reflected that those customers in their own estimation did not consider all the money they paid to have been loss.  The record therefore contradicts the PSR's assumption that every one of Mr. Runner's customers suffered loss.

The mail fraud acquittals present another problem with treating every dollar paid by the customers as loss: in acquitting on some counts and convicting on others, the jury may have been focused not on whether a given customer was defrauded, but on whether a given mailing was fraudulent.  That would mean that, in the jury's view, no money spent on the promotions relating to the acquitted counts could count as loss.  The PSR's proposed loss amount does not account for this possibility.

The Court should decline the PSR's invitation to include acquittal conduct, and the larger record of customers who avowedly did not experience harm, to increase the loss amount and thus Mr. Runner's potential sentence.  The United States Sentencing Commission has proposed

---

[3] As set forth in our objections to the PSR, these objections are not intended to waive our threshold objection that any loss amount is incorrect.  The defense maintains its objection to any loss amount determination on the ground that the government failed to sufficiently allege in the indictment or prove at trial that Mr. Runner intended his business to cause any legally cognizable loss.  (*See* DE 37 (Motion To Dismiss); DE 109 (Rule 29 Motion)).

amendments to the Guidelines that would either prohibit using acquittal conduct outright at sentencing, authorize a departure for it, or provide that the conduct can only be considered if it is established by clear and convincing evidence (a standard, as discussed above, that the government's loss evidence has not met).  *See* U.S. Sentencing Comm'n, Proposed Amendments to the Sentencing Guidelines at 40-41 (Dec. 26, 2023).

These amendments are almost certain to be adopted, or failing that, to be mandated by the Supreme Court.  Justice (then-Judge) Kavanaugh has testified before the Commission that "acquitted conduct should be barred from the guidelines calculation."  Justice Thomas has agreed, as have multiple former Justices across the ideological spectrum (including Justices Scalia, Ginsburg, Kennedy, and Stevens), and Justices Gorsuch, Barrett, and Sotomayor have expressed doubt that considering acquitted conduct to increase a sentence is constitutional.  *See* Congressional Research Service, "The Use of Acquitted conduct to Enhance Federal Sentences" (Feb. 8, 2023) *at:* https://crsreports.congress.gov/product/pdf/LSB/LSB11037; *see also* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 Yale L.J. 1681, 1714 (1992) ("Most lawyers, as well as ordinary citizens unfamiliar with the daily procedures of criminal law administration, are astonished to learn that a person in this society may be sentenced to prison on the basis of conduct of which a jury has acquitted him, or on the basis of charges that did not result in conviction."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1311 (D.N.M. 2007) (concluding that a variance would promote respect for the law more than a Guidelines sentence that was "substantially the result of conduct for which the United States chose not to charge [the defendant] and twenty-three counts for which [he] was acquitted"), *aff'd*, 523 F.3d 1258 (10th Cir. 2008).

<div align="center">

**2.      The Government Fails To Justify Its Estimate Or Proffer An Alternative**.

</div>

The government fails to explain how the PSR's loss estimate could possibly be reasonable.  It minimizes the acquittal conduct, and has no response to the questionnaires showing customers who experienced no loss.  Nor does it proffer any of several possible reasonable alternatives.

Instead, in its response to our PSR objections, the government contends that its loss figure is conservative, because it does not incorporate payments between 1994 and 1999.  But the jury made no determination that the fraud harmed any customers so long ago—there is no sales data for that time period, and no customer identified at trial made purchases in that time frame.  Nor, given the acquittals and the questionnaires cited above, does the mere fact that Mr. Runner was convicted of conspiracy suffice to determine that every customer in the entire charged time period experienced loss.  "[T]he scope of conduct for which a defendant can be held accountable under the Sentencing Guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (quoting *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991)); *see also* U.S.S.G. § 1B1.3 Application Note 2 ("[T]he scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy.").  As we have explained, the sentencing record is replete with customers who experienced no loss—because the government has no explanation for why this would be, it has not shown that customers in the 1994 to 1999 time period were likely defrauded.

