

**U.S. Department of Justice**

Consumer Protection Branch

---

**Charles B. Dunn**
Telephone: (202) 305-7227
Fax: (202) 514-8742
charles.b.dunn@usdoj.gov

**Overnight Delivery Address**
450 5th St., N.W., Room 6400
Washington, D.C. 20001

**Mailing Address**
P.O. Box 386
Washington, D.C. 20044

April 1, 2024

By ECF
The Honorable Joanna Seybert
United States District Judge
Eastern District of New York 920
Federal Plaza
Central Islip, NY 11722

Re: *United States v. Patrice Runner*
       Case No. 18-cr-578

Dear Judge Seybert:

      On average, over the course of the psychic mail fraud scheme, Patrice Runner defrauded more than 7,000 victims per week.[1] Seven thousand victims would be notable in any case—but for Runner, that was only seven days' work out of more than 20 years. He did nothing else; he possesses no other skills. Runner was a full-time fraudster for decades.

      Runner deserves a lengthy sentence that reflects the severity and duration of his crimes, deters other fraudsters from preying on elderly and vulnerable people, and protects the public from further harm. Over a two-week trial, the government's case showed that Runner is a career criminal whose daily efforts were consumed by how best to play his role in the global Maria Duval scam, all while actively avoiding scrutiny by the authorities. For decades, Runner led the North American efforts in this worldwide scheme, stealing more than $175 million[2] from his victims. Rather than pay any heed to the countless complaints and notes from victims and letters from government authorities, and even a formal action by the U.S. Postal Service, Runner continued the lies, covered his tracks, lied to the Postal Service, and kept the scheme going until the Department of Justice finally stopped him in 2014.

      Runner designed and operated a fake psychic scam that defrauded more than 1.3 million unique victims for more than 20 years.[3] Runner recruited numerous others to aid him in

---

[1] GX 800 shows more than 6.1 million victim payments between 1999 and 2014.

[2] *Id.*

[3] *Id.*

carrying out the scheme and worked with his international partners to evade detection, conceal his whereabouts, and develop techniques and additional fake psychics to steal more money. The Probation Department calculated the offense level as 47, an offense level that merits a life sentence under the Sentencing Guidelines. However, the Probation Department determined that a period of confinement of 240 months for each count (to run concurrently) would be more reasonable under the circumstances and sufficient to comply with the requirements in 18 U.S.C. § 3553. The United States disagrees with this recommendation as inappropriately lenient, and recommends a sentence of 360 months of confinement.

In his sentencing memorandum, Runner will no doubt state that he intended no harm, as he has throughout these proceedings, and that he felt he provided his victims with the benefit of the bargain, even if he grudgingly acknowledges the jury's role in adjudicating his guilt and makes a passing expression of remorse. He will certainly point to his confinement prior to trial, and assert that no additional confinement is warranted. But such a result would be completely disproportionate to the harm Runner caused to his victims and their families. Runner took total advantage of his victims and their desperation, millions of times. Each of those more than six million victim payments represents a person reaching out for help that never came and that Runner never even tried to provide. Runner promised his victims easy, magical answers in exchange for a fee, and provided nothing in return except a cheap, fake trinket.

This is a case of overwhelming, predatory greed. Runner did all of this and took advantage of people just to fund his incredible lifestyle—he couldn't scrape by on $120,000 per month.[4] He funded homes throughout the world,[5] a leather goods store in the south of France,[6] lavish vacations, private schools, and other luxuries, all on the backs of his victims. Runner shows no contrition, no sympathy for his victims, and no regret except that he was finally held to account. Runner deserves a significant sentence—including a substantial term of imprisonment—to finally demonstrate that the justice system takes his offenses seriously and that taking advantage of the most vulnerable persons in our society through mass-mailing fraud will not be tolerated.

## I. PROCEDURAL HISTORY

### A. Indictment and Guilty Verdict

A grand jury in this District returned the Indictment on October 25, 2018.[7] Runner was charged with one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, twelve counts of mail fraud in violation of 18 U.S.C. § 1341, four counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Following Runner' extradition from Spain, a jury trial was held from May 30, 2023 to June 15, 2023. On June 15, 2023, after a two-week trial, Runner was

---

[4] GX 130.

[5] Tr. at 214 (Thanos).

[6] GX 130; Tr. at 387 (Thanos).

[7] Dkt. No. 1.

convicted on 14 counts.[8] Runner faces a maximum of 20 years for the § 1349 conspiracy conviction; 20 years for each of the § 1341 mail fraud convictions; 20 years for each of the § 1343 wire fraud convictions; and 20 years for the conspiracy to commit money laundering conviction. Sentencing is scheduled for April 10, 2024.

