FILED
CLERK
4/30/2024 12:04 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
                              :  18-cr-00578-JS-1
UNITED STATES OF AMERICA,     :
                              :
     - versus -               :  U.S. Courthouse
                              :  Central Islip, New York
PATRICE RUNNER,               :
                              :  May 17, 2023
               Defendant      :  1:33 p.m.
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
BEFORE THE HONORABLE ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**

**For the Government**:          **Breon S. Peace, Esq.**
                                 United States Attorney

                        BY:     **John W. Burke, Esq.**
                                **Charles B. Dunn, Esq.**
                                 USDOJ - Consumer Protection
                                 Branch
                                 PO Box 386
                                 Washington, DC 20044


**For the Defendant**:           **Charles V. Millioen, Esq.**
                                **James Darrow, Esq.**
                                 Federal Defenders of New York
                                 Assistant Federal Defender
                                 770 Federal Plaza
                                 Central Islip, New York 11722



**Transcription Service**:       **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

1    THE CLERK:  Calling 18-0578, United States of

2  America v. Patrice Runner.  Please state your appearances

3  for the record.

4    MR. BURKE:  Good afternoon, your Honor.  Josh

5  Burke for the United States.

6    THE COURT:  Good afternoon.

7    MR. BURKE:  And with me are my --

8    THE COURT:  And with you?

9    MR. BURKE:  With me are co-counsel, Charles

10  Dunn, and Postal Inspector Hope Cerda.

11    THE COURT:  Good afternoon.

12    MR. MILLIOEN:  Good afternoon, your Honor.

13  Charles Millioen with Federal Defenders of New York, and

14  I'm here on behalf of Patrice Runner, who's seated to my

15  right in custody.  And also at counsel table is

16  co-counsel James Darrow, also with my office.

17    THE COURT:  Good afternoon.

18    So you don't see a court reporter here.  We

19  don't have one.  But I assure you, everything is

20  recorded.  So, for that reason, I'm just going to make

21  sure everybody speak to the mic.  I'll have you speak at

22  your seats.  Don't feel that you have to get up.  We just

23  have to make sure that we get everything.

24    So this is a bail hearing that I'm handling for

25  Judge Seybert.  Before we get into that, I'm also

Proceedings

1    handling the jury selection in this case, and that's

2    going to be -- that's set for May 30th.  That's going

3    forward.  But as long as I have you here, I want to go

4    through some housekeeping for that.

5              I would like some proposed voir dire.  I'd like

6    that by the 23rd.  I know you've got other pretrial

7    submissions for Judge Seybert.  So include this.  I need

8    proposed voir dire.  I'd also like you to speak to each

9    other and collaborate and come up with a statement, just

10   a short one paragraph at most, explanation of the case

11   that I can read to the jurors.  I'm sure you'll be able

12   to agree on something.

13             And also, one final list of names or entities

14   that I can read to the jurors.  It's not necessarily

15   witnesses, but it will be, you know, any names or

16   anything that might come up.  I will tell you, don't be

17   overly broad.  Like, for example, if there's a bank

18   involved, you don't have to say, you know, the name of

19   the bank.  I just recently did a case where you say a

20   name of the bank, of course, everyone's heard of the

21   bank.

22             So I'll go over a jury selection with you.

23   We'll find out what everyone does for a living.  But as

24   far as, you know, that list that you'll get together,

25   names, places, anything that might come up at selection.

Proceedings

1  So I just wanted to do that before I forgot before we got

2  to this hearing.

3          All right.  So this is a bail hearing.  It's my

4  understanding that the defendant is seeking to be

5  released prior to trial.  There is currently an order of

6  detention that was entered in this case.  I believe it

7  was Judge Locke at the time who issued the initial denial

8  of any bond.

9          He had found by a preponderance of the evidence

10 that there were no conditions or combination of

11 conditions that would assure the defendant's presence.

12 He mentioned the lack of suretors, the lack of community

13 ties, ties to -- ties outside of this country, and also

14 that there wasn't a bail package offered at that time.

15         So now this is -- and I'll ask the defense to

16 comment for me as to the grounds for this, the current

17 motion, and particularly their standards for a release to

18 prepare for trial, and there's also if there's new

19 information, to seek bail.  So let me hear from defense

20 first and tell me what you want me to consider.