The government argues that its purported actual loss figure is reasonable because an intended loss theory would result in a much bigger figure, indeed, "some billions of dollars." But this is no answer. Intended loss is hardly a reasonable metric for comparison. *See United States v. Banks*, 55 F.4th 246 (3d Cir. 2022) (holding that fraud Guideline does not authorize intended loss measure set forth only in commentary). Nor is it conceivable that the business was ever intended to be so profitable—customers' actual response rate year by year was a small fraction of the number of promotions sent out. (*See* GX 800 [check]). The business could not and did not reasonably intend every mailing sent obto result in payment.

The government asserts that the fact that fraud need not be completed is sufficient to find that "[a]ll of the victims who sent payments to Runner's operation" experienced loss. This is mistaken. Just because a jury found fraud does not mean it found loss. *See United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991) ("It need not be shown that the intended victim of the fraud was actually harmed."). It therefore does not follow from the mere fact of a fraud conviction that any victim was harmed.

Finally, the government protests that its only alternative to adding up every customer payment is to "put more than one million victims . . . on the stand." But actually it has several reasonable alternatives. The government has at hand the entirety of the business's OrderMotion sales data. Using that data, it could, for example, discount all the promotions that the jury determined were not material or that the questionnaires reflect were not considered by customers to be loss. Or, it could come up with a proportion of satisfied to dissatisfied customers based upon the split verdict and the questionnaires and average the loss to the dissatisfied portion. *See* U.S.S.G. § 2B1.1 cmt. n.3(C)(iv) (providing that loss estimate can take into account "[t]he approximate number of victims multiplied by the average loss to each victim"). It is not the availability of reasonable alternatives that is the problem. It is the government's unwillingness to surrender its enormous proposed loss figure, and the 26-point enhancement that accompanies it.

\*      \*      \*

"Under the Sentencing Guidelines, for a loss enhancement to apply, the Government bears the burden to prove both the existence and amount of the loss attributable to the offenses of conviction." *United States v. Cuti*, No. 08 CR. 972 DAB, 2011 WL 3585988, at \*4 (S.D.N.Y. July 29, 2011) (citing *United States v. Williams*, 247 F.3d 353, 358 n. 7 (2d Cir. 2001)). Without any reasonable proffered loss estimate, the government has failed to meet its burden. The Court therefore lacks a sufficient basis to apply the PSR's proposed 26-point loss enhancement, or, indeed, any other loss enhancement.

This is a sufficient basis to decline to rely upon the fraud Guideline in this case.

**B.      Three Other Proposed Enhancements Are Inapplicable**

      1.    The U.S.S.G. § 2B1.1(b)(9)(C) Enhancement Does Not Apply.

The PSR proposes a two-point enhancement for "a violation of any prior, specific judicial or administrative order . . . not addressed elsewhere in the guidelines" pursuant to U.S.S.G. § 2B1.1(b)(9)(C), in light of Mr. Runner's purported violation of a "final order" of the settled 2004 postal action.  (PSR ¶ 37; *see also id.* ¶ 44).

This enhancement does not apply.  There is no competent evidence that Mr. Runner violated the prior postal order.  Certainly the settlement agreement is not such evidence: it makes clear that there was no admission or concession of violation of law, and that it itself is not evidence of any violation.  (GX 400, at 116).  Moreover, it was undisputed at trial that the Postal Service never alleged breach of the agreement by Mr. Runner, the company, or anyone.  (Tr. 667).  To the contrary, the government's own evidence at trial showed that Mr. Runner ordered the business to *comply* with the final order, in that the business understood "the lead generators had to be changed," that Mr. Runner made those changes, and that "[t]he promotion in question [was] stopped."  (Tr. 352).

The government responds that Mr. Runner "was removed from the final order through a misleading affidavit."  But so what?  Much as the Postal Service may want to relitigate that issue from 20 years ago, the question is whether Mr. Runner *violated* the order.  There is insufficient proof that he did.