### B. Status of Related Cases

Three cooperators testified during Runner's trial. Mary Thanos, one of Runner's principal employees and co-conspirators, pleaded guilty in 2018, but has not yet been scheduled for sentencing.[9] Phil Lett, another of Runner's principal employees and co-conspirators, also pleaded guilty in 2018 and has not been scheduled for sentencing.[10] Daniel Arnold, Runner's primary list broker, pleaded guilty in 2018 and is scheduled to be sentenced on July 30, 2024.[11] Sherry Gore (who managed the "collection letter" process used to extract additional money from Runner's victims) pleaded guilty and was sentenced in 2018.[12] In addition, four principals of PacNet Services, Ltd., Runner's longtime payment processor, are indicted in the District of Nevada and pending extradition from Canada.[13]

## II.  THE GUIDELINES ARE THE STARTING POINT FOR DETERMINING RUNNER'S SENTENCE

### A. Legal Standard

Under *Booker*, the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220, 245 (2005). Nonetheless, district courts must calculate the applicable Guidelines range under the Guidelines existing at the time of the offense before imposing sentence. *Id.* The Guidelines remain "the lodestone of sentencing" and "anchor both the district court's discretion and the appellate review process." *Peugh v. United States*, 569 U.S. 530, 549 (2013). On appeal, the use of the Sentencing Guidelines "as a benchmark helps promote uniformity by tending to iron out sentencing differences" and results in a presumption that "a within-Guidelines sentence is reasonable." *Id*. at 542.

While district courts are generally free to impose sentences outside the recommended range, when doing so they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 544, 549. A major departure from the Guidelines "should be supported by a more significant justification than a minor one." *Id*. at 193.

---

[8] Dkt. No. 104. Runner was convicted for conspiracy to commit mail and wire fraud, eight counts of mail fraud, four counts of wire fraud, and conspiracy to commit money laundering.

[9] *United States v. Thanos*, 18-cr-260 (E.D.N.Y.).

[10] *United States v. Lett*, 18-cr-261 (E.D.N.Y.).

[11] *United States v. Arnold*, No. 18-cr-21 (E.D.N.Y.).

[12] *United States v. Gore*, No. 18-cr-46 (S.D. Ind.)

[13] *United States v. Day, et al.*, No. 19-cr-155 (D. Nev.).

## B. The Presentence Investigation Report (PSR) Correctly Calculates Runner's Offense Level as 47

According to the Probation Department, Runner warrants an offense level of 47 and should be sentenced within Criminal History Category I, which yields an advisory Guidelines sentence of life in prison. Runner PSR ¶¶ 31–56. The offense level is based on:

- a base level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1);

- a 26-level enhancement for loss of more than $150,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(N);

- a 2-level enhancement for an offense involving 10 or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i);

- a 2-level enhancement for an offense involving the violation of an injunctive order (the 2004 USPIS administrative action and the cease-and-desist order issued in 2007[14]), pursuant to U.S.S.G. § 2B1.1(b)(9)(C);

- a 2-level enhancement because Runner knew victims were vulnerable due to their advanced age,[15] pursuant to U.S.S.G. § 3A1.1(b)(1);

- a 2-level enhancement because the U.S.S.G. § 3A1.1(b)(1) enhancement applies and the offense targeted a large number of vulnerable victims; and

- a 4-level enhancement because Runner was the organizer and leader of the fraud scheme, which involved at least five participants,[16] pursuant to U.S.S.G. § 3B1.1(a); and

- a 2-level enhancement for an offense involving the use of sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C);

The PSR calculates Runner's offense level as 47. The Government agrees with this calculation.

---

[14] GX 400 at 127–29.

[15] Extensive evidence shows that Runner and his co-conspirators targeted older persons and the elderly through the uses of lists of consumers over a certain age—indeed, sometimes age was the primary criterion for a list rental. *See, e.g.*, GX 212; Tr. at 765–70 (Arnold); Tr. at 822–30 (Lett).

[16] These persons include, but are not limited to, the trial witnesses Lett, Thanos, and Arnold, as well as Jean-Claud Reuille, Jacques Mailland, and Daniel Sousse, about whom extensive evidence and testimony was presented at trial.

## C. Runner Should Receive a 26-Level Enhancement for Actual Loss of More Than $150,000,000

Runner's scheme was matched in its rapacity only by its brazenness. The stipulated amount of victim loss is more than $175 million for the last 15 years of the charged conspiracy, as shown by the OrderMotion data between 1999 and 2014.[17] More than 1.3 million victims are represented by this sum, each of whom sent money to Runner, who just pocketed the money and made no attempt to provide the promised services, at best sending a cheap, fake trinket. No psychic had a vision about easing a victim's financial troubles—the only person whose financial situation was improved was Runner.