21         MR. MILLIOEN:  Yes, your Honor.  First off, I

22 think it's apparent that this is the first meaningful

23 bail hearing that Mr. Runner's had.  And by meaningful, I

24 mean the defense actually having a bail package to

25 present to the judge.  Obviously, I wasn't there at that

Proceedings

1   appearance back in December of 2020, but I did look over

2   Randi Chavis's notes.  She was the attorney who was

3   attorney of record from Federal Defenders of New York.

4   She was present at that hearing.

5           Mr. Runner wasn't present.  I believe there was

6   some sort of issue over a waiver of appearance, him

7   possibly appearing telephonically.

8           THE COURT:  Was there an extradition, or was

9   this during COVID, or what?

10          MR. MILLIOEN:  So this was after he'd been

11  extradited to the United States.

12          THE COURT:  Okay.

13          MR. MILLIOEN:  So he had been in the United

14  States.  He was in U.S. custody.  He appeared for his

15  arraignment the day before on December 22nd, and then

16  this detention hearing was set for the 23rd.

17          THE COURT:  Okay.

18          MR. MILLIOEN:  Ms. Chavis wasn't able to put

19  any kind of bail package together at that point in time.

20  There was -- I don't know why he wasn't present.  There

21  was some talk, or at least some note by Ms. Chavis about

22  some sort of waiver of presence, but he wasn't present.

23  Perhaps COVID factored into that, I don't know.

24          But according to Ms. Chavis's notes, though,

25  Judge Locke did say and make it clear on the record that

Proceedings

1  we can reapply whenever we do have a bail package to

2  present.

3           THE COURT:  Right.  That's usually the case.

4  So go ahead.

5           MR. MILLIOEN:  Right.  So -- I'm sorry.  I just

6  note the government made a note that, you know, this

7  shouldn't even be reopened, but I did just want to

8  address that.

9           THE COURT:  Well, I think when there's new

10  information -- I certainly have cases where there's no

11  package.  And then if something new comes up that the

12  defendant didn't know about, or if something changes,

13  people come in, so --

14           MR. MILLIOEN:  Sure.  So, your Honor, we have a

15  bail package for the Court.  Mr. Runner's son, Axel

16  Runner, and I mentioned this in my letter, he's present

17  here today.  He's seated in the front row.

18           THE COURT:  Okay.

19           MR. MILLIOEN:  If you could just stand up.

20           And also, Dylan Runner, Mr. Runner's other son

21  is also present.  Dylan's just present as a supporter,

22  but Axel is willing to sign a bond.

23           Now, I know that the suretor report mentioned

24  that Axel has $25,000 in cash.  He is able to post

25  $10,000 of that amount, and then he's willing to sign for

Proceedings

1  an additional amount, and we would request $200,000.  We

2  believe that would be enough moral suasion for Mr. Runner

3  to appear in court.

4          Now, Mr. Axel Runner needs the additional

5  amount of money that he has saved up to establish a

6  residence throughout the course of this trial, for

7  himself as well as for his dad, and that would be going

8  into our other conditions.  So, besides the bond, secured

9  partially by cash, and the rest by Axel's signature, Axel

10  is prepared to act as a third-party custodian.

11          THE COURT:  Does he have a residence here now?

12          MR. MILLIOEN:  He does not right now.  He has

13  been looking at Airbnbs.  He's currently staying in a

14  hotel.

15          MR. MILLIOEN:  Where does he live now?

16          MR. MILLIOEN:  At, like, permanent residence?

17          THE COURT:  Where does he live?

18          MR. MILLIOEN:  Well, he's lived in Canada.

19  Right now, he's staying in a hotel here in Suffolk

20  County.

21          THE COURT:  For this, for purposes of being

22  here?

23          MR. MILLIOEN:  For purposes of being here.

24          THE COURT:  Okay.  And where is he a citizen

25  of?

Proceedings

1          MR. MILLIOEN:  Of Canada.

2          THE COURT:  Okay.  But he does not have a place

3   here right now?

4          MR. MILLIOEN:  Not at this time.

5          THE COURT:  Okay.

6          MR. MILLIOEN:  And really, he has found, you

7   know, like, Airbnbs that he could get for a month at a

8   time throughout the course of trial.  He has the money.

9   It's just really a matter of, you know, this Court's

10  decision.  But he's ready, he's willing, prepared to

11  establish that residence here locally.