The government also claims generally that Mr. Runner "continued to use the same lies and misrepresentations" before and after the cease and desist order was entered.  But it cites no promotion that violated the order.  And it selectively omits the order's key proviso that its prohibitions applied only "in connection with any promotional materials sent through the mail to recipients for whom Respondents possess no personal information other than name, address and the fact that the recipient's name and address appear on a particular mailing list."  (GX 400 at 123).  As the Court will recall from the evidence at trial, the only such recipients were totally new customers, *i.e.*, the leads, whose names the business rented from lists (or print ads).  Those people were mailed the lead generators, and the customers who responded would send in additional personal information (*see* PSR ¶ 19)—at that point, the order did not apply, because the business now had far more information for its "in house" customers than merely the person's name and address and their membership on a list (*see* PSR ¶ 20).

The government fails to distinguish between lead generators, some of which fell within the scope of the order, and back-end mailings, which did not.  It fails to show that any post-2006 lead generator was in violation of any paragraph of the cease and desist order.  It fails to explain its own cooperator's testimony that the lead generators were duly changed in compliance with the order.  (Tr. 352).  It therefore fails to establish that U.S.S.G. § 2B1.1(b)(9)(C) applies.

2.      The Two Vulnerable Victim Enhancements Do Not Apply.

The PSR proposes two enhancements for a large number of vulnerable victims, for a collective four points.  (PSR ¶¶ 39-40).  We neglected to object to these enhancements previously, but we do so now.

The PSR does not explain its position that Mr. Runner "knew or should have known the victim of the offense was a vulnerable victim."  One assumes it is related to the PSR's claim that Mr. Runner "specifically targeted low-income and elderly persons."  (PSR ¶ 19).  But neither of these, without more, is a viable basis for the enhancement.

For example, the mere fact that a person is elderly is not enough—what is required is a demonstration that Mr. Runner knew or should have known that many recipients were "*unusually* vulnerable due to age;" for example, the Guidelines commentary specifically excludes the case of fraudulent mailings "to the general public" where "one of the victims happened to be senile."  U.S.S.G. § 3A1.1 app. n.2 (emphasis added).  Here, the evidence at trial established Mr. Runner selected his recipients from lists, some of which could be restricted to people in an older age bracket.  But there was no evidence Mr. Runner knew or should have known that doing so would target people who were senile, or even "elderly."  Indeed, one of the government's customer witnesses was 53 years old at the time of *trial*, another, Kathy Ervin, was 64.  (Tr. 669; Tr. 110-11).  Moreover, the evidence was that the market for psychic products and services skewed older, so it made sense for the business to sell to that demand.  (*E.g.*, Tr. 1006-14).  Senility was not the point, the point was to meet a pre-existing demand by an older customer demographic.

As for customers being "low-income," there is zero basis in the record to establish that Mr. Runner knew or should have known that fact about his customers, let alone that they were unusually low-income.  It, too, is an insufficient basis for a vulnerable victim enhancement.

**C.      The Fraud Guideline's Loss Enhancement Is Not Rational**

The advisory Guidelines should be given no weight at sentencing for an independent reason: their focus on loss is not a rational basis for punishment.

Pursuant to the fraud Guideline, U.S.S.G. § 2B1.1(b)(1), the PSR's proposed loss amount enhances Mr. Runner's offense level from a base of 7 by 26 levels, to level 33.  (PSR ¶¶ 34-35, 44).  The enhancement increases Mr. Runner's advisory sentencing range from 0-6 months to 135-168 months.  In other words, loss amount is responsible for eleven to fourteen years of Mr. Runner's recommended punishment.

When, as here, a loss amount figure drives such a large increase to a base offense level at the bottom of the Guidelines sentencing chart, "that factor 'entitles a sentencing judge to consider a non-Guidelines sentence' based upon a disagreement with the [United States Sentencing] Commission's 'policy determination' that loss should be the primary determinant of punishment."  *United States v. Burghardt*, 702 Fed. App'x 4, 7 (2d Cir. 2017) (quoting *Algahaim*, 842 F.3d at 800).  Specifically, because making loss a principal determinant of

13

sentencing "is an 'unusual[]' approach to culpability, 'unknown to other sentencing systems,'" the district court should "'consider whether the cumulative effect of those enhancements,' in relation to the ... base offense level, should result in a non-Guidelines sentence." *Id.*

The flaws with the fraud Guideline's loss enhancement approach are now well-established. "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 377, 379-81 (2d Cir. 2013) (Underhill, J., concurring). Multiple amendments to the loss table, none of which had empirical grounding, "have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences." *Id.* at 380. The result is an enhancement that is "fundamentally flawed, especially as loss amounts climb." *Id.*; Kate Stith, *The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 Yale L.J. 1420, 1476 n.235 (2008) ("[T]he Guidelines' 'loss'-penalty tables appear to have been created out of whole cloth, without either statutory or empirical basis. The great weight the Guidelines attached to quantity has been devastatingly criticized, and nowhere explained." (citations omitted)).