This sum represents the proceeds of many, many millions of individual attempts to defraud U.S. and Canadian consumers; moreover, this is the *actual loss*, not an intended loss figure. An intended loss figure would amount to some billions of dollars.

### i. $175 million is a reasonable estimate of the actual loss Runner caused to victims.

Runner deserves a 26-level enhancement for causing more than 1.3 million victims to lose more than $175 million to the scheme. U.S.S.G. § 2B1.1(b)(1)(N). This figure is based on the OrderMotion database Runner and his co-conspirators used to track victim payments, as the parties stipulated at trial.

Sentencing courts must make a reasonable estimate of loss based on the available information. U.S.S.G. § 2B1.1 cmt. n.3(c); *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997). The $175 million calculation is a reasonable estimate of actual loss based on the available information because it is based on the total payments that victims made in response to Runner's fraudulent mailings. The Second Circuit has consistently held that a "district court is not required to calculate loss with 'absolute precision,' but need only by a preponderance of the evidence make 'a reasonable estimate of the loss' given the available information." *Id*. at 597 (citing *United States v. Coppola*, 671 F.3d 200, 250 (2d Cir. 2012)); *see also United States v. Powell*, 831 F. App'x 24, 25–26 (2d Cir. 2020). With regards to any refunds Runner may have issued in response to complaints, actual loss "includes the amount of property taken, even if all or part has been returned." *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997).

In his objections to the PSR, Runner argued that the loss calculation should be limited to the victims identified in mail fraud counts for which the jury found Runner guilty. But this view is deeply misguided; it does not reflect the scope of Runner's conduct, and it renders criminal intent meaningless. Runner's argument suggests, contrary to the Guidelines' instructions on calculating loss, that in order to prove loss, the Government was required to put more than one million victims—many of whom are elderly or have since passed away—on the stand. Obtaining specific information from 1.3 million victims was neither possible nor necessary to calculate a "reasonable estimate of loss, based on the available information." For this reason, the Second

---

[17] GX 800.

Circuit and other courts have rejected arguments that sentencing loss should be limited to the loss incurred by victims who testified at trial. *United States v. Bradbury*, 2000 WL 562430, *2 (2d Cir. 2000) (unpublished) (affirming inclusion of loss amounts suffered by victims not named in the indictment); *United States v. Powell*, 650 F.3d 388, 391–94 (4th Cir. 2011) (affirming inclusion of loss amounts suffered by victims who defendants did not have opportunity to cross-examine.)

Moreover, the Government is not required to obtain specific information from hundreds of thousands of fraud victims to prove "loss"—the mail and wire fraud statutes prohibit the scheme and the intent to defraud, not the success in defrauding specific, individual victims. *See United States v. Trapilo*, 130 F.3d 547, 551–52 (2d Cir. 1997) (holding that it is "the forming of the scheme to defraud" and the use of the mails and wires that is barred by the mail and wire fraud statutes, and that additional proof is not required). Runner was not only convicted of defrauding the specific victims identified in the mail fraud counts of conviction—rather, he was convicted of intentionally conspiring to commit wire fraud and mail fraud and for intentionally operating a fraudulent psychic mail fraud scheme for 20 years. That is not an allegation—it is the jury's unanimous determination.

Insofar as Runner argued throughout the trial that most victims were "repeat buyers" who did not complain and may argue here that the loss figure is thus undetermined, the $175 million is still a reasonable estimate of actual loss. That a paying customer did not complain does not mean that the psychic mailings were not fraudulent or that he or she was not defrauded. *United States v. Mosely*, 980 F.3d 9, 29 (2d Cir. 2020) (rejecting argument that for purposes of loss calculation, only complaining borrowers in payday-loan scam could be deemed to have been defrauded and noting, "[t]hat a borrower may have never objected to the loan does not mean that the process that led to it was free of fraudulent representations or that those borrowers were not defrauded…"). All of the victims who sent payments to Runner's operation did so because they had received the fake psychic letters that Runner mailed with fraudulent intent, and the losses they suffered are a reasonable and appropriate basis for the actual loss calculation.

Relatedly, the government objects to Runner's request in his objections to the PSR, requesting that the PSR contemplate a *downward* variance because the victim loss he caused leads to a significant increase to his offense level. The loss amount is the direct result of Runner's life's work—defrauding as many U.S. victims as he possibly could through a predatory mail fraud scheme. Runner spent 20 years operating this scheme while obscuring his involvement and hiding from law enforcement scrutiny. Runner obtained this enormous amount of money from his victims, one small check or cash payment at a time. The fact that he succeeded for so long and stole an enormous sum of money from his victims should not be used as a reason to reduce his sentence.