12         So, with that being said, we'd also request

13  electronic monitoring and home detention, restricting

14  travel to the Eastern District of New York.

15         THE COURT:  But as far as a place for your

16  client to go, he would have to go live somewhere, and you

17  don't have any place right now for him to go to.

18         MR. MILLIOEN:  At this point in time, he would

19  be able to stay in the hotel with Axel.  And then, once

20  Axel is able to get a longer-term residence, then they

21  would be going there.

22         THE COURT:  And what does Axel do for a living?

23         MR. MILLIOEN:  Axel, he's the director of paid

24  media at a Delaware-based company, Agent Launch, LLC, and

25  he makes about $125,000 a year.

Proceedings

1          THE COURT:  I'm sorry.  Did I ask you already

2    if he was a citizen?  I'm not sure.

3          MR. MILLIOEN:  Yes, you did, your Honor.

4          THE COURT:  And he's a citizen of?

5          MR. MILLIOEN:  Canada.

6          THE COURT:  Canada, sorry.

7          MR. MILLIOEN:  And with his employment, he

8    could work remotely.  And his employer has -- is aware of

9    this situation, is aware that he will need to work from

10   New York.

11         THE COURT:  Does he work remotely now?

12         MR. MILLIOEN:  Yes.  And his employer

13   understands that he would have to actually move to New

14   York.  And with regards to acting as a third-party

15   custodian, that his work schedule might be a little bit

16   in flux, even though it is remote.

17         THE COURT:  What's his family situation?  Does

18   he have a spouse?  Does he have children?  Where does he

19   live?  And who does he live with now?

20         MR. MILLIOEN:  Axel?

21         THE COURT:  Yeah.

22         MR. MILLIOEN:  If the Court wants to just

23   address Axel Runner, I'm sure he'd be willing to answer

24   these questions.

25         THE COURT:  Sure.  Why don't you -- you can

1  stand at the podium and speak into the mic.

2      Okay.  So I'll just have you state your name

3  and relationship to the defendant.

4      MR. A. RUNNER:  My name is Axel Runner, and I'm

5  Patrice's son.

6      THE COURT:  And how old are you?

7      MR. A. RUNNER:  I'm 26 years old.

8      THE COURT:  Do you have a spouse, a family?

9  And who do you live with in Canada?

10     MR. A. RUNNER:  I do not have a spouse, and I

11  don't have a family.  I live with my brother and a friend

12  of mine who's also a -- we're roommates essentially, the

13  three of us.

14     THE COURT:  So you're roommates with your

15  brother who's also present in court today?

16     MR. A. RUNNER:  Yes.

17     THE COURT:  Okay.  And tell me a little bit

18  about your -- what you do for a living, where you do it,

19  what the company does, where they're located.

20     MR. A. RUNNER:  So I work, like Charlie

21  mentioned, as a director.  So it's my job -- I manage a

22  team of people who manage Google and Facebook

23  advertisements online for real estate agents across North

24  America.  Our team is fully remote because there's no

25  office, but we operate within the U.S. and Canadian

Proceedings

1  markets.

2          THE COURT:  What's your salary?  How are you

3  paid?

4          MR. A. RUNNER:  I get paid monthly about

5  125,000 -- 10,000 a month.

6          THE COURT:  Are you a contract employer, or do

7  you have an annual salary?  How's that work?

8          MR. A. RUNNER:  Technically, I do work as a

9  contractor, but it's full-time.  But I get a fixed

10  monthly base salary.  And then, on top of that, I have a

11  percentage in equity in the company and a percentage of

12  profit share that gets paid out month over month.

13          THE COURT:  And how long have you had this

14  employment?

15          MR. A. RUNNER:  About a month and 10 -- sorry,

16  one year and 10 months, so just under two years.

17          THE COURT:  Okay.  And I'm sorry.  What did you

18  make annually last year?

19          MR. BURKE:  Last year in U.S. currency, I made

20  about 80, but it increases every month, so this year,

21  it's probably going to be about -- in the 125 to 150

22  range.

23          THE COURT:  Okay.  And you've known about your

24  father's incarceration for quite a while now, right?

25          MR. A. RUNNER:  Yes.

Proceedings

1      THE COURT:  Were you here -- I mean, I'm asking

2  because I wasn't here at the arraignment and hearing.

3  Were you there?

4      MR. A. RUNNER:  I was not.

5      THE COURT:  Okay.  And were you contacted or

6  have you been contacted by pretrial services and

7  interviewed?