Accordingly, there is a local judicial consensus that the loss Guideline should not be followed when, as here, its enhancements elevate the sentencing range to the bottom of the chart. *See, e.g.*, *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (loss enhancement policy is a "grievous wrong," and its "problems . . . have been evident since the inception of the Guidelines"); *United States v. Mair Faibish*, No. 12 Cr. 265 (E.D.N.Y. Mar. 10, 2016) (Vitaliano, J.) (sentencing) (observing, like "a whole host of judges who have said so publicly and scores of others who have . . . grumbled about it privately," that "the Guidelines even with its slight revisions, are mindlessly accelerated once you have numbers of any size added in the loss or gain table"); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission ... effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (Block, J.) (departing downward by 300 months from advisory fraud Guidelines because "the Sentencing Guidelines for white-collar crimes [are] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 514-15 (S.D.N.Y. 2006) (Rakoff, J.) (decrying "the utter travesty of justice that sometimes results from the Guidelines' fetish with abstract arithmetic, as well as the harm that Guidelines calculations can visit on human beings if not cabined by common sense"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (the amount of loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

Moreover, the very long sentences driven by the loss table are far afield from what was envisioned in creating the fraud Guideline in the first place, *i.e.*, that "a short but definite period of confinement might deter future [white-collar] crime more effectively than sentences with no confinement condition." Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22 (1988). "[T]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514; *see, e.g.*, A. Mitchell Polinsky &

Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Leg. Stud. 1, 12 (1999) ("less-than-maximal sanctions, combined with relatively high probabilities of apprehension, may be optimal" in white collar context, where "the disutility of being in prison at all may be substantial and the stigma and loss of earning power may depend relatively little on the length of imprisonment").

## IV.   THE REMAINING § 3553(a) FACTORS WARRANT AT MOST 60 MONTHS

Because in this case applicable the fraud Guideline "leads to a patently absurd sentence, it is appropriate for the court to rely more heavily on the § 3553 factors."  *See United States v. Johnson*, 2018 WL 1997975 at *4.  Those factors warrant, at most, a sentence of 60 months' imprisonment.

### A.   The Nature And Circumstances Of Mr. Runner's Conduct

Mr. Runner respects the jury's verdict and this Court's denial of his post-trial motions. He understands that he must be sentenced pursuant to the determination that he committed fraud and money laundering, and that a proportion of customers were victims.  However, the nature and circumstances of that conduct is substantially less grave than the government has portrayed, in two respects that together warrant no more than 60 months' imprisonment.

#### 1.   The "Victim Impact" Trial Testimony Does Not Warrant Punishment.

The government introduced at trial many statements by customers about the impact of Mr. Runner's conduct upon their lives.  For example, the witness customers testified that, despite paying for the astrological products and services, they did not receive the real astrological assistance they had hoped for.  (*See* Def.'s Rule 29 Motion at 7-8).  Unlike the financial harm to customers who are determined to be victims, which is directly linked to Mr. Runner's conduct of conviction, *see* Section IV.A.2 *infra*, this broader "victim impact" testimony does not warrant punishment.

This is a very unusual case.  As we have explained previously, we are aware of no other recent prosecutions of fortunetelling speech simply because the speech was false, and not, for example, where the false speech was joined with more standard indicia of fraud, like coercion (*e.g.* curses or threats) or theft (*e.g.* larceny or misappropriation).  (*See* Motion To Dismiss at 1-3, 11).  This rarity is due to a cultural shift in attitudes toward astrology and fortunetelling.  As we have demonstrated, our society no longer assumes, as it once did, that customers of astrology are victims—to the contrary, they are now granted the autonomy to operate within a robust market for fortunetelling speech that is protected by the First Amendment.  (*See id.* at 2-3).