### ii. An *intended* loss calculation would amount to billions.

The appropriate *intended* loss figure would be significantly higher than the $175 million figure victims actually paid in response to the fake psychic mailings—some *billions* of dollars. At trial, the prosecution introduced evidence of response rates, i.e., the percentage of victims

who provided paid responses to Runner's fraudulent psychic mailings.[18]  Even if only 5 percent of people who received the prize notices paid, then the intended loss figure—the amount Runner's operation would have generated if all recipients had made payments to the scheme—is approximately $3.5 *billion*.[19]  That intended loss figure would merit a 30-level enhancement instead the 26-level enhancement recommended by the PSR.  U.S.S.G. § 2B1.1(b)(1)(P).  Insofar as both the actual loss and intended loss figures both result in an advisory Guidelines sentence of life imprisonment, the Government does not object to the PSR's use of the lower actual loss figure instead of an intended loss calculation.

The Government acknowledges the recent decision of the Third Circuit in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), but that decision has no application in a situation like the present case, where the Government advocates calculation of the Guideline sentence based on *actual* loss, not *intended* loss.  *Id.* at 258 (concluding that the appropriate loss figure for sentencing "is the loss the victim actually suffered").

### D. Runner Should Receive a 2-Level Enhancement for an Offense Involving 10 or More Victims

Runner defrauded more than 1.3 million victims with his fake psychic scheme.  The parties stipulated to the data generated by Runner and his co-conspirators and which was maintained to keep track of victim payments—this data is reflected in summary government exhibit 800 and was provided to the jury for their deliberations.  That exhibit depicted over 6 million payments from the more than 1.3 million victims, indicating that most victims were repeatedly defrauded.

### E. Runner Should Receive a 2-Level Enhancement for Violating an Injunctive Order

In 2004, the United States Postal Inspection Service brought an administrative action against Runner, a shell company, and Maria Duval to stop the fraudulent psychic scheme.[20]  Runner then went to significant lengths to deceive the Postal Service about his involvement in his own mailing operation and to have himself removed as a Respondent to that action.[21]  The resulting cease-and-desist order in substance required Runner and his co-conspirators to end the scheme, but they continued for more than seven years, until the Department of Justice shut it down in 2014.

The numerous psychic mailings and complaints introduced at trial showed that Runner continued to use the same lies and misrepresentations in the psychic scheme as he did prior to the 2007 settlement and cease-and-desist order.  For example, the cease-and-desist order forbade the

---

[18] *See, e.g.*, GX 143 and Tr. at 278 (Thanos).

[19] Assuming that $175 million represents the proceeds of 5% of the total number of mailings, 20 times that amount amounts to $3.5 billion as the amount that would have been received if 100% of the victims paid.

[20] GX 400.

[21] GX 401, 402; Tr. at 348–52 (Thanos); Tr. at 635–44 (sidebar discussion of this aspect of the Postal action).

sending of mail to any person that falsely represented that "[t]he recipient of the solicitation was specifically selected to receive the mailing based on a reason other than the fact that the recipient's name appears on a mailing list" and that Runner and his co-conspirators "are aware of specific intimate information . . . about the recipient which will directly impact on the person's well being."[22] This was directed at the core deception of the scheme, which never changed. Through 2014, Runner mailed many millions more fake psychic letters that claimed intimate knowledge of the victims as a result of psychic powers and visions, never once stating that the reason the victim got the letter was because Runner rented a list with their name on it.

### F. Runner Should Receive a 4-Level Enhancement Because He Knew Many Victims Were Elderly and Vulnerable and He Targeted Large Numbers of Vulnerable Victims

Runner specifically targeted older and elderly victims. His own words make this point better than those of any trial witness. In a 2010 email to Phil Lett, Runner discussed his criteria for list selection, stating:

> I select 65+ years old on large lists when available (or age select could help to take a list that doesn't really have the target audience if 65+ years old select is available).[23]

As the Court will recall, a "select" is a way to narrow the demographic characteristics of a list of potential victims that Runner rented through brokers like Dan Arnold, in this case, a "select" for potential victims 65 and older.[24] In this 2010 email to Lett, Runner is saying that he gets the best bang for the list-rental buck from people 65 and older, and that even where the list does not directly relate to his business (such as people who have previously expressed interest in psychics) he will nevertheless rent the list as long as he can use it to target persons over the age of 65.