8      MR. A. RUNNER:  No.

9      THE COURT:  Okay.  Go ahead.

10     MR. MILLIOEN:  I think he has been, your Honor.

11  A pretrial services surety report was written.

12     THE COURT:  Can somebody hand that up to me?

13  Because it wasn't -- I know it was sent to me and I know

14  I have it.  I just don't have it right now on the bench.

15     MR. MILLIOEN:  Yes.

16     THE COURT:  I'm sorry if I'm taking your only

17  copy.

18     MR. MILLIOEN:  If I can show it to him --

19     MR. A. RUNNER:  Oh, yes.  Yes.  That was about

20  two weeks ago.

21     THE COURT:  About two weeks ago?

22     MR. A. RUNNER:  Two, three weeks ago, yeah.

23     THE COURT:  Okay.  So you pay rent where you

24  live now?

25     MR. A. RUNNER:  Yes, I pay rent in Canada.

Proceedings

1        THE COURT:  And where are you staying right

2   now?

3        MR. A. RUNNER:  We're staying at the Marriott

4   Hotel.  It's about a 10-minute walk from here.

5        THE COURT:  Okay.  Okay, thanks.  You can be

6   seated.

7        MR. A. RUNNER:  Thank you.

8        THE COURT:  All right.  Go on.

9        MR. MILLIOEN:  Yes, your Honor.  In terms of

10  other conditions, Mr. Runner would agree to stay away

11  from any airport, within one mile, stay-away order from

12  any airport, except to use highways to travel, if need

13  be, to a location other than an airport.  Obviously

14  we're --

15        THE COURT:  Does Mr. Runner have any family or

16  any ties to this country?

17        MR. MILLIOEN:  At this point, no, your Honor.

18        THE COURT:  Okay.  And he's a citizen of where?

19        MR. MILLIOEN:  He's a citizen of France and

20  Canada.

21        THE COURT:  Okay.

22        MR. MILLIOEN:  And we would also agree to all

23  other standard conditions.

24        THE COURT:  Right.

25        MR. MILLIOEN:  With a release.

Proceedings

1    THE COURT:  What about -- what else do you want

2  to be considered here?  I know that -- as a matter of

3  fact, I saw something on the docket today, where Judge

4  Seybert granted certain particularized access to your

5  client.

6    MR. MILLIOEN:  Yes, your Honor.  The discovery

7  issue has been difficult, to say the least.  Mr. Runner's

8  at MDC.  He has been given two hard drives of discovery.

9  And by he, I mean, he has not been given them, but MDC

10  was given one hard drive, and they're keeping it on

11  another side of the facility.  So not where he is, but

12  another side that he can't access.  And his access is

13  contingent on the COs at MDC to allow him to get there.

14    THE COURT:  What did -- did Judge Seybert

15  address that in her order today?

16    MR. MILLIOEN:  Judge Seybert did address that,

17  in terms of, you know, ordering MDC to allow easier

18  access.  But at the end of the day, there are a couple

19  things that are problematic for that:  Number one, the

20  lockdowns.  I mean, this recent lockdown trend at MDC,

21  it's making it so that the CO availability to even bring

22  him there, it's really contingent on that CO

23  availability.

24    And the lockdowns, coupled with the shortages

25  of staff members at MDC, are making that completely

Proceedings

1  unpredictable, and that Mr. Runner does not know when

2  he'll be able to see discovery, and it's really not

3  within his control at all.

4          THE COURT:  Right.

5          MR. MILLIOEN:  Also, the discovery -- and I'm

6  sorry.  The second hard drive has been received by the

7  facility, but it's not yet been made available to

8  Mr. Runner.  So I have the two hard drives.  One is on

9  the other side of the facility; one, we don't know where

10 it is.

11          THE COURT:  How much are we talking about it?

12 When we say hard drive, explain to me what that means in

13 terms of amounts.

14          MR. MILLIOEN:  You know, I could even let

15 Mr. Darrow comment on this, because quite frankly, I

16 stepped on the case not that long ago.

17          THE COURT:  Okay.

18          MR. MILLIOEN:  And from the discovery side -- I

19 know the voluminous nature of it.

20          THE COURT:  No, that's fine.  Let him talk if

21 he knows more about it.