Despite that cultural shift, we have, in this case, astrological speech being prosecuted because it is false, *i.e.*, because the astrology being sold is not real.  Consider the testimony of Farida Beharry, the very first customer witness, whom the government highlighted in its opening statement.  (Tr. 22-23).  Ms. Beharry testified that she bought a vibratory crystal from Mr. Runner's business, but the crystal "didn't work"—Maria Duval "said it would vibrate if you hold toward the moonlight, and it never did."  (Tr. 58).

The government elicited from Mary Thanos the reason the crystals didn't "work":

Q.     In your role as operations manager, did you make arrangements for any psychic to initialize and program these vibratory crystals?

A.     No.

. . . .

Q.     In your capacity as operations manager, did you make any arrangements for a psychic to review these forms?

A.     No.

(Tr. 340-41).  Of course, these questions are ludicrous.  It would have made no difference to Farida Beharry if a psychic had programed the crystals and reviewed the forms, because psychic powers are not real.  Nonetheless, that is the fraud that was prosecuted here.

The government has repeatedly protested that it is not policing astrological speech, and that the falsities it has been focused on are more earthbound—whether the crystals came from Paraguay, or whether the customer letters really went to Duval, for example.  But as we have explained, the customers consistently testified that the reason they wanted Duval and Guerin's products was the promise of getting some real magic to help them in their lives.  (*See* Rule 29 Motion at 7-8).  As a matter of victim impact, that is what was at stake for them.  Obviously, if the promise of real astrological assistance had been fulfilled, it would not matter to them if their vibratory crystal was from Paraguay or Hong Kong, or if their letters went to Duval or DMG.

We expect this impact to be a principal focus of the government at sentencing.  As a societal matter, however, it is not harm caused by any illegal conduct of Mr. Runner.  Unlike the payments by victims that have been determined by the jury and this Court to be harm, the impact upon customers of their realization that promised astrology was not "real" astrology is an inevitable part of even a lawful psychic bargain.  As we have explained, that is no longer something our society "protects" customers from.  It is not something for which Mr. Runner deserves punishment.

To illustrate this point, consider the government's own statement, in its rebuttal summation, that it would have left Mr. Runner alone if he had only engaged Maria Duval, in some remote location, to perform "the wors[t] séance ever done by a psychic, the shortest clairvoyant sessions ever performed at the lowest quality," in return for the customers' money.  (Tr. 1392).  Assume this statement is true, and Mr. Runner had done exactly that, and the government had declined to prosecute because it viewed his conduct as non-criminal.  Now consider the impact of this hypothetical conduct upon the customers.  Because astrology is not real, the vibratory crystal still would not have worked, Ms. Beharry still would not have had peace in her home, and all the other customers would still have failed to get what they really wanted from the products.

16

In other words, on the government's own theory, even if Mr. Runner's conduct had been *lawful*, the "victim impact" would have been the same. It therefore does not warrant punishment.

> ## 2.   The Vast Bulk Of Any Financial Harm Was Diffuse And Minimal.

As we have explained, the sentencing record reflects that a substantial proportion of customers experienced no financial harm. But even if the government were somehow correct to argue, as we expect it will, that the Court should estimate the financial harm as greater than $150 million, it is relevant for sentencing that any such harm was spread widely across hundreds of thousands of individuals, the vast majority of whom experienced minimal loss.

It was stipulated at trial that half the approximately 1.4 million customers of Mr. Runner's business bought just one product. (*See* DX AA-2). For these 696,711 people, a conservative measure of their harm was the cost of the initial promotion, *i.e.*, $40 at the most. As for the remaining purchasers, even assuming (contrary to the jury verdict and the sentencing record) that they were all victims, a conservative measure of their average loss was $311. (*See* GX 801 (at 5,431,006 orders, an average of 7.7 orders each multiplied by the usual $40 price)). To be sure, this is a material amount of money. But it does not spell poverty for anyone except the very poor.

The diffuse and minimal financial impact on the customers distinguishes this case from fraud cases in which people's savings accounts are wiped out, their credit is ruined, or their identities stolen. In terms of victim financial impact, it more resembles large-scale frauds of corporate entities, which then distribute the cost among many individuals in the form of slightly increased payments (like higher premiums borne by customers of a defrauded health care company).