Runner's predation upon the vulnerable did not end when he sent them a single fraudulent mailing. After sending an initial fraudulent mailing to the victims on a rented list, Runner and his co-conspirators kept careful track of the small percentage of recipients who responded by sending back money and then targeted those victims with repeated mailings. Typically, once a victim responded to the initial mailing, that victim would receive dozens of additional fraudulent mailings, all pretending to be additional personal correspondence from Maria Duval and the other psychics. Thus, Runner targeted vulnerable victims both through his purchase of victim lists from similar schemes and then by repeatedly bombarding those victims who sent him money with additional requests for payment. *See United States v. O'Neil*, 118 F.3d 65, 75-76 (2d Cir. 1997) (affirming vulnerable victim enhancement where "an important part of the scheme was the re-loading process, whereby individuals who already had been victimized by the scheme were contacted up to two more times and defrauded into sending more money to the companies").

---

[22] GX 400 at 129.

[23] GX 212.

[24] Tr. at 750, 757 (Arnold).

### G. Runner Should Receive a 4-Level Enhancement Because He Led a Fraud Scheme With At Least Five Participants and that Was Otherwise Extensive

i. **Runner led and organized the fraudulent scheme.**

The PSR's recommendation that Runner receive 4-level enhancement for his leadership role in the scheme, pursuant to §3B1.1(c), is consistent with the facts. The Guidelines provide factors for courts to consider in distinguishing a leadership and organizational role, which include:

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4. At trial, Runner's employees and co-conspirators testified that Runner ran the entire operation; that he was the boss and made managerial decisions in the day-to-day operations of the scheme; that he set the mailing schedules; controlled the money generated by the scheme; made decisions concerning employee hiring, schedule, and pay; made the decisions about which mailing lists to rent; and otherwise controlled the entire operation, including signing various agreements with vendors and later shielding himself from scrutiny by using straw-persons like Balbino Alvarez and Martin Dettling to sign documents on behalf of the operation. Indeed, Runner referred to himself as the "senior copyrighter and direct marketing expert" and "main marketing and advertising person" who was "operating one of the largest U.S. and Canadian mail order operation with esoteric concepts for many years."[25]

ii. **Runner led and organized criminal activity with five or more participants.**

The leader/organizer enhancement is appropriate under U.S.S.G. § 3B1.1 where five or more criminally responsible persons are involved in carrying out the criminal activity. In this case, those criminally responsible persons include, at a minimum: (1) Mary Thanos, (2) Phil Lett, (3) Dan Arnold, (4) Sherry Gore, (5) Jacques Mailland, (6) Jean Claude Reuille, and of course (7) Runner himself. Five of these persons have been held criminally responsible for their roles in the activity led and organized by Runner, including Thanos, Lett, Arnold, Gore (who have all pleaded guilty to conspiracy), and Runner; Reuille and Mailland were Runner's partners in running the Maria Duval psychic scam globally, as shown by other evidence adduced at trial.[26]

---

[25] GX 142.

[26] *See, e.g.*, GX 100, 101, 102, 133/133A (emails discussing negative publicity affecting the Maria Duval scheme globally and involving Thanos, Lett, Runner, Mailland, and Reuille).

To the extent that Runner points to Thanos or Lett as running the day-to-day of the scheme, a criminal conspiracy may have more than one leader or organizer. U.S.S.G. § 3B1.1, cmt. n. 4. Moreover, it is the activity that must have five or more persons, not the discrete group the defendant led or organized; the enhancement's prerequisites are satisfied where the defendant led or organized at least one individual in furtherance of the criminal activity carried out by five or more people. *See United States v. Thompson*, 537 F. Supp. 3d 439, 453 (W.D.N.Y. 2021) (citing *United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003)). Runner meets these criteria.

### iii. Runner's criminal activity was otherwise extensive.

The leader/organizer enhancement is also appropriate where the criminal activity was "otherwise extensive" under U.S.S.G. § 3B1.1. Criminal activity is otherwise extensive where "the unknowing services of many outsiders" are included in the execution of the fraud. U.S.S.G. § 3B1.1 cmt. n.3; *United States v. Archer*, 671 F.3d 149, 165 (2d Cir. 2011). The Court's determination under this provision is made by weighing three factors: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *Archer*, 671 F.3d at 165.

Here, the criminal activity is "otherwise extensive" by virtue of the involvement of numerous additional persons. These additional persons include the many vendors Runner used to further the scheme, including printers, letter shops, copywriters, the caging service in Deer Park, New York, and lower-level employees of PacNet, Runner's longtime payment processor. Every individual or category of individuals was essential to Runner's complex, long-running scheme. These vendors carried out many of the day-to-day tasks associated with the mailing operation, including production of the physical mailings. The PacNet employees enabled Runner's roundabout access to the banking system and thus enabled him to cash victims' checks, launder the proceeds, and ultimately profit from his scheme.