22          MR. DARROW:  Thank you, your Honor.  And I

23 think the government would agree, this case involves

24 voluminous discovery and exhibits.  We're talking about

25 millions of documents and terabytes of data.

Proceedings

1      THE COURT:  Okay.

2      MR. DARROW:  Mr. Runner has been provided a

3  subset of that, a very small subset.  Even that subset

4  is -- it's the biggest amount of discovery I've ever

5  dealt with since I've been at the Federal Defenders, by

6  orders of magnitude.  So this case has been pending for a

7  long time, in large part, because of the amount of

8  discovery.

9      Now, the exhibits that the government has

10 noticed for trial -- and 3,500 is, of course, a much

11 smaller subset of that.  But as your Honor knows, a

12 defense requires review of more than just that.

13 And so our review of the exhibits entails a review of

14 the larger discovery as well.  And so we need Mr. Runner

15 focused on the discovery, not least of which is because

16 many of the documents are in French.

17     THE COURT:  Where's your office?

18     MR. DARROW:  I'm based in Brooklyn, your Honor,

19 near the MDC.  So it's been me, mainly, coming down to

20 see Mr. Runner with regularity, which is why I know about

21 the difficulties in getting him the discovery.  And it's

22 been mostly me dealing with MDC legal -- and I should

23 say, with the assistance of the government.  I mean,

24 they've been very good about prodding the MDC when we

25 ask.

Proceedings

1        The difficulty, your Honor, as counsel

2   mentioned, is two things that's, I think, outside the

3   judge's control:  one of which is the lockdowns, which

4   are security issues that are based on staffing, that are

5   outside everyone's control except for the MDC.  They're

6   going to do what they do.  The fact of the matter, your

7   Honor, is the lockdowns have been frequent.  They've been

8   every single weekend, starting on Friday, ending on

9   Monday.  And they have extended through the week often in

10  the past months.

11        That is a time when Mr. Runner cannot view his

12  discovery.  The staffing issues mean, as a practical

13  matter, that when he does everything he's supposed to do,

14  ask to be transferred over to the other unit so he can go

15  to the VR to look at his discovery, every single time he

16  has to explain the issue to the new CO on the unit, who

17  then asks Mr. Runner, my client, why don't they just

18  bring the hard drive over here?  He doesn't know.  It's a

19  good idea.

20        THE COURT:  Do you have a place in your office

21  where you typically can go over discovery with clients?

22        MR. DARROW:  Yes, of course, your Honor.

23        THE COURT:  Okay.

24        MR. MILLIOEN:  And also, Mr. Darrow's in

25  Brooklyn.  In Central Islip, we actually do have an

Proceedings

1  office that we've made with a computer that's not

2  connected to the internet that is just there for

3  discovery for our clients who are out of custody.

4          THE COURT:  Okay.

5          MR. DARROW:  It's essentially a SCIF, your

6  Honor.

7          THE COURT:  Okay.  I now know what that means.

8  Okay.  I'm going to ask the government to comment on

9  this.

10          MR. BURKE:  Thank you, your Honor.  Between our

11  letter to the Court in response to the motion and our

12  original letter in December 2020, I think we've laid out

13  our position on Mr. Runner as a flight risk and that

14  there should not be a bond in this matter, your Honor.

15  But just briefly, nothing has changed.  We don't object

16  to the holding of this hearing, obviously.  Mr. Runner

17  has come forward with surety information, and that's

18  before the Court at this point.

19          We did point out there's no new facts about his

20  risk of flight.  The fact that he didn't flee in Spain

21  was known to him when he appeared here in 2020, and

22  otherwise, all of our arguments from our detention letter

23  in 2020 remain valid and in force.

24          THE COURT:  You know what, let me just go back

25  to defense.  Is there anything -- issue you wanted to

Proceedings

1  bring to my attention about your client's health?

2          MR. MILLIOEN:  Yes, your Honor.  I did want to

3  note that as well.  He is still having urine in his

4  blood.  Mr. Runner has made many, many requests to see

5  medical, and he was able to see a doctor about the urine

6  in his blood, but he was more or less told everything

7  seems to be fine, yet there's still urine in his blood.

8  The rest of his requests have gone unanswered.

9          He's still experiencing vertigo-like symptoms,

10 possibly related to anxiety.  Chronic insomnia.  He wakes

11 up in the middle of the night with migraines.  Again, I'm

12 not a doctor, but I would imagine it's also related to

13 the anxiety that he's facing right now in MDC.