To the extent that any vulnerable victim can be shown to have been defrauded by Mr. Runner and "as a result of the loss, bec[ame] unable to afford the necessities of life or medical care," that is "much more serious" and Mr. Runner should be punished accordingly. *Corsey*, 723 F.3d at 380 (Underhill, concurring). But the current sentencing record does not reflect such victims. Rather, it resembles the much *less* serious result when a large amount of loss imposed on "a large corporation able to absorb the financial consequences" by passing the costs along to individuals who bear much smaller costs. *See id.*

## B.   The Need To Avoid Unwarranted Sentencing Disparities

1.   Substantially similar defendants have received sentences of approximately 60 months or fewer. A principal example is in *United States v. Weingold*, 98 Cr. 483 (JWB) (D.N.J.); *see also United States v. Weingold*, 844 F. Supp. 1560 (D.N.J. 1994). The government has characterized Mr. Weingold's conduct as "highly similar to the scheme at issue in this case," in that "the government prosecuted a scheme that involved mass market solicitations offering psychic predictions promising specific amounts of money, lucky numbers to win the lottery, and trinkets purporting to be religiously or spiritually significant." (Gov't Opp. To Mot. To Dismiss 16). Mr. Weingold was sentenced to 63 months' imprisonment for this "highly similar" conduct.

Other comparable frauds involving far more grave harm to victims than Mr. Runner's have resulted in similar sentences. For example, in *United States v. Lorindo Powell*, No. 17 Cr. 311 (MKB), the defendant was sentenced to 51 months' imprisonment for defrauding elderly victims. The Guidelines range was 51-63 months, vastly smaller than Mr. Runner's range largely due to the difference in loss amount. Yet the government's sentencing memorandum observed that Powell "empt[ied] the bank accounts of her elderly victims" and "targeting the financial cushions the relied on to keep them comfortable in their final years. Having gained their trust, she not only stole their cash, but emptied their retirement accounts and got them thrown out of their homes."

On the other hand, securities fraud and similar defendants who caused big-figure losses borne largely by corporations, and thus ultimately diffused among many individuals, as in this case, commonly receive 60-month sentences or less. For example, the two defendants in *United States v. Khalupsky*, 15 Cr. 381 (RJD), were sentenced after trial 60 and 48 months. According to the government, their scheme was to hack into business newswires, steal non-public financial information, and then make trades generating $30 million in illegal profits. The Court varied downwards from the Guidelines recommendation of 210 to 262 months and 135-168 months, respectively. Similarly, this Court sentenced the defendant in *United States v. Thomas Donovan*, No. 12 Cr. 196 (JS), to 55 months. He had stolen $31 million from Ficus Investments, Inc., had faced prior civil liability for fraud. *See also United States v. Naveed Khan*, No. 16 Cr. 234 (BMC) (registered broker who received kickbacks for stock purchases and then laundered the money sentenced to 24 months for fraudulent market manipulation scheme leading to a loss of $131 million); *United States v. Sahachaisere*, No. 13 Cr. 452 (ENV) (coordinator of matched trades and pump and dump scheme that fraudulently inflated stock value by $100 million sentenced to 27 months after trial).

2.      Higher sentences have generally been reserved for far more culpable defendants. For example, *United States v. Rose Marks*, No. 11 Cr. 80072 (S.D. Fl. 2023), concerned the most egregious psychic fraud in recent memory. Rose Marks was convicted at trial of personally targeting a cancer victim and other vulnerable people, including those who were "suicidal" from grief, persuading them they had curses upon them that only she could fix, and stealing millions from them in money she represented would be used to help them. She stole $20 million from one victim alone over the course of years. Her Guidelines range was 262-327 months; the judge imposed a sentence of 121 months' imprisonment.

Even accepting the worst the government has said about Mr. Runner, his conduct was not anything close. He did not personally target cancer victims or the grieving. He did not take millions, or anything resembling millions, from individual people. And most importantly, his psychic promotions did not cause customers to believe they had no choice but to pay him. A 60-month sentence would adequately reflect these differences.