### H. **Runner Deserves a 2-Level Enhancement for the Use of Sophisticated Means to Carry Out His Fraud Scheme**

For many of the reasons described above, the sophisticated means enhancement applies to Runner's offense conduct. The commentary to the Guidelines defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1(b)(10)(C), n.8. In the Second Circuit, the enhancement applies "even if each step in the scheme was not elaborate," so long as "the total scheme was sophisticated in the way all the steps were linked together…" *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996). Here, Runner designed a mass-mail fraud scheme that sent millions of fake psychic letters to victims across the United States and Canada. The scheme was run under the guise of numerous shell companies (the "offshore companies" in the parlance of trial witnesses). Runner acquired mailing lists from list brokers and wrote and edited the psychic mailings. Runner employed a front-end and back-end mailing system that was meticulously designed to identify and repeatedly defraud those victims who were most susceptible to the scheme. Once victims responded to one notice, Runner and his co-conspirators carefully recorded that data using key codes associated with the mailing lists and psychic letters. Then, Runner

bombarded victims with additional fake psychic letters. Runner also provided these victims' information to other fraudsters through his list broker.

When Runner and his co-conspirators received checks from victims, they directed the caging service to forward them to their PacNet partners in Canada, who processed the victim payments into their own accounts and then wired the proceeds to Runner and his co-conspirators at their direction. To conceal themselves and their illicit activities, Runner and his co-conspirators deployed artifices such as the "offshore companies" in locations where they conducted no business (such as Hong Kong) and employed "straw men" like Balbino Alvarez and Martin Dettling to keep their names off the paperwork associated with the scheme.

Furthermore, committing a substantial part of a fraudulent scheme outside the United States is also a sufficient basis to apply the enhancement for sophisticated means, pursuant to Section 2B1.1(b)(10)(B). Here, the day-to-day operations of the scheme were conducted primarily from Canada. Runner oversaw the operation while living in numerous locations, including Canada, Costa Rica, France, and Switzerland. On the whole, Runner devised an elaborate scheme for which a "sophisticated means" enhancement is well deserved.

### III. STATUTORY FACTORS CALL FOR A SUBSTANTIAL PRISON SENTENCE

The factors listed in 18 U.S.C. § 3553 weigh in favor of imposing a lengthy sentence of imprisonment. These factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant.

#### A. Nature and circumstances of the offense: Runner targeted elderly and other vulnerable persons and went to great lengths to conceal his activities.

In his sentencing memorandum, Runner may argue that he has no prior convictions, but this ignores a lifetime of scamming people,[27] including the two decades running the scheme for which Runner now stands before the Court, awaiting sentence. Far from an errant decision in an otherwise law-abiding life, Runner's entire career consisted of criminal activity. The evidence developed at trial shows Runner's concerted efforts over multiple decades—daily effort over thousands of days reflecting countless decisions to deceive victims with lies, countless decisions to ignore the substance of complaints, countless decisions about how to evade responsibility. Fraud defined Runner's very existence—he didn't do anything else. He committed fraud, full time, for more than 20 years.

---

[27] GX 147 (this exhibit was not admitted for the jury's consideration at trial, but is reoffered for sentencing and contains Runner's 2009 description to a co-conspirator of his career in fraud, starting at the age of 12, as a way to make money quickly).

These years also reflect countless decisions to ignore government enforcement efforts, including Runner's decisions about lying to the U.S. Postal Service during the course of the administrative action between 2004 and 2007. Not only did Runner commit this fraud on the Postal Service, but he ignored the cease-and-desist, continuing the scheme for seven more years until the Department of Justice finally put a stop to it.

The overwhelming evidence adduced at trial showed that Runner targeted the elderly and vulnerable persons, bombarding them with dozens of the fake psychic letters. But it did not necessarily stop there: if an already-vulnerable victim dared to put a stop payment on or bounced a check, Runner sent those persons a series of escalating "collection" letters in attempts to victimize those vulnerable persons even more, ultimately threatening legal action and squeezing every drop of available money from these vulnerable victims.[28] Runner's appetite and greed were unbounded.

### B. History and characteristics of the Defendant: Runner did not care about the Government's attempts to stop his fraudulent scheme.

Apart from the breathtaking boldness of the fraud, Runner's scheme was also marked by concerted effort to hide from the authorities. Over time, Runner—fully aware of the criminal nature of his operation—learned to take himself off of any paperwork directly associated with the scheme, going so far as to create various business entities in Hong Kong to disguise the operation's location and ownership, use "straw" people (Martin Dettling and Balbino Alvarez) to sign documents for payment processing and mailboxes, and even went out of his way to deceive the U.S. Postal Service about his involvement in the psychic scam when the Postal Inspectors came calling with a formal action in 2004 which sought to stop the scheme and stop the harm to victims.