14          THE COURT:  Did he get the COVID vaccine?  It

15 says that he asked for it and he didn't receive it.

16          MR. MILLIOEN:  He's still not received the

17 COVID vaccine.

18          THE COURT:  Government look into that at all?

19          MR. BURKE:  Your Honor, we can make -- we could

20 inquire at MDC.  I don't know their policies or their

21 procedures on vaccinating inmates.

22          THE COURT:  It was my understanding, if

23 somebody asked for it, they would get it.  Maybe now

24 that's changed, I don't know.  But this person's asking

25 for it.

Proceedings

1      So let me ask you this, let me ask the defense

2 this.  Has there ever been any request for a medical

3 order to be issued in this case?

4           MR. DARROW:  Your Honor, I can speak to that.

5           THE COURT:  Please.

6           MR. DARROW:  I have put in at least one -- at

7 least one request to MDC legal -- two requests medically

8 to MDC legal on -- so one on the COVID issue, back when

9 COVID was still a national emergency -- it's sort of

10 passed into our wake -- and on the blood and the urine

11 issue, as soon as I was made aware of it.

12           And the problem, your Honor, and the reason --

13 the answer is no, I've not requested an order from the

14 judge.  But the reason why is we keep getting told it's

15 going to happen.  It will happen, you know, he's going to

16 be seen next week.  And then Mr. Runner is told, oh yeah,

17 yeah, you're on the list.

18           THE COURT:  That's even on the vaccine?

19           MR. DARROW:  No, I'm speaking only to the

20 doctor issue.

21           THE COURT:  Okay.

22           MR. DARROW:  On the vaccine, it's really been

23 just radio silence.

24           THE COURT:  Okay.

25           MR. DARROW:  That's a more widespread issue,

Proceedings

1  your Honor.  I can just proffer that I have other clients

2  there who have had this issue when they've asked more

3  recently.  I don't know why.  But I think of greater

4  concern, I think these days, your Honor, is not so much

5  the COVID, but the fact that he's got blood in his urine.

6          THE COURT:  I'm not a doctor either, so I'm

7  not -- I can't say whether that's --

8          MR. DARROW:  Me neither.  I just -- speaking as

9  a lay person --

10         THE COURT:  -- something I can't see.  He's

11  been seen for it, and he's been told, don't worry about

12  it?  Or has he just not been seen for it?

13         MR. DARROW:  He was, after a great effort, he

14  was finally seen by some sort of medical person at the

15  MDC, and he was told that everything was fine.  That's

16  what we have.

17         THE COURT:  Okay.  All right.  Anything else

18  that defense wants me to know that's either not in the

19  letter or that I haven't -- you haven't had the

20  opportunity to discuss?

21         MR. MILLIOEN:  I don't know in terms of the

22  Court and concerns regarding flight and France,

23  specifically in regards to their extradition policy, but

24  I don't --

25         THE COURT:  And from what I've read, it says

Proceedings

1  that France does not extradite its own citizens?

2      MR. MILLIOEN:  And quite frankly, I don't know

3  where the government's getting that.  I mean, I'm

4  familiar with their extradition policy.  Just like the

5  U.S., they're not obligated to extradite their citizens,

6  but they --

7      THE COURT:  Yeah, I don't know.  I don't know.

8      MR. MILLIOEN:  In the treaty itself, they very

9  well will extradite their citizens.  And in fact, if they

10  don't agree to extradite it -- extradite one of their

11  citizens, then the case is submitted to their own

12  authorities for prosecution.

13      THE COURT:  Right.  But it wouldn't be in two

14  weeks, right?  Certainly not.

15      Anything the government wants to add?

16      MR. BURKE:  Your Honor, I think the risk of

17  flight is possibly heightened two weeks out from trial.

18  As you're noting, we are very close to picking a jury and

19  starting a trial here.  The government does not think

20  that Mr. Runner moving into a hotel with his son is

21  sufficient assurance that he'll appear, in terms of a

22  stable location for him to live at or addressing any of

23  the other risk of flight concerns that we've raised.

24      THE COURT:  Okay.  All right.  Thank you all.

25  I'll have a decision on this pretty quickly, but just not

1  right now from the bench.  I want to think about it for a

2  bit.