As another comparator, in *United States v. Mathew James*, No. 19 Cr. 382 (JS), this Court recently sentenced the defendant to 12 years' imprisonment—10 years on the fraud counts and two years consecutive on the aggravated identity theft. Mr. James, as the Court is aware, was convicted after trial of what the government's press release touted as a $600 million scheme, and what its sentencing memorandum called "one of the largest health care frauds in the

country."  The case involved hundreds of stolen identities, $63 million in personal gain to the defendant (including "multiple" mansions, a "heated driveway," and a red Ferrari).  On every measure, Mr. Runner's case is not in the same ballpark.  On comparison of loss amounts and victim impact alone, a fraud sentence half as long is more than sufficient.

We expect the government may use the relatively high sentences imposed on sweepstakes fraud defendants as comparators for Mr. Runner.  Sweepstakes defendants are not similarly situated.  Unlike psychic speech, which, as we have explained, often benefits the customer, or at least does not impact them in a negative way that warrants punishment, sweepstakes fraud is always fraud.  There is no constitutional protection for "trick[ing] recipients in believing that they had won money and that, in order to receive or claim this money, the recipient had to send in a fee of $20 to $40," when, "[i]n actuality, the recipients had not won any money or prize." *United States v. Novis*, No. 20-CR-335 (JMA), 2023 WL 4746541, at *1 (E.D.N.Y. July 24, 2023).

3.      Statistics released by the United States Sentencing Commission for fiscal year 2022 reflect that a 60-month sentence would be an extraordinary punishment.  *See United States v. Jenkins*, 854 F.3d 181, 193 (2d Cir. 2017) (the "Commission's statistics, which were readily available to the district court at the time of sentencing, allow for a meaningful comparison of [defendant's] behavior to that of other . . . offenders").

In 2023, the mean sentence length for the primary offense category for fraud cases (not counting probationary sentences) was 28 months.  *See* U.S.S.C. 2022 Sourcebook of Federal Sentencing Statistics, Table 15; *at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table15.pdf.  In the previous fiscal year, in the Second Circuit, there were 499 sentences in the primary offense category for fraud cases.  Of those, the mean sentence length was 20 months, and the median was 12 months.  *See* United States Sentencing Comm'n, *Statistical Information Packet* (FY2022: Second Circuit) (Table 7) (chart reflecting the sentence length for each primary offense for the fiscal year 2022).

The requested sentence would be more than double all those numbers.

**C.      Mr. Runner's History And Characteristics**

1.      <u>Mr. Runner's Personal Motivations Do Not Warrant Punishment</u>.

Throughout trial, the government painted Mr. Runner as a cynical, greedy person, seeking to extract profit from the elderly and spiritually credulous.  But there was no evidence that this was in fact his motivation.

To be sure, Mr. Runner's business, like all businesses, was intended to be profitable.  Moreover, there was evidence that the customer lists were selected at times for an older age demographic.  But that was where the market was.  As government witness and company insider Phil Lett testified, "[a]stro customers tended to be from an older demographic age wise," whereas "younger people weren't as interested in astro."  (Tr. 1013-14).  Accordingly, the business targeted old people not because it sought to victimize them, but "because it was cheaper to target the segment that was more receptive to astro."  (Tr. 1014).

19

There was no evidence at trial that Mr. Runner targeted customers who were unusually vulnerable, or that he had personal knowledge of customer messages that came to the caging services in response to the Duval and Guerin letters.  To the contrary, as discussed above, Mr. Runner was drawn to the marketing of astrology because he felt he understood why people wanted it—like him, they were deprived of love, safety, and stability, and needed hope.  Like all astrology, the hope Mr. Runner sold was false, and the jury determined that some customers were harmed by that.  But others were not, and as to them, the most one can say of Mr. Runner is that he succeeded in giving them what they wanted.  *See* Section II.B *supra*.

Finally, the evidence of the supposedly "lavish" lifestyle that Mr. Runner lived consisted largely of his children's education and his family's travel.  As we have explained, these have been Mr. Runner's longstanding priorities.  While there is no good use for a victim's money, there has been no demonstration that he used it for venal purposes.