These circumstances, taken together, demonstrate Runner's awareness that his scheme was illegal, and that he did not care that it was illegal. These techniques used to dodge the authorities and conceal who was operating the scam were just costs of doing a very lucrative business.

### C. The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide adequate deterrence, to protect the public, and to provide just punishment.

Runner's scheme defrauded more than 1.3 million persons of more than $175 million. By any comparison this is a serious offense, which is reflected by the Guidelines sentence of life in prison. The sheer size and duration of the fraud indicates the need for a substantial sentence, including a lengthy sentence of imprisonment.

The unusual nature of this case and its massive scope has resulted in extensive press coverage from CNN, the Washington Post, Reuters, and many other outlets,[29] as well as a book

---

[28] Tr. at 897–911 (Lett); GX 245, 256, 257, 258, 259, 260.

[29] CNN published a series of articles about the Maria Duval psychic scam in 2016, *e.g.*, *Chapter*

publication.³⁰ This case represents an unusual opportunity for the Court to impose a sentence that may be widely reported and thus broadly convey the message that mass-market scams are not taken lightly, potentially deterring others who may be contemplating "getting into the mail" or undertaking other mass-market schemes. A significant sentence would therefore serve to protect the public, deter others, and provide just punishment.

Runner's history of concealment and avoidance—including the "offshore companies," the straw men, and deception in the U.S. Postal Service action—demonstrates the need for both specific and general deterrence. Runner got his name removed from the 2004 Postal action in bad faith, but that was nevertheless his slap on the wrist, and was not enough to stop him. Specific deterrence is necessary here—should the Court impose a short sentence, Runner will then be deported with nothing to stop him from engaging in his next scheme somewhere overseas. Nothing would prevent him from doing so—all he would need is paper, postage, and a mailbox, and suddenly Runner is up and running again.

General deterrence is also required. The unfortunate truth is that elder fraud and mass-marketing fraud remain rampant, continuing to plague the mail and other forms of communication, including the robocall and text-message scams coming through the phones in nearly every American's pocket. This case, having already received extensive media attention, is an opportunity for the Court to broadcast a message of general deterrence to mass-marketing fraudsters throughout the world.

The Court's sentence should be sufficient to demonstrate to Runner and to the broader community of fraudsters that they cannot commit fraud with impunity.

> D. **The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct: a sentence of 360 months' imprisonment is warranted due to the staggering number of victims and the loss amount Runner caused.**

Mail and wire fraud cases in the Second Circuit and elsewhere frequently result in significant terms of imprisonment, even with lesser offense levels than that incurred by

---

*One: Who is behind one of the biggest scams in history?* https://money.cnn.com/2016/02/24/news/psychic-maria-duval-chapter-one/index.html. *See also, e.g.*, The Washington Post, *His psychic scheme paid big for 20 years, feds say. Now, he faces prison* (June 20, 2023), https://www.washingtonpost.com/nation/2023/06/20/patrice-runner-psychic-scam-convicted/; The Montreal Gazette, *Quebec man convicted in the U.S. of scam using 'psychics'* (June 20, 2023), https://montrealgazette.com/news/crime/quebec-man-convicted-in-the-u-s-of-scam-using-psychics; Reuters, *U.S. shuts down international 'psychic' mail fraud* (May 9, 2016), https://www.reuters.com/article/idUSKCN0Y01YI/; San Diego Union-Tribune, *US prosecutors say they've shut down fake psychic scam* (May 9, 2016), https://www.sandiegouniontribune.com/sdut-us-prosecutors-say-theyve-shut-down-fake-psychic-2016may09-story.html.

³⁰ Blake Ellis & Melanie Hicken, A DEAL WITH THE DEVIL: THE DARK AND TWISTED TRUE STORY OF ONE OF THE BIGGEST CONS IN HISTORY (2018).

Runner, especially in mass-mailing cases with elderly and other vulnerable victims. For example:

      a.      *United States v. Ryan Young*, 18-cr-46 and 23-cr-70 (E.D.N.Y., Azrack, J.). In these mass-mailing cases, Young was charged with operating a mass-mailing scheme 2011–2016, and while on pretrial release, began another mass-mailing scheme during 2019–2022. Total victim loss between these two schemes exceeded $49 million. Young pleaded guilty to conspiracy in both cases. In January 2024, Young was sentenced to 72 months in prison.