3           Is there anything else that you wanted to say?

4           MR. MILLIOEN:  Yes, your Honor.  I'm very

5  sorry.  There was one other thing.

6           THE COURT:  That's okay.

7           MR. MILLIOEN:  We spoke to a representative of

8  the marshals today regarding where Mr. Runner is going to

9  be throughout the course of this trial.  And today we

10  were told that it's very well likely he's going to be in

11  MDC, which from the standpoint of our ability to consult

12  with Mr. Runner throughout the course of the trial,

13  weeknights are going to be, practically speaking, we're

14  not going to be able to consult with him.

15           The legal team will be staying in Central

16  Islip.  If he's going back to Brooklyn, there's just no

17  way we're going to be back in Brooklyn.  And even if we

18  were to get back in Brooklyn, attorneys typically have to

19  wait at least an hour.

20           THE COURT:  Would you make a request that he be

21  housed -- and again, I cannot tell marshals what to do,

22  but would you make a request that he be housed in either

23  Nassau or Suffolk if possible?

24           MR. MILLIOEN:  We can make the request.  Again,

25  I don't -- and that's just sort of the unknown here, in

Proceedings

1 that we can make the request, but are the marshals going

2 to do it?  We don't know.

3          But at the same time, based on what we're

4 hearing today that it's looking like MDC, that's the most

5 recent word we've got on it.

6          THE COURT:  Right, but that's every case that's

7 here.  Every case that we try here, every criminal case,

8 are they all housed in MDC?

9          MR. MILLIOEN:  Well, some are out here in

10 Suffolk.  And I think, again, going to the issue of, you

11 know, this not being just a felon in possession of a

12 firearm, where regular communication with our clients can

13 be needed as trial's unfolding.  I mean, the government's

14 turned over hundreds of exhibits.  Based on what exhibits

15 they're entering each day, we're going to have to consult

16 with him about those exhibits on a day-to-day basis.

17          THE COURT:  Right.  How long is this trial

18 supposed to last?

19          MR. DARROW:  Your Honor, the government has

20 said two calendar weeks, given the trial schedule for its

21 case, and then we'll have a case.

22          THE COURT:  Okay.  And that's not Fridays?  I

23 don't know if Judge Seybert set some Fridays.

24          MR. DARROW:  That's right, your Honor.  I think

25 the government's case will take eight days, as they've

Proceedings

1  estimated, and then we have a case after that.  So three

2  calendar weeks at least.

3         THE COURT:  I'm also asking that for purposes

4  of selection as well.

5         MR. DARROW:  Of course.

6         THE COURT:  Okay.

7         MR. MILLIOEN:  And again, the lockdown schedule

8  has been particularly spiking on weekends at MDC, which

9  is also going to affect our ability to see him, and that

10  delays everything, even for legal visits.

11         For the legal visits at MDC, we are allowed to

12  bring in a laptop.  We can't even bring in a laptop cord.

13  We can't bring a power cord.  So, even for our visits

14  with him over the weekend and spending a significant

15  amount of time with him, MDC's policies are just not

16  conducive to allowing meaningful attorney consultation on

17  a case like this, with these sort of particular issues, a

18  20-year alleged span of activity that the government's

19  alleging.

20         And if the Court -- I did just really want to

21  say, the Court -- I'm sorry, the government did, in their

22  brief, cite a few cases addressing that, complexity of

23  the case, voluminous discovery, that's not enough under

24  3142(i) for a temporary release.

25         And I think what's interesting in looking at

Proceedings

1 those cases, the difference in the posture of those

2 defendants than Mr. Runner, in the Dupree case, that

3 defendant was initially released on bond, and then he was

4 arrested after he committed new financial crimes.  So he

5 brings this 3142(i) motion after having committed new

6 crimes while he was out, getting taken in, then he made

7 four unsuccessful bail applications before moving for

8 temporary release.

9 Their second case, Petters, P-E-T-T-E-R-S, that

10 defendant was initially ordered detained because he was

11 discussing fleeing the country with a cooperating

12 witness, specifically to countries that don't extradite.

13 He obtained false information, researched heavily,

14 discussed leaving also with the mother of his children,

15 and told the cooperating witness that he had previously

16 fled criminal charge in Colorado.