2.      Mr. Runner's Conditions Of Confinement Warrant Leniency.

As discussed above, Mr. Runner has suffered over three years of exceptionally brutal conditions at MDC Brooklyn, locked in his cell for the majority of that time with his urgent medical care knowingly disregarded.  This ordeal alone warrants extraordinary leniency.

The appalling conditions at MDC Brooklyn are by now well known.  Judge Furman recently issued an opinion observing that the conditions there—including "near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care," as well as "widespread" contraband and multiple inmate suicides—have become such a "major, growing, and widely understood problem" that "it is routine for judges in both [the Southern] District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC."  *United States v. Gustavo Chavez*, No. 22-CR-303 (JMF) (S.D.N.Y. Jan. 4, 2024), at 1-2 & n.6 (citing cases).

Judge Furman was correct, reduced sentences are indeed routine for these reasons.  *See also United States v. Juan Diaz*, No. 23 Cr. 26 (S.D.N.Y. 2024) (Schofield, J.) (granting time served sentence for distribution of fentanyl and remarking: "Under other circumstances, different conditions in the prison system for medical treatment, both at the MDC and more broadly, I would sentence you to a term of imprisonment; but I don't think that's appropriate, given the circumstances and your medical conditions.").  Sentence reductions due to harsh conditions of confinement were similarly the norm during the COVID-19 pandemic, when Mr. Runner was first enduring his incarceration, even for defendants convicted of drug or violent offenses without underlying medical conditions susceptible to COVID-19.  *E.g.*, *United States v. Justin Nettles*, No. 20 Cr. 509 (KPF) (S.D.N.Y.) (downward variance by approximately 40 months in armed robbery case); *United States v. Jaime Gonzalez*, No. 16-826 (Engelmeyer) (S.D.N.Y.) (downward variance by 90 months in drug trafficking case); *United States v. Victor Camacho*, No. 19 Cr. 389 (McMahon) (downward variance by 57 months in drug trafficking case) (S.D.N.Y.); *see also, e.g.*, *United States v. Quannell Ricks*, No. 20 Cr. 330 (KAM) (downward variance by 37 months in gun trafficking case due to harsh MDC conditions during the pandemic, among other factors).

20

In several respects, Mr. Runner's experience has been among the worst I have witnessed among clients detained at MDC. As discussed above, in light of his decision to go to trial in such a document-heavy case, he has been detained far longer than most inmates, and therefore has been subject to near-constant lockdowns, dreadful conditions, and endemic violence far longer than most inmates. Moreover, the flagrant disregard for Mr. Runner's medical care has been reprehensible even by MDC standards. It took MDC staff well over a year to permit Mr. Runner to see a doctor for the blood in his urine. They now still refuse to dispense the medication that doctor has prescribed. It took them two years to give Mr. Runner a COVID-19 vaccine. One cannot avoid the impression that no one on staff would care if Mr. Runner died.

Our society does not countenance such conditions. Mr. Runner has suffered far more than he should have already. For this reason, too, a 60-month sentence is sufficient.

### D.    The Need For Deterrence

Specific deterrence is not a consideration that warrants additional punishment in this particular case. No human would wish to undergo again what Mr. Runner has already. Moreover, Mr. Runner faces deportation to Europe when his sentence is over. Even if there remained an American market for mail-order astrology (doubtful, in light of the rise of Internet-based marketing), Mr. Runner would no longer be able to participate in it.

As for general deterrence, we have already explained why sentences of approximately 60 months or less described above are the correct benchmarks. There is no evidence that a longer period will have any greater deterrent effect. To the contrary, the available evidence is that even a modest prison term achieves the necessary effect in this context. *See supra* Section III.C; *and see United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("[C]ommon sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not. Thus, a relatively modest prison term . . . is 'sufficient, but not more than necessary' for [general deterrence] purposes.").

<center>*    *    *</center>

The defense respectfully requests, at most, a 60-month term of incarceration.

<div style="margin-left:50%">

Respectfully submitted,

/s James Darrow

James Darrow
Assistant Federal Defender
Tel. (718) 407-7419
james_darrow@fd.org

*Attorneys for Patrice Runner*
</div>

cc:     Counsel of record (by ECF)
        U.S. Probation Officer Ashtin Audain (by email)

<center>21</center>