      b.      *United States v. Sean Novis and Gary Denkberg,* 20-cr-335 (E.D.N.Y., Azrack, J.). In this mass-mailing case, the defendants were each convicted of conspiracy, mail fraud, wire fraud, and aiding and abetting mail fraud over the course of a 13-year scheme with more than $92 million in victim loss. In August, 2023, Novis was sentenced to 90 months confinement and a $500,000 fine; Denkberg was sentenced to 66 months confinement and a $250,000 fine.

      c.      *United States v. Castro, et al.*, 19-cr-295 (D. Nev.). In this mass-mailing case, the defendants were convicted of conspiracy and mail fraud over the course of an eight-year scheme, resulting in victim losses of more than $10 million. The defendants were sentenced in October 2023. Mario Castro was sentenced to 240 months confinement and a $500,000 fine. Miguel Castro was sentenced to 235 months confinement and a $500,000 fine. Jose Mendez was sentenced to 168 months confinement and a $100,000 fine.

These case show that fraudsters who target elderly and vulnerable Americans through the mail should receive substantial prison sentences. And yet Runner's scheme ran for longer and was significantly larger—stealing more money from more victims—than the schemes prosecuted in *Young*, *Novis*, and *Castro*. As described above, Runner's offense level of 47 accounts for the staggering losses he caused to more than one million victims, his specifically targeting the elderly and the vulnerable, and his efforts to avoid law enforcement detection, among other factors.

### E. The Government is already distributing restitution to victims of the scheme, without any contribution from Runner.

The Government does not anticipate seeking a restitution order given the large number of victims (over 1.3 million). The mandatory restitution statute that typically governs fraud cases does not apply because the "number of identifiable victims is so large as to make restitution impracticable." 18 U.S.C. § 3663A(c)(3); U.S.S.G. § 5E1.1(b)(2); *United States v. Rigas*, 409 F.3d 555, 563 (2d Cir. 2005) (finding that mandatory restitution under section 3663A did not apply in the case where the defendant victimized tens of thousands of individuals and determining the amount of restitution owed to each victim would be too complex).

This is not to say that the victims have no recourse—far from it. In 2021, the Department of Justice entered into deferred prosecution agreements with two separate companies, Epsilon Data Management and KBM Group, under the terms of which the two companies admitted to selling or renting the data of millions of American consumers to the perpetrators of mass mailing fraud schemes, including Runner's scheme. These two companies paid a total monetary penalty

of $191 million, of which $161 million is being distributed to victims via a claim administrator.[31] Using the data obtained in the course of its investigation, the United States instructed the claim administrator to reimburse all living victims who paid $20 or more to Runner's fraudulent scheme. According to the claim administrator, as of January 2024, 158,973 victims have cashed reimbursement checks totaling $57,484,894.22.[32] The claim administrator has issued approximately 105,000 additional victim reimbursement checks totaling more than $34 million which have yet to be cashed, and is in the process of identifying the heirs of victims who have passed away so that they may be offered an opportunity to claim reimbursement.

### F. Runner should be ordered to pay a criminal fine of $500,000.

To calculate an appropriate fine, the Guidelines instruct courts to consider the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence; any restitution the defendant has made or is obligated to make; and whether the defendant previously has been fined for a similar offense, among other factors. *See* U.S.S.G. § 5E1.2(d).

All of the factors articulated above indicate that Runner should be ordered to pay the maximum fine of $500,000. He defrauded more than 1 million victims of more than $175 million and has not paid a dime to a single victim in restitution. As a result of the Government's efforts described above, Runner will never be obligated to pay victims back for the harm he and his co-conspirators caused. At a minimum, Runner should be obligated to pay a fine that represents less than one third of one percent of the money he stole.

### G. Criminal Forfeiture

The United States, through its forfeiture AUSA in the Eastern District of New York, anticipates filing a motion in the coming days for a forfeiture monetary judgment.

---

[31] *Consumer Data Victim Compensation*, https://www.justice.gov/civil/consumer-data-victim-compensation.

[32] This data was obtained from the claim administrator on January 26, 2024.

## CONCLUSION

The sentence imposed should leave Runner with no doubts that his scheme was unlawful, and that society will not tolerate taking advantage of the vulnerable so that criminals may line their pockets. He should be deprived of his liberty to a degree sufficient to—at last—deter him, to protect the public from further harm, and to account for the seriousness of his conduct and the harms caused.

Dated: April 1, 2024                    Respectfully submitted,

/s/ Charles B. Dunn
JOHN W. BURKE
RACHEL E. BARON
ANN F. ENTWISTLE
CHARLES B. DUNN
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice

CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a true copy of the foregoing was filed with the Court using the CM/ECF system electronically on this 1st day of April 2024, and served using the CM/ECF system to all counsel of record.

                                                     */s/* Charles B. Dunn
                                                     Charles B. Dunn
                                                     Trial Attorney