17 And the final case that they cited, Birbragher,

18 B-I-R-B-R-A-G-H-E-R, the Iowa District Court case, that

19 defendant admittedly participated in international arms

20 and drug trafficking ring; and the organization that he

21 was associated with, there were murders that were

22 attributable to that.  So --

23 THE COURT:  Every bail decision is different,

24 right?  The standards might be the same.  In this case, I

25 take it you're looking at it both as an application for

1   bail, you know, based on change in circumstances from the

2   initial bail, and you're also asking for it to prepare

3   for trial.

4           MR. MILLIOEN:  That's correct.

5           THE COURT:  So it's on both.

6           MR. MILLIOEN:  That's correct, your Honor.  I

7   just wanted the court to sort of be aware of what really

8   the context of those defendants, and that Mr. Runner has

9   not had any of those types of egregious issues.

10          THE COURT:  Let me ask the government, is there

11  any other facts with respect to Mr. Runner's -- other

12  than, you know, what we've already said here -- his

13  situation that makes this case different?

14          And also, would you agree in terms of how long

15  the trial would be?  And do you know anything about

16  somebody who's housed during trial here at MDC, and the

17  ability to get them housed here, or anything like that?

18          MR. BURKE:  Your Honor, on that last point, the

19  government does not have any control over -- we do not

20  have any control over where he's housed.  We'd be happy

21  to join the request that he be moved out closer to this

22  court, or have it be an unopposed or joint request to the

23  marshals.  And we'd be happy to do that.

24          In terms of the length of trial, that is our

25  estimate, that our case may run as long as two weeks,

Proceedings

1    given Judge Seybert's schedule of trying the case four

2    days a week.  And we don't know how long the defense case

3    would be, but I think three weeks, beginning June 5th, is

4    a good estimate.

5          THE COURT:  And what about particular factual

6    circumstances of this defendant versus other cases?

7          MR. BURKE:  Yes, your Honor.  The cases we

8    cited were to lay out the standard --

9          THE COURT:  Right.

10          MR. BURKE:  -- under 3142(i), which is an

11   incredibly rarely-used provision to make a different bond

12   determination based on need to prepare for trial, or

13   other extraordinary circumstances.

14          We are primarily concerned about Mr. Runner's

15   serious risk of flight.  He was extradited, he is a

16   citizen of two other countries, and we do think there's a

17   major concern that if he fled and made it to one of those

18   countries, it would be years, and maybe never, that we

19   would see him again to finish this prosecution.

20          The requested conditions of release are also a

21   major concern.  He is -- again, I've said this once, and

22   you questioned his son about his residence in the U.S.,

23   and his plan for how to have a place for his father to

24   stay, and those kind of concerns.

25          Currently staying in a hotel, and then maybe

Proceedings

1  staying in an Airbnb with a non-U.S. citizen is not a

2  normal condition of release or a surety that gives the

3  Court or the government assurance that Mr. Runner will

4  not flee.

5         So those are the facts of this case, and we

6  oppose both motions.

7         THE COURT:  All right.  Thank you.

8         Was there -- I noticed there was talk at the

9  defense table.  Is there anything else that you wanted?

10         MR. MILLIOEN:  If I could just have a moment,

11  just to talk to Mr. Darrow.

12         THE COURT:  Sure.

13                    (Counsel confer)

14         MR. MILLIOEN:  Your Honor, just one other thing

15  as a condition of release, and I've talked to Mr. Runner

16  about this.  If the Court does have any concern regarding

17  the extradition status in France, if that will weigh into

18  the Court's opinion -- I mean, without really knowing,

19  I'm not sure -- but Mr. Runner would be willing to

20  execute a written waiver of extradition from France into

21  the United States.

22         THE COURT:  Yeah, and let me just correct

23  something.  I know it might have been interpreted of my

24  saying, oh, since it's close to trial, there's a greater

25  tendency to flee.  That's not what I meant.  What I was

Proceedings

1  saying is, when I would say it would be weeks, my

2  experience, the time in which it takes to extradite

3  someone is certainly not one week if it came to that.  So

4  that is the only thing I meant to say there.

5          MR. MILLIOEN:  And that's it, your Honor.

6  Thank you.

7          THE COURT:  Okay.  All right.  Thank you, all.

8          MR. DARROW:  Thank you, your Honor.

9          MR. BURKE:  Thank you, your Honor.

10                  (Matter concluded)

11                      -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, MICHELLE COSTANTINO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **30th** day of **April**, 2024.

_____
Transcriptions Plus II, Inc.